## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CASA SYSTEMS, INC., *et al.*,[1] | Case No. 24-10695 (KBO) |
| Debtors. | (Joint Administration Requested) |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION
## OF CASA SYSTEMS, INC. AND ITS DEBTOR AFFILIATES

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Joseph M. Mulvihill (Del. Bar No. 6061)
Timothy R. Powell (Del. Bar No. 6894)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jbarry@ycst.com
       jmulvihill@ycst.com
       tpowell@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIDLEY AUSTIN LLP**
Stephen E. Hessler (*pro hac vice* pending)
Patrick Venter (*pro hac vice* pending)
Margaret R. Alden (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: shessler@sidley.com
       pventer@sidley.com
       malden@sidley.com

Ryan L. Fink (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: ryan.fink@sidley.com

Julia Philips Roth (*pro hac vice* pending)
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (310) 595-9500
Facsimile:  (310) 595-9501
Email: julia.roth@sidley.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are Casa Systems, Inc. (8867), Casa Systems Securities Corporation (1151), and Casa Properties LLC (6767). The Debtors' service address is 100 Old River Road, Andover, MA 01810.

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the *Joint Plan of Liquidation of Casa Systems, Inc. and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"),[2] for which the Debtors will seek confirmation by the Bankruptcy Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference.  The Debtors are providing the information in this Disclosure Statement to certain holders of Claims for the purpose of soliciting votes to accept or reject the Plan.

Pursuant to the RSA, the Plan is currently supported by the Debtors and the Consenting Term Loan Lenders that have executed the RSA.

The Debtors urge each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage holders of Claims in Class 3 to read this Disclosure Statement (including the Risk Factors described in Article X hereof) and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances of the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing.

---

<div style="border:1px solid black; padding:10px;">

<u>RECOMMENDATION BY THE DEBTORS</u>

EACH DEBTORS' BOARD OF DIRECTORS, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT BY NO LATER THAN <u>MAY 24, 2024 AT 5:00 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.

</div>

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan or the *Declaration of Edward Durkin in Support of Chapter 11 Petitions and First Day Pleadings* filed contemporaneously herewith (the "<u>Durkin Declaration</u>"), as applicable.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the Disclosure Statement and the Plan, the Plan will govern.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF LIQUIDATION OF CASA SYSTEMS, INC. AND ITS DEBTOR AFFILIATES.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE

DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE VIII OF THE PLAN. THERE IS NO ASSURANCE THAT

**THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

# TABLE OF CONTENTS

ARTICLE I. QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE STATEMENT AND THE PLAN ........................................................................................... 1

    A.    What is chapter 11? ............................................................................................. 1

    B.    Why are the Debtors sending me this Disclosure Statement? ............................ 1

    C.    Am I entitled to vote on the Plan? ..................................................................... 1

    D.    What will I receive from the Debtors if the Plan is consummated? ................... 2

    E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, or a Priority Tax Claim? ........................................................................................... 2

    F.    Are any regulatory approvals required to consummate the Plan? ...................... 2

    G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ....... 2

    H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ................................................................................................ 2

    I.    What are the sources of Cash and other consideration required to fund the Plan? ............. 3

    J.    Is there potential litigation related to the Plan? ................................................. 3

    K.    Does the Plan preserve Causes of Action? ........................................................ 3

    L.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? ........................................................................................................... 3

    M.    When is the deadline to vote on the Plan? ......................................................... 4

    N.    How do I vote on the Plan? ................................................................................ 4

    O.    Why is the Bankruptcy Court holding a Combined Hearing? ........................... 4

    P.    What is the purpose of the Combined Hearing? ................................................ 4

    Q.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ........................................................................................................ 5

    R.    Do the Debtors recommend voting in favor of the Plan? ................................... 5

    S.    Who supports the Plan? ...................................................................................... 5

ARTICLE II.  OVERVIEW OF THE PLAN ................................................................... 6

    A.    Introduction. ....................................................................................................... 6

    B.    The Plan. ............................................................................................................. 6

    C.    The Adequacy of This Disclosure Statement. .................................................... 7

    D.    Summary of Classes and Treatment of Claims or Interests. .............................. 7

    E.    Solicitation Package. .......................................................................................... 8

    F.    Voting and Confirmation of the Plan. ................................................................ 9

        1.    Certain Factors to be Considered Prior to Voting. ............................... 9

2.    Voting Procedures and Requirements................................................................. 9

3.    Plan Objection Deadline. ................................................................................. 10

4.    Combined Hearing. .......................................................................................... 10

5.    Confirmation. ................................................................................................... 11

6.    Acceptance. ...................................................................................................... 11

7.    Feasibility........................................................................................................ 11

8.    Best Interests Test; Liquidation Analysis. ...................................................... 12

9.    Compliance with Applicable Provisions of the Bankruptcy Code. ................ 12

10.   Alternatives to Confirmation and Consummation of the Plan........................ 12

G.   Releases by the Debtors Set Forth in the Plan. ...................................................... 13

ARTICLE III. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
OVERVIEW ................................................................................................................. 13

A.   Corporate History................................................................................................... 13

B.   Business Operations. .............................................................................................. 14

1.    Cable. ............................................................................................................... 15

2.    CAD. ................................................................................................................ 15

3.    Cloud. ............................................................................................................... 16

4.    RAN. ................................................................................................................ 17

5.    Sales. ................................................................................................................ 17

6.    Research and Development and Intellectual Property. .................................... 17

C.   The Debtors' Prepetition Corporate and Capital Structure. ................................... 18

1.    Original Term Loan. ........................................................................................ 18

2.    Superpriority Term Loan. ................................................................................ 19

3.    Sub Term Loan. ............................................................................................... 21

4.    Equity Holders. ................................................................................................ 21

D.   Events Leading to the Chapter 11 Filings. ............................................................. 22

1.    The Company's Strained Liquidity and Operational Challenges. ................... 22

E.   Exploration of Strategic Alternatives and the Commencement of These Chapter 11 Cases.
25

1.    The Extensive Prepetition Sale Processes........................................................ 25

2.    Restructuring Negotiations with Key Stakeholders. ........................................ 27

3.    The Restructuring Support Agreement. ........................................................... 28

ARTICLE IV. EVENTS DURING CHAPTER 11 CASE ............................................ 29

A.   Commencement of the Chapter 11 Cases and the Debtors' Professionals. ........... 29

B.   First Day Relief....................................................................................................... 29

C.   The Proposed Bidding Procedures and Cloud/RAN Sale Motion. ................................... 30

D.   Bar Dates. .................................................................................................................. 31

E.   Proposed Confirmation Schedule. ............................................................................. 31

ARTICLE V. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 32

A.   Administrative Claims, Priority Tax Claims, and Statutory Fees. .................................... 32

   1.   Administrative Claims. ....................................................................................... 32

   2.   Professional Fee Claims. .................................................................................... 33

   3.   Priority Tax Claims. ........................................................................................... 34

   4.   U.S. Trustee Statutory Fees. ............................................................................... 34

B.   Classification of Claims and Interests. ........................................................................ 34

C.   Treatment of Claims and Interests. ............................................................................. 35

   1.   Class 1 – Other Secured Claims. ........................................................................ 35

   2.   Class 2 – Other Priority Claims. ........................................................................ 35

   3.   Class 3 – Term Loan Facility Claims. ................................................................. 36

   4.   Class 4 – General Unsecured Claims. ................................................................. 36

   5.   Class 5 – Intercompany Claims. ......................................................................... 36

   6.   Class 6 – Section 510(b) Claims. ....................................................................... 37

   7.   Class 7 – Existing Equity Claims. ...................................................................... 37

   8.   Class 8 – Intercompany Interests. ...................................................................... 37

D.   Special Provision Governing Unimpaired Claims. ....................................................... 38

E.   Elimination of Vacant Classes. .................................................................................. 38

F.   Voting Class, Presumed Acceptance by Non-Voting Classes. ....................................... 38

G.   Controversy Concerning Impairment. ......................................................................... 38

H.   Subordination of Claims. ........................................................................................... 38

I.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .. 38

J.   Insurance. ................................................................................................................. 39

ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN ..................................... 39

A.   General Settlement of Claims and Interests. ................................................................ 39

B.   Restructuring Transaction. ......................................................................................... 39

   1.   Sale Transactions. ............................................................................................. 39

   2.   Wind-Down. ..................................................................................................... 40

C.   Sources of Consideration for Plan Distributions. ........................................................ 40

D.   Vesting of Assets. ..................................................................................................... 41

E.   Preservation of Causes of Action. .............................................................................. 41

F.    Corporate Action............................................................................................. 41

G.    Cancellation of Existing Securities and Agreements....................................... 42

H.    Effectuating Documents; Further Transactions. .............................................. 42

I.    Section 1146 Exemption from Certain Taxes and Fees.................................... 43

J.    Sale Orders....................................................................................................... 43

K.    Authority to Act. .............................................................................................. 43

L.    Separate Plans. ................................................................................................. 43

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
............................................................................................................................................. 44

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ................... 44

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases...................... 45

C.    Reservation of Rights........................................................................................ 45

D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.
      45

E.    Indemnity Obligations. .................................................................................... 46

F.    D&O Liability Insurance Policies..................................................................... 46

G.    Employment Agreements.................................................................................. 46

H.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. .......... 46

I.    Nonoccurrence of Effective Date...................................................................... 46

J.    Employee Compensation and Benefits. ............................................................ 46

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE .......................... 47

A.    Conditions Precedent to the Effective Date. .................................................... 47

B.    Waiver of Conditions........................................................................................ 48

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS . 48

A.    Final Satisfaction of Claims and Termination of Interests. .............................. 48

B.    Releases by the Debtors.................................................................................... 49

C.    Releases by Holders of Claims and Interests.................................................... 50

D.    Exculpation. ..................................................................................................... 51

E.    Injunction. ........................................................................................................ 52

F.    Setoffs. ............................................................................................................. 53

G.    Release of Liens. .............................................................................................. 53

H.    Recoupment. ..................................................................................................... 54

ARTICLE X. RISK FACTORS..................................................................................... 54

A.    Bankruptcy Law Considerations....................................................................... 54

1. The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims. .................................................................................................. 54

2. Parties in Interest May Object to the Plan's Classification of Claims and Interests. ..... 55

3. The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral. ........... 55

4. The RSA May Be Terminated. ................................................................................... 55

5. The Conditions Precedent to the Effective Date of the Plan May Not Occur. .............. 55

6. The Debtors May Fail to Satisfy the Vote Requirements. ............................................ 55

7. The Debtors May Not Be Able to Secure Confirmation of the Plan. ........................... 56

8. The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes. ................................................................................ 56

9. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code. .......................................................................................................................... 56

10. The Debtors May Object to the Amount or Classification of a Claim. ......................... 56

11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.. 57

12. Releases, Injunctions, and Exculpation Provisions May Not Be Approved. ................. 57

B. Allowance of Claims. ........................................................................................................ 57

C. Risks Related to Recoveries Under the Plan. ..................................................................... 57

1. The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims. .................................................................................................... 57

2. Any Valuation of Any Assets to be Distributed Under the Plan Is Speculative. ........... 58

3. The Debtors Cannot Guarantee the Timing of Distributions. ...................................... 58

4. Certain Tax Implications of the Debtors' Bankruptcy. ................................................ 58

D. Risks Related to the Debtors' Businesses. ......................................................................... 58

1. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases. ...................................................................................................... 58

2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses. ................................................................................................................. 59

3. The Debtors' Business Is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business. ......................................... 59

4. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations. ............ 59

5. The Debtors Might Not Be Able to Satisfy Closing Conditions in Connection with the Sale Transactions. ...................................................................................................... 59

6. The Sale Transactions Will Affect the Debtors' Operations. ....................................... 60

E. Disclosure Statement Disclaimer. ..................................................................................... 60

1. The Financial Information Contained in This Disclosure Statement Has Not Been Audited. ...................................................................................................................... 60

2. Information Contained in This Disclosure Statement Is for Soliciting Votes. .............. 60

3.   This Disclosure Statement Was Not Reviewed or Approved by the SEC.....................60

4.   This Disclosure Statement May Contain Forward Looking Statements........................60

5.   No Legal or Tax Advice Is Provided to You by This Disclosure Statement.................61

6.   No Admissions Made....................................................................................................61

7.   Failure to Identify Potential Objections. .........................................................................61

8.   No Waiver of Right to Object or Right to Recover Transfers and Assets.....................61

9.   Information Was Provided by the Debtors and Was Relied Upon by the Debtors'
     Advisors. ........................................................................................................................61

10.  Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update...............61

11.  No Representations Outside This Disclosure Statement are Authorized.......................62

ARTICLE XI.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF
CONSUMMATION OF THE PLAN ..........................................................................................62

A.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors...................64

1.   U.S. Federal Income Tax Consequences of the Sale Transactions..............................64

2.   Cancellation of Debt and Reduction of Tax Attributes. ...............................................64

B.   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
Claims Entitled to Vote on the Plan...........................................................................................65

1.   U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Voting
     Class................................................................................................................................65

2.   Accrued Interest............................................................................................................65

3.   Market Discount............................................................................................................65

4.   Bad Debt Deduction......................................................................................................66

C.   Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of
Allowed Claims Entitled to Vote on the Plan............................................................................66

1.   Gain Recognition. ..........................................................................................................66

2.   Interest on Allowed Claims. ..........................................................................................67

D.   Information Reporting and Back-Up Withholding. ..........................................................68

E.   FATCA. ............................................................................................................................68

F.   Importance of Obtaining Professional Tax Assistance.....................................................69

ARTICLE XII. ADDITIONAL INFORMATION ..........................................................................69

ARTICLE XIII. RECOMMENDATION AND CONCLUSION ...................................................69

**<u>EXHIBITS</u>**

Exhibit A        Joint Plan of Liquidation of Casa Systems, Inc. and Its Debtor Affiliates

Exhibit B        Restructuring Support Agreement

Exhibit C        Corporate Organization Chart

# ARTICLE I.
# QUESTIONS AND ANSWERS REGARDING
# THIS DISCLOSURE STATEMENT AND THE PLAN

**A.      What is chapter 11?**

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of April 22, 2024).  Each category of holders of Claims and Interests, pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth in Article III of the Plan and Article V of this Disclosure Statement.

Except as otherwise provided in the Plan, nothing in the Plan shall affect the Debtors' or the Plan Administrator's rights regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**D.      What will I receive from the Debtors if the Plan is consummated?**

A summary of the anticipated recovery to holders of Claims or Interests under the Plan is set forth in Article II.D. of this Disclosure Statement.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

THE PROJECTED RECOVERIES SET FORTH IN ARTICLE II.D. HEREIN ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A description of these Claims and their treatment is included in Article III of the Plan and Article V of this Disclosure Statement.

**F.      Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors do not anticipate that any regulatory approvals are required to consummate the Plan, including any of the Sale Transactions contemplated thereby.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance as to what precisely will happen.  It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of potential consequences of extended Chapter 11 Cases, or of a liquidation scenario under chapter 7 of the Bankruptcy Code, see Article X of this Disclosure Statement, and the Liquidation Analysis to be filed subsequent to the Filing of this Disclosure Statement in advance of entry of the Solicitation Procedures Order.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under

---

[3] The recoveries set forth herein may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' Sale Transactions.

the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"— or as soon as reasonably practicable thereafter, as specified in the Plan.  "Consummation" of the Plan refers to the occurrence of the Effective Date.  See Article VIII of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date," for a discussion of conditions precedent to Consummation of the Plan.

### I.    What are the sources of Cash and other consideration required to fund the Plan?

The Debtors and the Plan Administrator, as applicable, shall fund distributions under the Plan with proceeds from the Sale Transactions and the Net Distributable Proceeds, if any, all in accordance with the terms of the Plan.

### J.    Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

### K.    Does the Plan preserve Causes of Action?

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled, as described in greater detail in Article IV.F of the Plan.

### L.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors will also seek findings of fact and conclusions of law with regards to officers' and directors' performance of their duties as officers and directors of the Debtors.  The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Term Loan Lenders in obtaining their support for the Plan pursuant to the terms of the RSA.

The Released Parties, the Exculpated Parties, and the Debtors' directors and officers have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize value of the Debtors for the benefit of all

parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrant the benefit of the release and exculpation provisions.

EACH RELEASING PARTY WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED IN THE PLAN OR WHO DO NOT TIMELY OBJECT TO THE PLAN.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.

Based on the foregoing, the Debtors believe that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions are contained in Article IX of the Plan and Article IX of this Disclosure Statement.

### M.     When is the deadline to vote on the Plan?

The Voting Deadline is May 24, 2024, at 5:00 p.m. (prevailing Eastern Time).

### N.     How do I vote on the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to holders of Claims that are entitled to vote on the Plan (the "Ballot").  For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **actually received** by Epiq Corporate Restructuring, LLC ("Epiq"), the Debtors' Bankruptcy Court-appointed claims and noticing agent (the "Notice and Claims Agent"), **on or before the Voting Deadline of May 24, 2024, at 5:00 p.m. (prevailing Eastern Time)**.

### O.     Why is the Bankruptcy Court holding a Combined Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.  Shortly after the commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule the Combined Hearing.  All parties in interest will be served notice of the time, date, and location of the Combined Hearing once scheduled.  The Combined Hearing may be adjourned from time to time without further notice.

### P.     What is the purpose of the Combined Hearing?

The confirmation of a plan by a bankruptcy court binds the debtor, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Because the Debtors are liquidating, they are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code with regard to any Holders of Claims or Interests.

**Q.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Casa Systems, Inc.
> c/o Epiq Ballot Processing
> 10300 SW Allen Blvd
> Beaverton, OR 97005
>
> *By electronic mail at:*
> casasystems@epiqglobal.com and referencing "Casa Systems" in the subject line
>
> *By telephone (toll-free) at:*
> 877-477-4039

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://dm.epiq11.com/CasaSystems (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

**R.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of the Debtors' stakeholders, and that any alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**S.     Who supports the Plan?**

The Plan is supported by the Debtors and the Ad Hoc Group, **which holds over 98% of the Company's funded debt, including approximately 98% of the Superpriority Term Loans and 100% of the Stub Term Loan** (each as defined below).

## ARTICLE II.
## OVERVIEW OF THE PLAN

---

### RECOMMENDATION BY THE DEBTORS

It is the Debtors' opinion that confirmation and implementation of the Plan is in the best interests of the Debtors' Estates and their creditors.  Therefore, the Debtors recommend that all creditors whose votes are being solicited submit a ballot to **accept** the Plan.

---

### A.      Introduction.

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as **Exhibit A**, and the exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions, which are summarized in Article VIII hereof.  There is no assurance that these conditions will be satisfied or waived.  At the Combined Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a chapter 11 plan are that the plan: (i) is accepted by the requisite holders of claims or interests in impaired classes under the plan; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan; (iii) is feasible; and (iv) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.  Because Classes 4, 5, 6, 7, and 8 will receive no distributions under the Plan, those Classes are deemed to reject the Plan.  Because Classes 1 and 2 are unimpaired, they are deemed to vote to accept the Plan.  *See* Article II.F.5.  for a discussion of the Bankruptcy Code's requirements for Plan Confirmation.

### B.      The Plan.

The Debtors filed for chapter 11 bankruptcy protection on April 3, 2024 (the "Petition Date").  The Debtors intend to sell all or substantially all of their assets pursuant to section 363(f) of the Bankruptcy Code prior to and in connection with confirmation of the Plan.  Subsequent to confirmation, the Debtors intend to enter the next phase of these Chapter 11 Cases, which involves the (i) wind-down of the Debtors; and (ii) the liquidation of the Debtors' remaining assets.

A chapter 11 bankruptcy case permits a debtor to resolve its affairs and distribute the proceeds of its estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors have filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement.  The Plan contemplates a liquidation of the Debtors and their Estates and is therefore referred to as a "plan of liquidation."  The primary objective of the Plan is to maximize the value of recoveries to Holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for distribution in accordance with the Bankruptcy Code and Plan.  The Debtors assert that the Plan accomplishes this objective and is in the best interests of their Estates, and therefore seek to confirm the Plan.  The Plan classifies holders of Claims or Interests according to the type and nature of the Holder's Claim or Interest, as more fully described below.

The Plan designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (1) Impaired or Unimpaired by the Plan; (2) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (3) deemed to accept or reject the Plan. Claims against the Debtors and Interests in the Debtors are classified in eight (8) separate Classes, as described herein.

### C.    The Adequacy of This Disclosure Statement.

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan. The Debtors are providing this Disclosure Statement in accordance with those requirements. This Disclosure Statement includes, without limitation, information about:

- the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder (Article II hereof);

- the statutory requirements for confirming the Plan (Article II.F. hereof);

- the Debtors' organizational structure, business operations, and financial obligations (Article III hereof);

- the events leading to the filing of the Debtors' Chapter 11 Cases (Article III hereof);

- the major events during the Chapter 11 Cases, including significant pleadings filed in the Debtors' Chapter 11 Cases (Article III hereof);

- certain risk factors that holders of Claims should consider before voting to accept or reject the Plan (Article X hereof);

- the classification and treatment of Claims or Interests under the Plan, including identification of the holders of Claims entitled to vote on the Plan (Article V hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan (Article VI hereof);

- the releases and exculpation provisions contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Article IX hereof); and

- certain United States federal income tax consequences of the Plan (Article XI hereof).

### D.    Summary of Classes and Treatment of Claims or Interests.

The classification of Claims or Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to holders of Claims or Interests in each Class are summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code,

Administrative Claims, and Priority Tax Claims have not been classified.  For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Article II of the Plan.

Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated Cash or other assets to be distributed to holders of Allowed Claims in that Class, divided by the estimated aggregate amount of Allowed Claims in that Class. Each of the estimated Cash or other assets, and the estimated aggregate amount of Allowed Claims, have been made in ranges with both low and high estimates.  In determining those amounts, the Debtors have assumed that the Plan is consummated as described herein.

For a discussion of various factors that could materially affect the amount of assets to be distributed pursuant to the Plan, see Article X of this Disclosure Statement.

| Class | Claims and Interests | Status | Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| Class 3 | Term Loan Facility Claims | Impaired | Entitled to Vote | 11% |
| Class 4 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| Class 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| Class 8 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

E.    **Solicitation Package.**

The package of materials (the "Solicitation Package") to be sent to holders of Claims on the Plan will contain:

- the Disclosure Statement (including the Plan and all other exhibits hereto, which includes the);

- the combined notice of commencement of these Chapter 11 Cases and the Combined Hearing;

- an appropriate form of Ballot, together with detailed voting instructions and a pre-addressed, postage pre-paid return envelope; and

- any additional documents that the Bankruptcy Court has ordered to be made available in connection with solicitation of votes on the Plan.

The Solicitation Package may also be obtained free of charge from the Debtors' Notice and Claims Agent, Epiq, by: (1) visiting https://dm.epiq11.com/CasaSystems; (2) emailing the Notice and Claims Agent at casasystems@epiqglobal.com; or (3) calling 877-477-4039.

**F.     Voting and Confirmation of the Plan.**

The Debtors seek entry of an order with respect to the motion for Combined Hearing, which will, among other things, (1) conditionally approve this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and (2) establish Plan voting tabulation procedures, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting purposes (the "Tabulation Rules") pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.     Certain Factors to be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors assert that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims, which would likely reduce the recoveries to the Holders of Claims.

2.     Voting Procedures and Requirements.

Pursuant to the Bankruptcy Code, only classes of Claims against or Interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan.  A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity.  Classes of Claims or Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan.  In addition, Classes of Claims or

9

Interests that do not receive distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan. The classification of Claims or Interests is summarized, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired, in Article V of this Disclosure Statement. April 22, 2024 shall serve as the voting record date for administrative convenience, *provided* that any creditor who later files a valid and timely Proof of Claim is provided the appropriate Solicitation Package and right to vote or opt-out, as and if applicable, on a rolling basis (the "Voting Record Date"). The Voting Record Date shall be used for the purpose of determining which Holders of Filed or scheduled Claims in Class 3 are entitled to receive a Solicitation Package.

Voting on the Plan by each Holder of a Claim in Class 3 is important. Please carefully follow all of the instructions contained on the Ballot(s) provided to you. All Ballots must be completed and returned in accordance with the instructions provided. To be counted, your ballot or ballots must be received by 5:00 p.m., prevailing Eastern Time, on May 24, 2024 (the "Voting Deadline") at the address set forth on the preaddressed envelope provided to you.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call or email the Debtors' Notice and Claims Agent, at 877-477-4039 or casasystems@epiqglobal.com. Also, this Disclosure Statement, the Plan and all of the related exhibits and schedules are available, without charge, to any party in interest at https://dm.epiq11.com/CasaSystems.

Ballots cannot be transmitted orally, by email or by facsimile. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service, regular U.S. mail, or electronically via the Voting Agent's e-Ballot portal promptly, so that it is received by the Voting Agent before the Voting Deadline.

3.      Plan Objection Deadline.

The deadline to file objections to the Confirmation of the Plan (the "Confirmation Objections") is May 24, 2024, at 5:00 p.m. (prevailing Eastern Time) (the "Objection Deadline"). All Confirmation Objections must be in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any Confirmation Objection must be filed with the Bankruptcy Court and served on the Debtors, any official committee of unsecured creditors appointed in the Chapter 11 Cases (if any), and the Consenting Term Loan Lenders on or before the Objection Deadline.

4.      Combined Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Debtors will request, on the Petition Date, that the Bankruptcy Court conditionally approve this Disclosure Statement and set a Combined Hearing to approve this Disclosure Statement on a final basis and confirm the Plan. The Combined Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to

section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing without further notice to parties in interest.

     5.    <u>Confirmation</u>.

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:[4]

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan that has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders the Plan is feasible;

- all U.S. Trustee Fees due and owing have been paid or the Plan provides for the payment thereof on the Effective Date; and

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to those holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that each holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in that Class has accepted the Plan.

     6.    <u>Acceptance</u>.

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

     7.    <u>Feasibility</u>.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor (unless liquidation or reorganization is proposed in the Plan). Because the Plan proposes a liquidation of all of the Debtors' assets, for purposes of this test the

---

[4] The descriptions contained herein are only a summary of certain confirmation requirements; they are not exhaustive of all confirmation requirements and should not be construed as such.

Debtors must analyze the ability of the Plan Administrator to meet its obligations under the Plan. The Debtors' analysis regarding recoveries available to Holders of Allowed Claims under the Plan and whether the Plan Administrator will have sufficient assets to accomplish its tasks under the Plan will be contained in the Plan Supplement (to be filed prior to the Voting Deadline). The Debtors currently anticipate their liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

8.      Best Interests Test; Liquidation Analysis.

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any impaired Class who has not voted to accept the Plan.  Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of that impaired Class a recovery on account of the holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that the holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To address the best interests test, subsequent to the Filing of this Disclosure Statement, the Debtors will prepare and File the Liquidation Analysis in advance of entry of the Solicitation Procedures Order, which the Debtors anticipate will be sent to Holders of Claims in connection with the solicitation of votes to accept or reject the Plan.

Because the Plan proposes a liquidation of all the Debtors' assets, the Debtors have analyzed factors that will impact recoveries (the "Recoveries") available to creditors in each scenario.  These factors include professionals fees and expenses, asset disposition expenses, applicable taxes, potential Claims arising during the pendency of the Plan or chapter 7 cases and trustee fees and expenses.  The Liquidation Analysis will include a summary of the Recoveries under the Plan and in a hypothetical chapter 7 liquidation.

In summary, the Debtors will demonstrate in the Liquidation Analysis that a chapter 7 liquidation would result in diminution in the Recoveries to be realized by holders of Allowed Claims, as compared to the proposed distributions under the Plan.  Consequently, the Debtors will demonstrate in the Liquidation Analysis that the Plan will provide a greater ultimate return to holders of Allowed Claims than would a chapter 7 liquidation of the Debtors.

9.      Compliance with Applicable Provisions of the Bankruptcy Code.

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code.  The Debtors considered each of these issues in the development of the Plan and have determined that the Plan complies with all provisions of the Bankruptcy Code.

10.     Alternatives to Confirmation and Consummation of the Plan.

The Debtors evaluated alternatives to the Plan, including alternative structures and terms of the Plan.  While the Debtors concluded that the Plan is the best alternative and will maximize recoveries by Holders of Allowed Claims, if the Plan is not confirmed, the Debtors, or (subject to

the Debtors' exclusive periods under the Bankruptcy Code to file and solicit acceptances of a plan or plans) any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan. Further, if no plan under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases. In liquidation cases under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the remaining assets of the Debtors and distribute proceeds to creditors. The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code. For further discussion of the potential impact on the Debtors of the conversion of the Chapter 11 Cases to chapter 7 liquidation, see Article X.A of this Disclosure Statement. The Debtors have determined that confirmation and Consummation of the Plan is preferable to the available alternatives.

### G. Releases by the Debtors Set Forth in the Plan.

Article IX of the Plan provides that each Released Party is deemed released by the Debtors and their Estate from any and all claims and Causes of Action except as set forth therein. The Debtors have determined that applicable law and the facts support those releases and that the Bankruptcy Court can and should approve them.

### ARTICLE III.
### THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A. Corporate History

Casa is incorporated under the laws of the state of Delaware and is the ultimate parent of the other Debtors and owns, directly or indirectly, all of the Non-Debtor Affiliates. The Debtors' wholly owned subsidiaries are located and operate globally, including in Australia, Canada, China, France, Germany, Hong Kong, Ireland, the Netherlands, Spain, the United Kingdom, and New Zealand. An organizational chart of the Company is attached as Exhibit C hereto.

On December 15, 2017, Casa completed an initial public offering ("IPO") on the Nasdaq Stock Market ("NASDAQ"), issuing approximately 6,000,000 shares of common stock at $13.00 per share.[5] Since its IPO in December of 2017, Casa has publicly traded on NASDAQ under the trading symbol "CASA."

The Company maintains its corporate headquarters in Andover, Massachusetts. Operations date back to 2003 with the development of the Company's groundbreaking software that leveraged the programmability of certain hardware and general-purpose processors. In 2008, the Company dramatically improved broadband speeds with its commercially deployable cable modem termination system. In 2012, the Company revolutionized the industry by becoming the first to introduce broadband convergence, which enabled the delivery of voice, digital video, and data all over a single cable port.

---

[5] Casa Systems, Inc., Prospectus (Dec. 15, 2017).

Moreover, when the market had traditionally relied on network architecture that was closely connected to underlying hardware, the Company foresaw the impending architectural shift toward the virtualization and disaggregation of networks and acted accordingly—in 2016, it launched its unique and innovative Axyom software.  Axyom is at the heart of the Company's core network offerings, acting as a multi-service, ultra-broadband delivery architecture, while also providing the element management system functions needed to efficiently operate such services. The Axyom software architecture utilizes cloud-native principles to ensure scalability, and it is optimized for the virtual computing environment.

Two years later, the Company debuted the Axyom 5G converged core, which not only delivered optimized solutions specific to mobile, fixed and cable broadband networks, but also supported converged solutions.  This innovative technology relies on cloud-native principles and enables operators to reduce long-term capital expenditures and operating expenses by avoiding separate cores for each access type with overlapping functions.

In July 2019, the Company expanded its international operations through the acquisition of NetComm Wireless Limited ("NetComm"), an Australian company focused on the development of fixed wireless broadband, wireless, and related technologies.  The Company purchased NetComm for cash consideration of AUD $161 million (or approximately USD $114 million). The Company acquired NetComm to accelerate its broadband convergence strategy by including NetComm's fixed wireless and access device technologies in its portfolio.  Unfortunately, the NetComm business ultimately underperformed the Company's expectations and played a material role in the Company's strained liquidity position.  As described below, the NetComm Entities[6] are currently subject to voluntary administration proceedings ("VA Proceedings") in Australia and are expected to be subject to a sale and/or liquidation process pursuant to such proceeding.

As of the Petition Date, the Company has approximately 823 employees, 245 of whom are located in the United States and 578 of whom are located across the Company's myriad global locations (excluding NetComm employees).  The Company's employees are responsible for, among other things, engineering, research and development, sales, manufacturing, technical support, product management, and professional services for the Company.  The Company has limited internal manufacturing capabilities and instead contracts with a number of third-party suppliers to manufacture the hardware necessary to provide their services.

## B.    Business Operations.

The Company's full, end-to-end portfolio of all-access broadband network solutions extends from a cloud-native, converged network core to the customer premises.  The network "core" functions as the backbone of a data center and it handles long-distance, high-speed traffic between points in a broader network and devices at the network's edge.  The network edge keeps data closer to the edge of the internet and near end users, thereby handling local connectivity and providing internet services to end-users and devices.  Customer premises equipment is, as the name suggests, physically located at a customer's premises, and it works to facilitate the connection at

---

[6] "NetComm Entities" shall mean, collectively, Casa Technologies Pty Ltd, Casa Communications Holdings Pty Ltd, and NetComm Wireless Pty Ltd.

between the customer's internal network and the CSP's network.  Examples include devices such as routers, modems, small cells, and other similar networking equipment.

To meet CSPs' network needs at the core, edge, and customer premises, the Company's portfolio of solutions consists of four primary segments: (i) broadband hardware and software solutions for current and next-generation broadband wireline networks ("Cable"), (ii) Casa access devices ("CAD"), (iii) a cloud-native software portfolio ("Cloud"), and (iv) radio access networks ("RAN").

> 1.   Cable.

The Company's Cable products are deployed in centralized, distributed, or virtual environments and support the seamless transition to distributed access architecture through innovative product development.

Historically, the Company generated the majority of its revenue from the Cable market through its legacy solution, iCCAP.  In recent years, however, the Company has diversified its business via expansion of its target markets, including wireless and fixed-line broadband solutions, and research and development into modern Cable solutions, such as vCCAP, RPD and RMD.  At this time, the RPD/RMD market remains competitive, with at least 12 providers offering RPD/RMD solutions.  Conversely, the Company competes with only one other vCCAP provider.  Nevertheless, as MSOs face pressure to upgrade their networks, the Company believes that its significant investment into researching and developing their vCCAP solution will prove to be a profit-maximizing endeavor.

> 2.   CAD.[7]

The CAD business segment provides broadband connectivity to homes, business, and machines through wireless networks and fiber extension technology.  Within the CAD segment of the Company's business, there are four primary access solutions: (i) fiber extension, (ii) fixed wireless access ("FWA"), (iii) home broadband, and (iv) industrial internet of things ("IoT").

Fiber extension ("Fiber-to-the-Distribution-Point" or "FTTdp") solutions allow CSPs to extend the fiber running in the street or basement, utilizing the copper lead-ins at an end user's premises.  The solution consists of a distribution point unit, which is installed outside of the home or in the basement of a multi-dwelling unit, and a network connection device, which is installed inside the home.  The Company's FTTdp solutions offer a cost- and time-effective means to provide a fiber-to-the-home experience to the end user and the operator, reducing time delays and cost overruns where the fiber penetration into buildings becomes problematic.  The Company's portfolio focuses on cost optimization for service providers, with solutions ranging from software to accessories that enhance the installation process.

FWA delivers high-speed broadband access to homes and businesses using the coverage and reach of a mobile network, thereby eliminating the need for a copper, fiber, or coaxial cable

---

[7] The Company offers myriad Cable solutions to multi-service operators ("MSOs"), or cable companies, including legacy solutions such as their integrated converged cable access platform ("iCCAP") and modern solutions, including their virtual converged cable access platform ("vCCAP") and remote-PHY ("RPD") and MACPHY ("RMD") devices.

to the customer's premises. The FWA solutions can be delivered as self-install indoor units or as pro-install outdoor units that are mounted to the side of the customer's premises. One primary goal of the FWA devices is reducing the total cost of ownership for operators, achieved through class-leading hardware performance and the Company's range of accessories that optimize the installation process and overall install success rate.

Residential broadband gateways allow customers to connect to very high-speed fiber services, ensuring fast and reliable connections to multiple devices throughout customers' home. Because the Company acquired these devices from its acquisition of NetComm, it only sells home broadband gateways for customer premises in Australia and New Zealand.

IoT routers and modems provide businesses and governments with networking products that are enabled for 3G and 4G/LTE data communication. These solutions enable customers to utilize remote diagnostics, real-time monitoring, and wireless access via the internet to manage machines. The Company designed its IoT devices for industrial application, including in the retail, transportation, health, metering digital signage, security, banking and mining industries.

Unfortunately, the CAD business has not performed as well as expected, and it has, as illustrated by the gross profit chart, experienced a substantial decline in overall profitability.

      3.   <u>Cloud</u>.

As the CSP industry is in the early stages of a major architectural shift toward technologies and products related to the "cloud," the Company has utilized profits from its Cable business to invest heavily in Cloud. The Company's Cloud business segment provides the potential for significant future revenue and profitability.

Legacy wireless core networks are designed as a single evolved package core and cannot optimally handle new, high-capacity traffic flow. In contrast, cloud-native network solutions, like the Company's 5G mobile core, are decoupled from underlying hardware, which allows for significantly increased efficiencies, upgradability, configuration flexibility, service agility, and scalability not feasible with hardware-centric approaches.

Through its converged 5G mobile core, the Company is also able to offer CSPs multi-edge access computing ("<u>MEC</u>"), which brings technology closer to the network edge. The Company has already seen early signs of adoption of this software with the execution of an agreement with Verizon to provide MEC-related core solutions (the "<u>MEC Agreement</u>").

The Company's core-Cloud product also includes virtualized broadband network gateway ("<u>vBNG</u>") routers, and security gateway software, which collectively enable CSPs and enterprises to cost-effectively and dynamically increase network speed, add bandwidth capacity and new services, reduce network complexity, and reduce operating and capital expenditures regardless of access technology. The Company's vBNG routers provide advanced subscriber management and routing capabilities in a cloud-native, virtualized solution. By separating the control and data plane functions, vBNG enables elastic scaling and service agility, while allowing the service provider to put the control and data planes where they make most sense. Accordingly, vBNG can be deployed in either centralized architectures (on the same server in the data center or central office) or distributed ones (at the network edge or node closer to the end user). vBNG is deployed as a

service on the Axyom software framework.  It is convergence-ready with built-in access gateway functions interfacing with the Company's 5G core.  At the 2019 Broadband World Forum, the Company demonstrated how its vBNG and 5G core could enable subscribers to use services seamlessly as they move between mobile and fixed connectivity.  This solution won the Company the Broadband Forum Innovation Award for 5G in 2019.

       4.    <u>RAN</u>.

The Company's in-house developed 4G/5G small cell radios are designed as remotely deployable access points that provide cellular connectivity services at the network edge in conjunction with transport security functions to address coverage and capacity challenges. Comprised of enterprise small cells, Apex 5G Evo radio, and 5G mmWave radio, the Company's RAN products improve 5G wall penetration, a key network feature to wireless providers.  In doing so, the small cell radios enable CSPs to cost-effectively densify their networks while simultaneously improving coverage and enhancing throughput.  The Company believes that the small cell business remains lucrative as it drives recurring revenue from Casa's Cloud software due to the synergies of the Company's RAN and Cloud hardware/software products and services.

       5.    <u>Sales</u>.

The Company derives revenue from sales of products and services, including software. Prior to 2020, the majority of the Company's product revenue came from sales of broadband products, particularly the Company's I-CCAP solution to cable operators worldwide.  In 2021 and 2022, however, sales of the Debtors' wireless and fixed-line broadband products to mobile network operators and diversified CSPs globally comprised a majority of the Debtors' revenue.  The Company also generates service revenue, primarily from sales of maintenance and support services, which end customers typically purchase in conjunction with the Company's products, and, to a lesser extent, from sales of professional services and extended warranty services.

To facilitate sales of its products and software, the Company utilizes both resellers and a direct global sales force, supported by sales agents.  Resellers receive orders from end customers prior to placing an order with the Company, and the Company confirms the identification of the end customer prior to accepting such order.  The Company subsequently invoices the reseller an amount that reflects a reseller discount and records revenue based on the amount of the discounted transaction value.  Sales agents primarily assist the Company's sales force with certain customers located in the Latin America and Asia-Pacific regions.  If a sales agent is involved in a particular sale process, the Company receives the order directly from and sell the products and services directly to the end customer, and the Company typically pays a commission to the sales agent, calculated as a percentage of the related transaction value.

       6.    <u>Research and Development and Intellectual Property</u>.

The Company invests heavily in research and development in order to both drive down the cost of its network technology and improve its capacity over time.  In 2021 and 2022, the Company's research and development expenses were $84.4 million, or approximately 21.0% of its revenue, and $85.2 million, or approximately 29.7% of its revenue, respectively.  By taking calculated risks to invest early in research and development opportunities, the Company sought to

be the first to the market with deployable, innovative solutions. Recently, in light of current market trends, the Company has invested heavily in developing wireless and fixed-line broadband solutions.

The Company's investment into research and development has resulted in myriad developments, including the world's first extended-range 5G New Radio Data call over millimeter wave, cloud-native 5G software, and breakthrough fixed-line broadband technology.

Moreover, the Company has sought to enhance its technological innovation through partnerships with industry standard-setting organizations and groups, such as CableLabs, 3GPP, and Wi-Fi Alliance. These efforts allowed the Company to advance industry standards while developing and evolving its own solutions to meet those new standards.

In connection with the technology described above, the Company maintains a portfolio of trademarks, patents, copyrights, domain names, trade secrets, licenses, and contractual agreements to protect its intellectual property rights. As of the Petition Date, the Debtors hold seventeen (17) United States patents, with expiration dates through 2040, as well as twenty-four (24) patents issued in foreign jurisdictions. Eleven (11) United States patent applications remain pending. The Debtors also hold three (3) registered trademarks in the United States and thirty-two (32) trademarks internationally, along with two (2) pending trademark applications in foreign jurisdictions.

### C.      The Debtors' Prepetition Corporate and Capital Structure.

As of the Petition Date, Casa had approximately $183.04 million in funded secured debt obligations.

### 1.      Original Term Loan.

On December 20, 2016, prior to undertaking its IPO, Casa entered into that certain Credit Agreement (the "Original Credit Agreement"), with various lenders party thereto (the "Prepetition Original Lenders"), JPMorgan Chase Bank, N.A. ("JPM"), as administrative agent and collateral agent (and any successor agent thereof, the "Prepetition Original Agent"), and JPM and Barclays Bank PLC ("Barclays"), as joint lead arrangers and joint bookrunners. The Original Credit Agreement provided for (i) a term loan facility of $300 million, due to mature on December 20, 2023 (the "Original Term Loans"), and (ii) a revolving credit facility of up to $25 million in revolving credit loans and letters of credit, which matured on December 20, 2021 (the "Original RCF Facility").

Borrowings under the Original Term Loans bore interest at a floating rate, which could be either a Eurodollar rate plus an applicable margin or, at the Debtors' option, a base rate (defined as the highest of (x) the JPM prime rate, (y) the federal funds effective rate, plus one-half percent (0.50%) per annum and (z) a one-month Eurodollar rate plus 1.00% per annum) plus an applicable margin. The applicable margin for borrowings under the Original Term Loan was 4.00% per annum for Eurodollar rate loans (subject to a 1.00% per annum interest rate floor) and 3.00% per annum for base rate loans. Proceeds from the Original Term Loan were ultimately used by the Company to acquire NetComm, pay certain shareholder distributions made prior to the Company's IPO, and for other general corporate purposes.

2.    <u>Superpriority Term Loan</u>.

Beginning in November 2022 and continuing through May 2023, the Company expressed concern over its ability to generate enough cash flow to meet debt obligations and therefore, its ability to continue as a going concern if it was unable to refinance the Original Term Loans.[8]

On June 15, 2023, after extensive negotiations, Casa and certain of the Prepetition Original Lenders entered into that certain Exchange Agreement (the "<u>Exchange Agreement</u>") by and among Casa, the Prepetition Orignal Lenders party thereto and Prepetition Original Agent, and that certain Superpriority Credit Agreement (the "<u>Superpriority Credit Agreement</u>") by and among Casa, the lenders party thereto (the "<u>Prepetition Superpriority Lenders</u>" and together with the Prepetition Original Lenders, the "<u>Prepetition Lenders</u>"), JPMorgan Chase Bank, N.A., as administrative agent (the "<u>Prepetition Superpriority Administrative Agent</u>"), Delaware Trust Company, as collateral agent, to exchange approximately $218,848,000 of the Original Term Loans, representing approximately 97.8% of the then outstanding principal balance, for loans of an equal principal amount having a first priority security interest in all or substantially all of the assets of Casa and certain subsidiaries of Casa (the "<u>Guarantors</u>")[9] with an extended maturity date of December 20, 2027 (subject to certain springing maturity terms as set forth in the Superpriority Credit Agreement) (the "<u>Superpriority Term Loans</u>").  Moreover, as part of the Exchange Agreement, the Debtors were required to pay down $40 million of the Superpriority Term Loans as part of an early principal repayment.

The Superpriority Term Loans bear interest at the Adjusted Term SOFR Rate (as defined in the Superpriority Credit Agreement) (subject to a 2.00% per annum floor) or Base Rate (as defined in the Superpriority Credit Agreement), as applicable, plus (x) in the case of SOFR Rate Loans (as defined in the Superpriority Credit Agreement), 6.50% per annum or (y) in the case of Base Rate Loans (as defined in the Superpriority Credit Agreement), 5.50% per annum, provided that, the foregoing interest rate margin in respect of both SOFR Rate Loans and Base Rate Loans shall be increased (i) by 0.50% per annum on July 1, 2024 and (ii) by 1.00% per annum on and after January 1, 2025 (for a total increase of 1.50% per annum), if, in each case, the outstanding amount of Superpriority Term Loans on such date is in excess of $125,000,000 (with continuing effect from such date regardless of the outstanding amount of Superpriority Term Loans at any time after such date of determination); and any time after June 30, 2025, with respect to Superpriority Term Loans (x) in the case of SOFR Rate Loans, 13.00% per annum or (y) in the case of Base Rate Loans, 12.00% per annum.  In addition, the Exchange (as defined below) resulted in certain PIK fees added to the outstanding principal balance of the Superpriority Term Loans.

Immediately following execution of the Superpriority Credit Agreement (the "<u>Exchange</u>"), approximately $5 million of the Original Term Loan principal remained outstanding and due to mature on December 20, 2023.  The Superpriority Term Loans are guaranteed by the Guarantors pursuant to a Guaranty, dated as of June 15, 2023, by and between Casa, the Guarantors, and

---

[8] *See* Casa Systems, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2022); Casa Systems, Inc., Annual Report (Form 10-K) (Mar. 15, 2023); Casa Systems, Inc., Quarterly Report (Form 10-Q) (May 9, 2023).

[9] The Guarantors include Debtors Casa Properties LLC, Casa Systems Securities Corporation, and NetComm Wireless Inc. and Non-Debtor Affiliates Casa Communications Limited, Casa Technologies Pty Ltd, Casa Communications Holdings Pty Ltd, and NetComm Wireless Pty Ltd.

Prepetition Superpriority Administrative Agent. Further, in the nine months prior to the refinancing, the Company had retired approximately $50 million of debt, which, when taken together with the $40 million paydown described above, culminated in a debt reduction of over $90 million. With an overwhelming amount of the Prepetition Original Lenders participating in the Exchange and a significant amount of debt deleveraged from its balance sheet, the Company felt validated in the strength of its business and future plans.

By extending the maturity date of the Original Term Loan, the Exchange enabled the Company to focus its efforts on strengthening the business and taking additional steps to achieve profitability. During this time, the Company hired new key officers to lead the business, including a new CEO with substantial industry experience and a new principal accounting officer. Further, as detailed below, the Company engaged advisors and initiated marketing efforts to sell its CAD and Cable segments to potential buyers as it shifted towards a core focus on the Cloud/RAN businesses. Despite the Company's best efforts to sell certain of its assets, the CAD and Cable markets continued to deteriorate and potential buyers showed little actionable interest, which prevented the Debtors from consummating a sale. As the Company began experiencing revenue challenges, in the absence of finding a buyer for the CAD or Cable businesses, it grew concerned about its ability to meet an upcoming liquidity covenant in the Superpriority Credit Agreement.

Accordingly, on December 8, 2023, Casa, the Guarantors, and certain Prepetition Superpriority Lenders entered into a first amendment to the Superpriority Credit Agreement (the "First Amendment to the Superpriority Credit Agreement"), which extended the date that certain liquidity covenant tests contained in the Superpriority Credit Agreement applied to the Company and extended the date which the financial reporting deadlines applied to Casa.

On December 27, 2023, Casa, the Guarantors, and certain Prepetition Superpriority Lenders entered into a second amendment to the Superpriority Credit Agreement, which further extended the date by which the liquidity covenant tests and financial reporting deadlines applied to Casa to January 29, 2024.

On January 29, 2024, Casa, the Guarantors, and certain Prepetition Superpriority Lenders entered into a third amendment to the Superpriority Credit Agreement, which further extended the date by which the liquidity covenant tests and financial reporting deadlines applied to Casa to February 16, 2024.

On February 15, 2024, Casa, the Guarantors, and certain Prepetition Superpriority Lenders entered into a fourth amendment to the Superpriority Credit Agreement, which further extended the date by which the liquidity covenant tests and financial reporting deadlines applied to Casa to March 15, 2024.

On March 11, 2024, Casa, the Guarantors, and certain Prepetition Superpriority Lenders entered into a limited waiver to the Superpriority Credit Agreement, which waived certain defaults and events of defaults arising out of the VA Proceedings and any liquidity test dates applied to Casa until March 24, 2024.

On March 23, 2024, Casa, the Guarantors, and certain Prepetition Superpriority Lenders entered into a fifth amendment and limited waiver amendment to the Superpriority Credit

Agreement, which waived an event of default arising from the non-payment of the interest payment due on March 15, 2024 until April 2, 2024 and further extended the waiver date of the defaults and events of defaults arising out of the VA Proceedings and any liquidity test dates applied to Casa until April 2, 2024.

        3.      <u>Stub Term Loan</u>.

Approximately $5 million in principal remained outstanding and owing to the non-exchanging Prepetition Original Lenders (the "<u>Non-Exchanging Prepetition Lenders</u>") under the Original Term Loans that did not participate in the Exchange (such remaining amount, the "<u>Stub Term Loan</u>").  On June 15, 2023, in connection with the Exchange and the Superpriority Credit Agreement, Casa, certain Prepetition Original Lenders, and the Prepetition Original Agent entered into a first amendment to the Original Credit Agreement (the "<u>First Amendment to the Original Credit Agreement</u>"), which, among other things, permitted the transaction contemplated by the Exchange and removed (i) all mandatory prepayments (other than at maturity), (ii) substantially all affirmative and negative covenants, and (iii) certain events of default previously applicable to the Original Term Loans.

On December 8, 2023, Casa entered into a second amendment to the Original Credit Agreement, which extended the maturity date of a portion of the Stub Term Loan from December 20, 2023, to January 15, 2024.

On January 12, 2024, Casa entered into a third amendment to the Original Credit Agreement (the "<u>Third Amendment to the Original Credit Agreement</u>"), which elevated the Non-Exchanging Prepetition Lenders' liens to be pari passu with the liens of the other Prepetition Lenders under the Superpriority Credit Agreement and extended the maturity date on the Stub Term Loan from January 15, 2024, to September 30, 2024.  To effectuate this Third Amendment to the Original Credit Agreement, Casa and certain of its affiliates also entered a certain Pari Passu Intercreditor Agreement, dated as of January 12, 2024, with the Delaware Trust Company, in its capacity as collateral agent under the Superpriority Credit Agreement and the Original Credit Agreement.

On March 11, 2024, Casa entered into a limited waiver to the Original Credit Agreement, which waived certain defaults and events of defaults arising out of the VA Proceedings until March 24, 2024.  On March 23, 2024, Casa entered into a limited waiver amendment to the Original Credit Agreement which further extended the waiver date of the defaults and events of defaults arising out of the VA Proceedings to April 2, 2024.

        4.      <u>Equity Holders</u>.

        a.      *Common Stock*

Casa is authorized to issue 5,000,000 shares of preferred stock (the "<u>Preferred Stock</u>") and 500,000,000 shares of common stock (the "<u>Common Stock</u>"), each at $0.001 par value.  As of the Petition Date, no Preferred Stock is issued or outstanding, 103,445,339 shares of Common Stock are issued, and 99,847,944 shares of the Common Stock are outstanding.

As of the Petition Date, Casa's directors, executive officers, and 10% stockholders beneficially owned, in the aggregate, approximately 50.3% of Casa's outstanding stock. In addition to outstanding Common Stock, as of the Petition Date, there were 5,942,125 shares subject to outstanding options, 13,265,093 shares subject to restricted stock unit awards ("RSUs"), and an additional 6,068,824 shares reserved for future issuance under equity incentive plans.

On April 18, 2022, Casa entered into a Securities Purchase Agreement (the "SPA") with Verizon providing for the private placement of an aggregate of 9,323,000 shares of Casa's Common Stock, par value $0.001 per share at a price of $4.24 per share, for an aggregate purchase price of approximately $39,530,000. Moreover, as part of the recently executed MEC Agreement, Verizon invested $40 million into Casa's Common Stock, making it a 9.9% equity holder in the Company.

On September 26, 2023, NASDAQ notified Casa that the bid price for Casa's Common Stock had closed below $1.00 per share for thirty (30) or more consecutive business days (August 8, 2023, through September 25, 2023) and that Casa was therefore not in compliance with the minimum bid price requirement for continued inclusion on NASDAQ (the "Bid Price Requirement"). In connection therewith, Casa was notified that, if it did not regain compliance with the Bid Price Requirement within 180 calendar days (March 25, 2024), its securities would be delisted from NASDAQ trading platform.

On March 27, 2024, after failing to regain compliance with the Bid Price Requirement by March 25, 2024, Casa received notice from NASDAQ that the Company's common stock was scheduled for delisting at the opening of business on April 5, 2024.

> *b.*     Warrants.

On June 15, 2023, in connection with the Superpriority Credit Agreement and the Exchange, Casa entered into a Warrant Agreement (the "Warrant Agreement") with American Stock Transfer & Trust Company, LLC, as warrant agent. Subject to the terms and conditions set forth therein, certain of the Prepetition Original Lenders (or their affiliates or designees) received (or had the right to receive) warrants (the "Warrants"), exercisable for an aggregate of 19,373,000 shares of Casa's Common Stock when vested, with an exercise price of $0.01 per share of Common Stock. The Warrants were issued to certain of the Prepetition Original Lenders on a pro rata basis in accordance with the amount of the Superpriority Term Loans held by such lenders.

In the aggregate, the Warrants are exercisable for up to 19.99% of the shares of Casa's Common Stock that were issued and outstanding as of the date the Warrants were issued. As of the Petition Date, 1,696,316 shares have been exercised in connection with the Warrants.

### D.     Events Leading to the Chapter 11 Filings.

> 1.     The Company's Strained Liquidity and Operational Challenges.

While operating as market leaders, the Company faced a myriad of operational challenges, including shifting market dynamics, customer loss, the COVID-19 pandemic, and Casa's substantial debt and inability to meet the liquidity covenant under the Superpriority Credit

Agreement in June 2023, that, taken together, culminated in their current strained liquidity position and the need to commence these Chapter 11 Cases.

### a. COVID-19 Pandemic.

The effects of the COVID-19 pandemic caused disruptions to the Company's global supply chain. Throughout 2021 and 2022, the Company experienced shipping bottlenecks and shortages of supply that resulted in an inability to fulfill certain customer orders within normal lead times. This adversely impacted the Company's revenue and operating results for fiscal years 2021 and 2022. In connection with the foregoing, the Company also experienced significant increases in shipping costs. Given these supply chain delays, the Company heavily invested in inventory, particularly Cable and CAD hardware, in 2021 and 2022 to meet customer demands and ultimately fulfill expected future sales, which required a significant amount of short-term cash outflows. Shortly thereafter, the Cable market experienced a significant decline, as detailed further below, thus dissipating demand and leaving the Company over-inventoried and cash-stretched.

### b. Shifting Market Dynamics and Customer Losses.

The Debtors have faced an overall slowing of customer growth in the Cable industry—historically, the Debtors' primary source of revenue. Demand for linear television has declined for the past few years and the trend is expected to continue as demand for streaming services and other direct-to-consumer forms of media gain popularity. With fewer end market customers purchasing Cable solutions from MSOs, many MSOs have amassed an inventory of such Cable solutions, thereby eliminating the need for MSOs to make new purchases from Cable providers like the Company. The effects of this slowing customer growth have had an industry-wide impact, as illustrated by the declining stock prices of similarly situated telecommunications companies.

In addition, the Company believes that the CSP industry is in the early stages of transitioning to the virtualization of networks and the use of networks with distributed architectures, which may ultimately affect revenues in the industry if the architectural shift does not occur, does not occur at the predicted pace, or if the products and services developed are not attractive to customers after such shift takes place. Regardless, to sustain competition, the Company developed products and services that it believed would be attractive to its customers and potential customers as part of this shifting market dynamic with an emphasis on the Company's Cloud and RAN business segments. These development efforts were cost intensive and, in the absence of a transaction that extended its liquidity runway, the Cloud and RAN business segments were not able to scale sufficiently to bring the Company to profitability in the near term.

Simultaneously with the foregoing market shifts, the Company faced significant customer losses between 2021 and 2023 in both its Cable and CAD business units, substantially reducing the Company's projected revenues. While the Company has invested significant capital towards customer acquisition and growth prospects, particularly as it relates to its Cloud and RAN business segments, such prospects ultimately did not materialize on the timeline dictated by the Company's liquidity situation.

23

###### c. *Going Concern Qualification and the Exchange*

Although the Company had predicted in late 2021 and early 2022 that 2022 would be a strong financial year, the actual results were materially below expectations. And while the Company sought to resolve its debt in 2022 and early 2023 to avoid a going-concern qualification, it was not positioned to do so given its substantial losses for the fiscal year ending December 31, 2022. Thus, in March 2023, prior to the consummation of the Exchange, Ernst & Young, the Company's auditor, issued a going-concern qualification in its audit opinion for the Company's annual 10-K for fiscal year 2022, as the Original Term Loans, at the time, were set to mature within one year and the Company did not yet have committed financing or available liquidity to meet such debt obligations. As an immediate consequence, certain of the Company's prospective customer contracts were delayed, and in some cases lost to competitors, which had a material impact on the Company's go-forward prospects. Additionally, the Exchange was consummated in June 2023, and while the Exchange ultimately resolved the going-concern qualification, the Debtors also made a $40 million principal paydown payment in connection with the Exchange.

###### d. *Reductions in Force and Other Cost-Saving Measures.*

Recognizing its strained liquidity position, the Company took actions to preserve its ability to continue operations in the ordinary course. In April of 2023, the Company approved a plan to reduce its workforce by 134 employees, representing approximately 13% of the Company's workforce as of the Petition Date. This reduction in force, together with certain other actions undertaken by management, resulted in approximately $5.1 million in cash operating expense savings for 2023. Such measures included, among other things, (i) an acceleration of collections of receivables, (ii) deferral of expenditures, (iii) sales of excess inventory, and (iv) the attempted sale of the Company's non-core assets. Over the course of January and February 2024, the Company further issued reduction in force notifications to a total of 29 employees, including eight (8) former employees of the Debtors. Throughout this time, the Company carefully sought to balance the need to reduce costs with the need to maintain essential employees and operations.[10]

Moreover, on August 16, 2023, the Company entered into a purchase and sale agreement (the "Purchase Agreement") with DND Homes, LLC (the "Buyer"), for the sale of the Company's headquarters at 100 Old River Road, Andover, Massachusetts (the "Property") for a purchase price of $6,400,000.00. Upon the closing of the sale, the Company entered into a commercial lease (the "Lease") with the Buyer, pursuant to which the Property would be leased back to the Company (the Purchase Agreement and the Lease, collectively, the "Sale-Leaseback"). As a result of the Sale-Leaseback, the Company received proceeds of approximately $6,110,000.00, after taxes, expenses and fees, all of which was used, pursuant to the requirements of the Superpriority Term Loans, to pay down the principal balance of the Superpriority Term Loans.

---

[10] For example, the Company made a conscious decision to limit the number of reductions to its Cable and CAD research and development teams. As an innovator in the industry, the Company relies heavily on such teams and believed that any significant reductions in force would affect the value of these segments in the eyes of existing customers and potential buyers.

E. **Exploration of Strategic Alternatives and the Commencement of These Chapter 11 Cases.**

Since recognizing its potential liquidity challenges, the Company has proactively pursued a broad range of potential strategic transactions to address its continuing liquidity needs.

1. <u>The Extensive Prepetition Sale Processes</u>.

The Debtors have spent the majority of the last two years marketing their assets. In August 2022, the Company retained Piper Sandler & Co. ("Piper Sandler") to explore a potential sale of the Company's CAD Assets. That marketing process ultimately failed to produce an actionable proposal.

Simultaneously, the Company engaged in discussions with potential buyers for its Cable business and in November 2022, after months of discussions, received a non-binding indication of interest ("IOI") from one such potential buyer. At that time, however, the Company chose to not pursue further discussions with the potential buyer.[11]

Subsequently, the Debtors launched a targeted sale process to explore a potential sale of the Debtors' Cable Assets. As part of this process, the Company contacted ten potential parties, with four such parties executing non-disclosure agreements. At the time the Company initially launched the Cable sale process, it had experienced a strong second quarter and was on track towards an annual revenue goal of $137 million. However, in late August 2023, annual Cable sales projections plummeted to approximately $80 million as a result of the industry-wide shifts discussed above. And while the Company did initially receive non-binding IOIs from three such parties, after revising its Cable forecast, two of such parties declined to continue in the process and the remaining party revised its IOI downward into a bid that the Debtors ultimately determined, in their business judgment, was not an actionable proposal.[12]

In October 2023 the Debtors launched a second sale process to explore the sale of its CAD business with the assistance of the former CEO of NetComm to specifically target Australian-based buyers. After contacting ten additional potential buyers, eight signed nondisclosure agreements and engaged in review of due diligence, and two subsequently submitted IOIs. In November 2023, the Company signed an exclusivity agreement with one of the potential buyers, but the potential buyer dropped out of the process soon thereafter due to declines in 2024 projected

---

[11] Additionally, over the last several months, as the Company has further endeavored to improve its liquidity situation, it has maintained an open line of communication with an ad hoc group of the Prepetition Lenders (the "Ad Hoc Group"). In doing so, the Company has provided the Ad Hoc Group with comprehensive updates regarding its financial forecasts, business, and the potential sale processes, enabling the Company and the Ad Hoc Group to have fruitful discussions regarding next steps. Following the execution of the Superpriority Credit Agreement, many of these discussions focused on the sale of the CAD business, the stabilization of the Cable business, and the opportunity for growth in the Cloud and RAN sectors.

[12] Despite the initial response from the aforementioned potential bidders, the Company remained optimistic that it could consummate a sale of its Cable business when one of the parties who had previously been contacted as part of the initial marketing process decided to reengage in mid-October 2023. Over the immediately following several weeks, the Company engaged in significant negotiations with such party and provided a substantial amount of due diligence, including participating in management meetings and attending myriad diligence meetings and calls. Ultimately, however, the interested party declined to submit a further proposal.

revenues.  Subsequently, the Debtors contacted another potential buyer who had submitted an IOI, and the parties entered into an exclusivity agreement and engaged in extensive negotiations.  After several weeks of diligence and negotiations, on February 23, 2024, this potential buyer significantly decreased the proposed purchase price, and ultimately dropped out of the process.  In light of this development, the Debtors continued efforts to market the CAD business and, on February 29, 2024, received an additional non-binding IOI from a potential purchaser.  After further discussions with such purchaser, however, the Debtors, in consultation with their advisors, determined that the IOI was not an actionable proposal.  Accordingly, in the absence of an actionable proposal to sell the CAD Assets, and in light of the immediate funding needs to operate the CAD business as a going concern and the Company's overall liquidity challenges, on March 11, 2024, the director(s) of the NetComm Entities, in consultation with the Debtors and their respective advisors, commenced VA Proceedings in Australia with respect to the NetComm Entities.[13]

In connection with the VA Proceedings, the Administrators are conducting a sale process for the NetComm Entities and/or their business assets and several interested parties, including both strategic and financial purchasers, have expressed interest in the entities and/or assets.  The Administrators expect that the sale process will be complete in approximately eight to ten weeks.  The Administrators are working closely with the NetComm team in Australia and have advised the Company that they will operate the business for a period of time while they explore a going-concern transaction, which should result in limited disruption for the employees of the NetComm Entities.

Additionally, in the months prior to the commencement of these Chapter 11 Cases, the Debtors continued their ongoing marketing processes, and with the assistance of Ducera Partners LLC ("Ducera"), contacted a targeted number of third parties about potential interest in a sale transaction that could, in the Debtors' determination, in consultation with their advisors, be consummated on the timeline dictated by the Debtors' declining liquidity position.  This outreach effort included parties who were interested in buying substantially all of the Debtors' assets as well as those who expressed interest in a more limited scope of assets.  During this time, the Debtors ultimately held substantive discussions with more than 26 parties in connection with potential sale transactions and the Debtors' management team, along with Ducera, engaged in dozens of diligence sessions and other transaction-related conversations with eight parties which expressed a more significant level of interest and requested such further information.  Additionally, the Debtors' management team conducted informal outreach and conversations with a significant number of additional interested parties.  These discussions bore significant fruit as the Debtors secured (i) a purchaser for its Cloud/RAN businesses, which proved critical in garnering the Ad Hoc Group's support for these Chapter 11 Cases and the postposition marketing process to be pursued during such cases, and (ii) a stalking horse bid for its Cable business.

---

[13] In the VA Proceedings there is a moratorium on the enforcement of claims against the NetComm Entities and that certain administrators (the "Administrators") are appointed to manage and/or sell the CAD Assets for the benefit of the NetComm Entities' stakeholders.  The Prepetition Superpriority Lenders have a security interest in substantially all of the assets of the NetComm Entities, which are guarantors under the Superpriority Credit Agreement.  Accordingly, any sale of the NetComm Entities and/or their assets will largely accrete to the benefit of the Prepetition Lenders in partial satisfaction of their funded debt Claims against the Company.

The Debtors intend to build upon their prepetition efforts by publicly marketing their assets. Ducera will immediately launch a postpetition marketing process, by contacting key parties from the prepetition processes as well as additional potential purchasers, including those who may be interested in only certain business segments or a subset of the Assets. Pursuant to the Bidding Procedures, the Debtors intend to further market the Assets to potential buyers and facilitate access to diligence materials. Such materials include details of the proposed Bidding Procedures, a non-confidential presentation and, for those executing a non-disclosure agreement with the Debtors, access to a virtual data room (the "Data Room"), confidential presentation materials and, as appropriate, meetings with management. This postpetition marketing process for the Assets will include a broader universe of potential buyers due to the public nature of the Bidding Procedures and the ability to sell the Assets free and clear of claims and interests and provides the best path forward to consummating one or more value-maximizing transactions. This path contemplates the closing of a sale of the Debtors' Cloud/RAN assets within the first approximately 21 days of these Chapter 11 Cases, the proceeds of which will fund the remainder of the cases, including the postpetition marking process.

Given the Debtors' liquidity situation and the robust prepetition marketing process, the Debtors have determined that their best opportunity to maximize the value of their Estates for the benefit of all the Debtors' stakeholders relies on their ability to expeditiously complete the Sale Transactions in a manner that minimizes administrative expenses. Therefore, the expedited, efficient sale process is necessary to maximizing value for all stakeholders.

2.      Restructuring Negotiations with Key Stakeholders.

Recognizing the urgency of the intensifying liquidity crisis in the fall of 2023, the Company engaged certain restructuring advisors to further evaluate the situation and assist holistic with a restructuring transaction, including Ducera, Sidley Austin LLP ("Sidley"), and Alvarez and Marsal North America, LLC ("A&M" and, together with Ducera, and Sidley, the "Restructuring Advisors").

On December 21, 2023, Casa appointed Harvey L. Tepner as an independent director (the "Independent Director") of its board of directors (the "Board") and, on February 9, 2024, established an independent committee (the "Transaction Committee") of its Board, with the Independent Director as the sole member, to supplement its ongoing efforts to formally investigate and explore options related to its capital structure, liquidity, debt restructuring, and sale opportunities. Given the Debtors' liquidity position, the Board also instructed the Debtors' management team and advisors to begin contingency planning efforts in parallel with the continuing discussions with potential purchasers regarding a potential strategic transaction.

Over the past several months, the Debtors and their management team and advisors evaluated various strategic options, including both in-court and out-of-court solutions. The Debtors engaged in extensive discussions with the Ad Hoc Group and other parties regarding potential transactions. These potential transactions included both in-court and out-of-court sales as well as potential reorganization/equitization transactions. Ultimately, the Debtors were able to successfully negotiate an RSA with the Consenting Term Loan Lenders, who support a sale of the Debtors' assets and a prompt confirmation of the Plan that ensures the continued operation of the

Debtors' businesses during the marketing process and ultimately a winddown of the Debtors' estates.

In connection with the foregoing, prior to the commencement of these Chapter 11 Cases the Company secured a purchaser for its Cloud/RAN assets and a stalking horse bidder for its Cable business, the latter of which will be subject to a competitive marketing an auction process during the cases in order to maximize the value of the Debtors' assets.

3.    The Restructuring Support Agreement.

As a result of the extensive engagement between the Debtors and the Ad Hoc Group, the Debtors were successfully able to negotiate an RSA[14] with the Ad Hoc Group, who support a sale of the Debtors' assets and a prompt confirmation of the Plan in accordance with the milestones set forth in the RSA, that ensures the continued operation of the Debtors' businesses during the marketing process and ultimately a wind-down of the Debtors' Estates.

Under the RSA, each Consenting Term Loan Lender has agreed to, among other things, and as further provided in the Restructuring Support Agreement, to support the Restructuring Transactions (as defined in the RSA) and vote and use commercially reasonable efforts to exercise any powers or rights available to it in each case in favor of any matter requiring approval to the extent reasonably requested and necessary to implement the Restructuring Transactions.

In furtherance of the Restructuring Transactions contemplated in the RSA, the Debtors have agreed to, among other things, implement the Restructuring in accordance with the milestones set forth in Section 4 of the RSA, including, without limitation, the following milestones:

(a)    no later than April 3, 2024, the Debtors shall have filed the Plan, the Disclosure Statement, the First Day Pleadings (including a motion seeking entry of the Cash Collateral Order), the Solicitation Procedures Motion, the Bar Date Motion, the Bidding Procedures Motion, and the Private Sale Motion;

(b)    no later than April 5, 2024, the Bankruptcy Court shall have entered the interim Cash Collateral Order;

(c)    no later than April 23, 2024, the Debtors shall have filed their schedules of assets and liabilities and statements of financial affairs;

(d)    no later than April 24, 2024, the Bankruptcy Court shall have entered the Private Sale Order, the final Cash Collateral Order, the Solicitation Procedures Order, and the Bar Date Order;

(e)    no later than April 26, 2024, the Debtors shall have commenced solicitation of votes to accept or reject the Plan;

---

[14] That certain Restructuring Support Agreement, dated April 2, 2024, attached to the Durkin Declaration as **Exhibit B** (the "Restructuring Support Agreement" or "RSA").

(f)      no later than May 10, 2024, the Debtors shall have filed the Plan Supplement;

(g)      no later than May 31, 2024, the Bankruptcy Court shall have held a hearing on confirmation of the Plan and approval of any Sale Transaction;

(h)      no later than May 31, 2024, the Bankruptcy Court shall have entered the Confirmation Order, an order granting final approval of the Disclosure Statement and the Sale Order approving the sale of the Cable Assets; and

(i)      no later than June 6, 2024, the Plan Effective Date shall have occurred and the Sale Transactions shall have closed.

## ARTICLE IV.
## EVENTS DURING CHAPTER 11 CASE

### A.      Commencement of the Chapter 11 Cases and the Debtors' Professionals.

On April 3, 2024 (the "Petition Date"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

The Debtors are seeking retention of Epiq as its Notice and Claims Agent, effective as of the Petition Date.  The Debtors intend to additionally seek the retention of Sidley Austin LLP and Young Conaway Stargatt & Taylor, LLP as counsel to the Debtors, A&M as financial advisor, and Ducera as investment banker.

### B.      First Day Relief.

On or soon after the Petition Date, the Debtors filed a number of motions and other pleadings (collectively the "First Day Motions") to ensure an orderly transition into chapter 11, including the following:

- motion to jointly administer these Chapter 11 Cases for procedural purposes only;

- motion to authorize the Debtors to use cash collateral, and grant adequate protection (the "Cash Collateral Motion");

- motion relating to the continued use of the Debtor's existing cash management system and certain related relief;

- motion for authority to pay certain prepetition employee-related obligations and certain related relief;

- motion for authority to pay certain prepetition taxes and fees and certain related relief;

- motion to establish procedures for determining adequate assurance for the provision of utility services and to prohibit utility service providers from altering, refusing, or discontinuing service and certain related relief;

- motion for authority to maintain certain insurance policies and programs, to honor insurance obligations and for certain related relief;

- motion for authority to pay certain critical vendors and other priority claimants;

- motion to authorize the Debtor to redact certain personally identifiable information and waive the requirements to file a list of all equity security holders;

- motion for entry of an order scheduling a combined Disclosure Statement approval and Plan confirmation hearing, conditionally approving the Disclosure Statement, establishing a Plan and Disclosure Statement objection deadline and related procedures, approving the solicitation procedures, approving the Combined Notice, and granting related relief (the "Combined Hearing Motion"); and

- application to retain Epiq as the Debtors' Notice and Claims Agent.

The Debtors are seeking the entry of orders granting the relief requested in the First Day Motions on an interim or final basis, as applicable, at the earliest such matters may be heard by the Bankruptcy Court.

### C.    The Proposed Bidding Procedures and Cloud/RAN Sale Motion.

On or soon after the Petition Date, the Debtors filed a motion (the "Cloud/RAN Sale Motion") seeking approval of the private sale of the Company's Cloud and RAN assets.

In addition, the Debtors filed a combined motion (the "Bidding Procedures Motion") seeking approval of the bidding procedures (the "Bidding Procedures") and a purchase agreement for the Cable assets (the "Cable Stalking Horse APA").  As more fully described in the Bidding Procedures Motion, the Bidding Procedures contain provisions relating to, among other things, (a) participation requirements, (b) access to due diligence, (c) Bid Requirements (as defined in the Bidding Procedures Motion), (d) designation of Qualified Bidders (as defined in the Bidding Procedures Motion), (e) credit bids, (f) auction procedures (as applicable); and (g) the selection of the Successful Bid, Back-Up Bid, or Stalking Horse Bid (each as defined in the Bidding Procedures Motion).

The Bidding Procedures Motion and the Cloud/RAN Sale Motion provide for the following proposed sale timelines:

| Date | Deadline/Event |
| --- | --- |
| April 24, 2024, at a time TBD | Cloud/RAN Sale Hearing; and Cable Bidding Procedures Hearing |
| April 24, 2024 | Potential Assumption and Assignment Notice Filing Deadline |
| April 25, 2024 | Cloud/RAN Sale Close |
| May 8, 2024 at 4:00 p.m. (ET) | Cure, Contract, and Sale Objection Deadline |
| May 13, 2024, at 4:00 p.m. (ET) | Cable Bid Deadline |

| Date | Deadline/Event |
|------|----------------|
| May 14, 2024 | Deadline for Debtors to notify Potential Bidders of whether their Bids are Qualified Bids |
| May 15, 2024, starting at 10:00 a.m. (ET) | Cable Auction (if necessary) |
| May 24, 2024, at 4:00 p.m. (ET) | Adequate Assurance Objection Deadline |
| May 29, 2024 | Sale Objection Reply Deadline |
| May 31, 2024, at a time TBD | Cable Sale Hearing |
| On or prior to June 6, 2024 | Cable Sale Closing |

**D.      Bar Dates.**

On the Petition Date, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form And Manner of Notice Thereof* (the "Bar Date Motion").  The Debtors seek to establish the following Bar Dates as requested by the Debtors:

- *General Bar Date* as of 11:59 p.m. (prevailing Eastern Time) on May 24, 2024.

- *Governmental Bar Date* as of 11:59 p.m. (prevailing Eastern Time) on September 29, 2024.

- *Rejection Damages Bar Date* as the later of (i) the General Bar Date, and (ii) 11:59 p.m., prevailing Eastern Time, on the date that is thirty (30) days after the later of (A) entry of an order approving the rejection of any executory contract or unexpired lease of the Debtors and (B) the effective date of a rejection of any executory contract or unexpired lease of the Debtors pursuant to operation of any Court order.

- *Amended Schedules Bar Date* as the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, to such claim, and (ii) 11:59 p.m., prevailing Eastern Time, on the date that is twenty-one (21) days from the date on which the Debtors provide notice of the amendment to the Schedules.

**E.      Proposed Confirmation Schedule.**

Pursuant to the Combined Hearing Motion, the proposed schedule and deadlines for Confirmation include:

| Date and Time (prevailing Eastern Time) | Event of Deadline |
|---|---|
| April 22, 2024 | Voting Record Date |
| April 26, 2024 | Solicitation Commencement Date |
| May 24, 2024 at 5:00 p.m., ET | Voting Deadline |
| May 24, 2024 at 5:00 p.m., ET | Release Opt-Out Deadline |
| May 24, 2024 at 5:00 p.m., ET | Objection Deadline |
| May 31, 2024 pending Court availability | Combined Hearing |

# ARTICLE V.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.      Administrative Claims, Priority Tax Claims, and Statutory Fees.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article II of the Plan.

1.      <u>Administrative Claims</u>.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, (1) Cash in an amount equal to such Allowed Administrative Claim in accordance with the following: (i) if Allowed on or prior to the Effective Date, then on the Effective Date or as soon as reasonably practicable thereafter, (ii) if not Allowed as of the Effective Date, then no later than forty-five (45) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; or (2) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

Except for Professional Fee Claims, and notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Claims must be Filed and served on the Debtors or the Plan Administrator (as applicable) and their counsel by no later than the Administrative Claims Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date.  The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claims.

Except as otherwise provided in Articles II.B, II.C, or II.D of the Plan, holders of Administrative Claims that do not File and serve a Proof of Claim or application for payment of administrative expenses requesting the allowance of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors, the Plan Administrator, the Estates, or the Debtors' assets and properties, and any Administrative Claims shall be deemed disallowed as of the Effective Date unless otherwise ordered by the Bankruptcy Court.

2.      <u>Professional Fee Claims</u>.

All Professional Persons (other than OCPs) seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (1) file, on or before the date that is forty-five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred; and (2) be paid in full, in Cash, from the Professional Fee Reserve Account in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. Objections to Professional Fee Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Fee Claim.

All requests for payment of Professional Fee Claims of OCPs shall be made pursuant to the OCP Order.  To the extent any Professional Fee Claims of the OCPs have not been Allowed pursuant to the OCP Order on or before the Effective Date, the amount of Professional Fee Claims owing to the OCPs shall be paid in Cash to such OCPs by the Debtor or the Plan Administrator (as applicable) from the Professional Fee Reserve Account as soon as reasonably practicable after such Professional Fee Claims are Allowed pursuant to the OCP Order.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Plan Administrator (as applicable) shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Plan Administrator (as applicable).  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Plan Administrator (as applicable) may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors and the Ad Hoc Group Advisors no later than two (2) Business Days before the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professionals' final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors may, in consultation with the Ad Hoc Group Advisors, estimate the unpaid and unbilled fees and expenses of such Professional.  The Debtors shall fund and reserve the Professional Fee Reserve Account until payment in full of all Allowed Professional Fee Claims. If the Professional Fee Reserve Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims shall be paid by the Plan Administrator as Allowed Administrative Claims.  For the avoidance of doubt, the Professional Fee Reserve Account cannot be used to pay any Secured, Priority, or Administrative Claims until all Professional Fee Claims are satisfied or otherwise reserved for.

3.      <u>Priority Tax Claims</u>.

On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed Priority Tax Claim and the Debtors agree, with the consent of the Required Consenting Term Loan Lenders (such consent not to be unreasonably withheld or delayed), to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Priority Tax Claim, each Holder thereof will be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

4.      <u>U.S. Trustee Statutory Fees</u>.

All Quarterly Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date any Disbursing Agent shall be jointly and severally liable to pay all Quarterly Fees when due and payable. The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Debtors, and any entity making disbursements on behalf of any Debtor, or making disbursements on account of an obligation of any Debtor, shall file with the Bankruptcy Court separate UST Form-11 PCR reports when they become due.

**B.      Classification of Claims and Interests.**

Except for the Claims addressed in Article III of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Class to the extent that any portion of the Claim or Interest qualifies within the description of such other Class. A Claim also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been otherwise paid, released, or satisfied at any time.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Term Loan Facility Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### C.    Treatment of Claims and Interests.

1.    <u>Class 1 – Other Secured Claims.</u>

i.    *Classification*:  Class 1 consists of all Other Secured Claims against the Debtors.

ii.    *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtors (with the consent of the Required Consenting Term Loan Lenders, such consent not be unreasonably withheld or delayed) agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Secured Claim, each Holder thereof will receive:  (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) reinstatement of such Claim; or (d) such other treatment rendering such Claim Unimpaired.

iii.    *Voting*:  Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Priority Claims.</u>

i.    *Classification*:  Class 2 consists of all Other Priority Claims against the Debtors.

ii.    *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtors  (with the consent of the Required Term Loan Lenders, such consent not to be unreasonably withheld or delayed) agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Priority Claim, each Holder thereof will receive:  (a) payment in full in Cash; or (b) such other treatment rendering such Claim Unimpaired.

iii.    *Voting*:  Class 2 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy

Code.  Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

      3.      <u>Class 3 – Term Loan Facility Claims.</u>

      i.      *Classification*:  Class 3 consists of all Term Loan Facility Claims.

      ii.      *Allowance*:  Term Loan Facility Claims shall be deemed Allowed in the principal amount outstanding under the Term Loan Credit Agreements (including all accrued and unpaid interest as of the Petition Date).

      iii.      *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of a Term Loan Facility Claim and the Debtors (with the consent of the Required Consenting Term Loan Lenders, such consent not to be unreasonably withheld or delayed) agree to less favorable treatment for such Holder, in full and final satisfaction of the Term Loan Facility Claim, each Holder thereof will receive its *pro rata* share of the Term Loan Recovery.

      iv.      *Voting*:  Class 3 is Impaired, and Holders of Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

      4.      <u>Class 4 – General Unsecured Claims.</u>

      i.      *Classification*:  Class 4 consists of the General Unsecured Claims against the Debtors.

      ii.      *Treatment*:  Except as otherwise set forth in the Plan, on the Effective Date, all General Unsecured Claims shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Claims shall not receive any distribution, property, or other value, under the Plan on account of such Claims. Notwithstanding the foregoing, to the extent there are any Net Distributable Proceeds, each holder of a General Unsecured Claim shall receive its *pro rata* share of the Net Distributable Proceeds.

      iii.      *Voting*:  Class 4 is Impaired, and Holders of General Unsecured Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 4 General Unsecured Claims are not entitled to vote to accept or reject the Plan.[15]

      5.      <u>Class 5 – Intercompany Claims.</u>

      i.      *Classification*:  Class 5 consists of the Intercompany Claims between and among the Debtors.

      ii.      *Treatment*:  On the Effective Date, all Intercompany Claims shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and

---

[15] As of the date hereof, Holders of Class 4 General Unsecured Claims are expected to receive no recovery and are thus presumed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Holders of such Claims shall not receive any distribution, property, or other value under the Plan on account of such Claims.

          iii.    *Voting*:  Class 5 is Impaired, and Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject the Plan.

          6.        <u>Class 6 – Section 510(b) Claims.</u>

          i.    *Classification*:  Class 6 consists of Section 510(b) Claims against the Debtors.

          ii.    *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Claims shall not receive any distribution, property or other value under the Plan on account of such Claims.

          iii.    *Voting*:  Class 6 is Impaired, and Holders of General Unsecured Claims are conclusively deemed to Class 6 is Impaired, and Holders of Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 6 Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

          7.        <u>Class 7 – Existing Equity Claims.</u>

          i.    *Classification*:  Class 7 consists of all Existing Equity Interests Claims between and among the Debtors.

          ii.    *Treatment*:  On the Effective Date, all Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Existing Equity Interests shall not receive any distribution, property or other value under the Plan on account of such Interest.

          iii.    *Voting*:  Class 7 is Impaired, and Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Existing Equity Interests are not entitled to vote to accept or reject the Plan.

          8.        <u>Class 8 – Intercompany Interests.</u>

          i.    *Classification*:  Class 8 consists of all Intercompany Interests in the Debtors.

          ii.    *Treatment*:  On the Effective Date, all Intercompany Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Intercompany Interests shall not receive any distribution, property, or other value under the Plan on account of such Interest.

iii.     *Voting*:  Class 8 is Impaired, and Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 8 Intercompany Interests are not entitled to vote to accept or reject the Plan.

**D.     Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator with respect to any Unimpaired Claims, including all legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**E.     Elimination of Vacant Classes.**

Any Class that, as of the commencement of the Combined Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**F.     Voting Class, Presumed Acceptance by Non-Voting Classes.**

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

**G.     Controversy Concerning Impairment.**

If a controversy arises as to whether any Claim or any Class of Claims is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Combined Hearing.

**H.     Subordination of Claims.**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Plan Administrator (as applicable) reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**I.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by the Class entitled to vote pursuant to this Article III of the Plan.  The Debtors hereby request confirmation of the Plan under section 1129(b) of the Bankruptcy Code

with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plans.

### J.    Insurance.

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

## ARTICLE VI.
## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    General Settlement of Claims and Interests.

Pursuant to section 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

### B.    Restructuring Transaction.

On or before the Effective Date, the Debtors or the Plan Administrator shall enter into and take any actions that may be necessary or appropriate to effectuate the Sale Transactions or the Wind-Down of the Debtors, as applicable, including but not limited to:  (1) the execution and delivery of appropriate agreements or other documents of consolidation, conversion, disposition, transfer, or dissolution containing terms that are consistent with the terms of the Plan and the RSA and that satisfy the requirements of applicable law; (2) the execution and delivery of any appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, duty, or obligation on terms consistent with the Plan and the RSA; (3) the filing of appropriate documents with the appropriate governmental authorities pursuant to applicable law; and (4) any and all other actions that the Debtors or the Plan Administrator determine are necessary or appropriate to effectuate the Plan.

Subject to the terms of the RSA, the Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

1.    <u>Sale Transactions.</u>

The Debtors shall engage in a process for the sale of all or substantially all of their assets. The Debtors shall seek the approval of the Sale Orders, which shall approve the sale of all or substantially all of the Debtors' assets to one or more purchasers, including the Cloud/RAN Purchaser pursuant to the Cloud/RAN APA, and the Cable Stalking Horse Bidder pursuant to the Cable Stalking Horse APA, or, if such higher or better bids are received consistent with the Bidding Procedures Order, to the Purchaser pursuant to the highest or best bidder.

The Debtors do not anticipate any Net Distributable Proceeds from the Sale Transactions and the liquidation of the Net Distributable Assets.  If, however, Net Distributable Proceeds occur as a result the Sale Transactions and the liquidation of the Net Distributable Assets, the Debtors will distribute such Net Distributable Proceeds, on a *pro rata* basis, according to the Distribution Waterfall.

2.    Wind-Down.

Following the Effective Date and subject to the Wind-Down Budget, the Plan and the Plan Administrator Agreement, the Plan Administrator shall wind-down the affairs and operations of the Debtors, their Estates, and their Affiliates, as applicable, including, but not limited to: (i) expeditiously and efficiently liquidating the Net Distributable Assets, if any, including, if appropriate, through the prosecution of any Claims or Causes of Action of the Debtors preserved under the terms of the Plan; (ii) distributing the proceeds thereof to the Holders of Term Loan Facility Claims, or, if applicable, distributing the Net Distributable Proceeds, if any, according to the Distribution Waterfall; and (iii) commencing one or more insolvency proceedings with respect to certain of the Debtor Affiliates in applicable foreign jurisdictions.

The responsibilities and authority of the Plan Administrator shall include the following rights and responsibilities:   (i) preserving and liquidating the Net Distributable Assets; (ii) administering and paying taxes, including, among other things, (a) filing tax returns (to the extent not the obligation of any Purchaser), and (b) representing the interest and account of the Debtors before any taxing authority in all matters; (iii) retaining and paying, without the need for retention or fee applications, professionals in connection with the Plan Administrator's performance of its duties under the Plan; (iv) distributing information statements as required for U.S. federal income tax and other applicable tax purposes; (v) Filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases; (vi) making distributions to Professionals for Allowed Professional Fee Claims from the Professional Fee Reserve Account; (vii) making distributions to Holders of Term Loan Facility Claims pursuant to the Plan as promptly as practicable; (viii)  making distributions of the Net Distributable Proceeds, if any, according to the Distribution Waterfall; (ix) procuring the necessary insurance to facilitate the Wind-Down, including appropriate D&O Liability Insurance Policies;  and (x) such other responsibilities as may be vested in the Plan Administrator pursuant to the Plan or an order of the Bankruptcy Court (including, without limitation, the Confirmation Order), or as may be necessary and proper to carry out the provisions of the Plan.

**C.    Sources of Consideration for Plan Distributions.**

Subject to the terms of the Plan, including the provisions concerning the Professional Fee Reserve Account and the Wind-Down Budget, the Debtors or the Plan Administrator (as

applicable) shall fund distributions under the Plan with the proceeds from the Sale Transactions and the Net Distributable Proceeds, if any, all in accordance with the terms of the Plan.

### D.    Vesting of Assets.

Except as otherwise provided in the Plan or the Sale Orders, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Net Distributable Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests. Subject to the terms of the Plan, on or after the Effective Date, the Plan Administrator may use, acquire, and dispose of the Net Distributable Assets, and may prosecute, compromise, or settle any Claims and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

### E.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors that are not otherwise (i) transferred or sold pursuant to the Sale Transactions or (ii) waived, relinquished, exculpated, released, compromised or settled pursuant to the Cash Collateral Order, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX hereof, which shall be deemed released and waived by the Debtors and the Plan Administrator as of the Effective Date. No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, including in Article IX of the Plan, the Sale Orders, the Cash Collateral Order, or an order of the Bankruptcy Court, the Debtors and the Plan Administrator, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation and Consummation of the Plan.

### F.    Corporate Action.

On the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall be dissolved for all purposes unless the Plan Administrator determines that dissolution can have any adverse impact on the Net Distributable Assets; *provided*, that neither the Debtors nor any party released pursuant to Article IX of the Plan shall be responsible for any liabilities that may arise as a result of non-dissolution of the Debtors; *provided further*, that nothing in the Plan shall be construed as relieving the Debtors or the Plan

Administrator (as applicable) of their duties to pay Quarterly Fees as required by the Bankruptcy Code and applicable law until such time as a final decree is entered in the Debtors' Chapter 11 Cases or the cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code. The Plan Administrator shall submit with the appropriate governmental agencies a copy of the Confirmation Order, which Confirmation Order shall suffice for purposes of obtaining a Certificate of Dissolution from the Delaware Secretary of State.

Without limiting the foregoing, on the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan, and the directors and officers of the Debtors shall be deemed to have resigned and the employees of the Debtors terminated. From and after the Effective Date, the Plan Administrator shall be authorized to act on behalf of the Estates, provided that the Plan Administrator shall have no duties other than as expressly set forth in the Plan or the Confirmation Order.

G.     **Cancellation of Existing Securities and Agreements.**

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, the Term Loan Credit Agreements and all agreements, instruments, notes, certificates, indentures, mortgages, securities and other documents evidencing any Claim or Interest, and any rights of any Holder in respect thereof, shall be deemed cancelled and of no further force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Plan Administrator. The holders of or parties to such cancelled instruments, securities, and other documentation shall have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, including the right of a Holder of Term Loan Facility Claims to receive distributions on account of its Claims.

H.     **Effectuating Documents; Further Transactions.**

Upon entry of the Confirmation Order, subject to the terms of the RSA, the Debtors or the Plan Administrator (as applicable) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan. Subject to the terms of the RSA, the Debtor, the Plan Administrator, all Holders of Claims receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate actions required by the Debtors in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors or the Plan Administrator.

I.       **Section 1146 Exemption from Certain Taxes and Fees.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan or the Sale Transactions shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall comply with the requirements of section 1146(c) of the Bankruptcy Code and forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation all such instruments or other documents governing or evidencing such transfers without the payment of any such tax, recordation fee, or governmental assessment.

J.       **Sale Orders.**

Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall affect, impair or supersede the Sale Orders or Sale Documents, each of which will remain in full force and effect and governs in the event of any inconsistency with the Plan.

K.       **Authority to Act.**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, security holders, officers, directors, or other owners of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to the applicable law of the state(s) in which the Debtors are formed, without any further vote, consent, approval, authorization, or other action by such stockholders, security holders, officers, directors, or other owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

L.       **Separate Plans.**

Notwithstanding the combination of separate plans of liquidation for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

M.       **Plan Administrator.**

The Plan Administrator shall be appointed by the Debtors, with the consent of the Required Consenting Term Loan Lenders (such consent not to be unreasonably withheld or delayed). Once appointed, the identity of the Plan Administrator shall be disclosed in the Plan Supplement. The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to effectuate the Wind-Down. As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with,

and abide by, the terms of the Plan and take any actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Except to the extent necessary to complete the Wind-Down of any remaining assets or operations from and after the Effective Date, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state or province in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal and (2) shall be deemed to have canceled pursuant to the Plan all Interests.

On and after the Effective Date, the Plan Administrator shall have all direct and indirect governance powers with respect to each of the Debtors.  The Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the persons acting as directors and officers of the Debtors shall be deemed to have been resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, or sole officer, as applicable, of the Debtors and shall succeed to the powers of the Debtors' directors and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors.  For the avoidance of doubt, the foregoing shall not limit the authority of the Debtors or the Plan Administrator, as applicable, to continue the employment of any former manager or officer, including pursuant to any transition services agreement entered into in connection therewith.

## ARTICLE VII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

Indemnification Obligations, the D&O Liability Insurance Policies, and the Employment Agreements), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court or not included on the Schedule of Assumed Executory Contracts and Unexpired Leases, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than those Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Confirmation Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Documents or the Plan, and payment of any cure amounts relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties unless a Proof of Claim is Filed with the Notice and Claims Agent and served upon counsel to the Plan Administrator within thirty (30) days of the Effective Date.

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable.  Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions of the Plan.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed within thirty (30) days of the Effective Date will be disallowed automatically, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties.**

**C.      Reservation of Rights.**

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors, the Plan Administrator, or their respective affiliates has any liability thereunder.  Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Plan Administrator under any executory or non-executory contract or unexpired or expired lease.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Plan Administrator, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnity or continued maintenance obligations.

E.      **Indemnity Obligations.**

Each of the Debtors' Indemnification Obligations shall not be discharged, impaired, or otherwise affected by the Plan.  The Indemnification Obligations shall be deemed Executory Contracts assumed or assumed and assigned by the Debtors under the Plan.

F.      **D&O Liability Insurance Policies.**

Each D&O Liability Insurance Policy to which the Debtors are a party as of the Effective Date shall be deemed an Executory Contract and shall be automatically assumed or assumed and assigned by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code.  For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

G.      **Employment Agreements.**

Any Employment Agreement not assumed and assigned pursuant to the Sale Documents as part of the Sale Transactions shall be assumed by the Plan Administrator on the Effective Date of the Plan.

H.      **Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

I.      **Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

J.      **Employee Compensation and Benefits.**

All employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are

deemed to be, and shall be treated as, Executory Contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**A.**    **Conditions Precedent to the Effective Date.**

The occurrence of the Effective Date of the Plan is subject to each of the following conditions precedent:

1.    The Bankruptcy Court shall have entered an order, in form and substance consistent with the RSA, including the consent rights of the Required Consenting Term Loan Lenders contained in the RSA, approving the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.    The Plan, the Disclosure Statement and the other Definitive Documents, and all other documents contained in any Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein, shall be in full force and effect and in form and substance consistent with the RSA, including the consent rights of the Required Consenting Term Loan Lenders contained in the RSA.

3.    The RSA shall not have been terminated, and shall remain in full force and effect, and no event or occurrence shall have occurred that, with the passage of time or the giving of notice, would give rise to the right of the Required Consenting Term Loan Lenders to terminate the RSA.

4.    The Bankruptcy Court shall have entered the Confirmation Order, in form and substance consistent with the RSA, including the consent rights of the Required Consenting Term Loan Lenders contained in the RSA, which shall have become a Final Order or as to which any stay of the Confirmation Order pursuant to any Bankruptcy Rule is waived by the Bankruptcy Court.

5.    Any applicable Sale Transactions shall have closed, and the Debtors shall have received the Sale Proceeds.

6.    The Debtors shall have implemented the Restructuring Transactions and all other transactions contemplated in the RSA and the Plan to be implemented on or before the Effective Date, in a manner consistent with the RSA, including the consent rights of the Required Consenting Term Loan Lenders contained in the RSA.

7.    The Professional Fee Reserve Account shall have been fully funded pursuant to the terms of the Plan.

8.    All reasonable and documented fees and expenses of the Ad Hoc Group Advisors and the Prepetition Agents shall have been paid in full in Cash as provided in the RSA or the Cash Collateral Order, as applicable.

9.      The Wind-Down Budget shall not exceed the Wind-Down Amount, and the Priority Claims Amount shall not exceed the Priority Claims Amount Cap.

10.      The Plan Administrator shall have been appointed, with the consent of the Required Consenting Term Loan Lenders (such consent not to be unreasonably withheld or delayed), and accepted his or her appointment, and the Plan Administrator Agreement shall have been executed and delivered, in form and substance consistent with the RSA, including the consent rights of the Required Consenting Term Loan Lenders contained in the RSA.

11.      All requisite filings with governmental authorities and third parties shall have become effective, and all such governmental authorities and third parties shall have approved or consented to the Restructuring Transaction, to the extent required.

12.      All documents contemplated hereby to be executed and delivered on or before the Effective Date shall have been executed and delivered in form and substance consistent with the terms of the RSA, including the consent rights of the Required Consenting Term Loan Lenders contained in the RSA.

13.      All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

## B.      Waiver of Conditions.

Unless otherwise specifically provided for in the Plan, the conditions set forth in Article VIII.A. may be waived, in whole or in part, in writing by the Debtors and the Required Consenting Term Loan Lenders, without notice to any other parties in interest or the Bankruptcy Court and without a hearing.

## ARTICLE IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

## A.      Final Satisfaction of Claims and Termination of Interests.

**Pursuant to Bankruptcy Rule 9019 (as provided for in Article IV.A of the Plan) and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distribution, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims (including intercompany Claims resolved or compromised after the Effective Date by the Debtors), Interests, and Cause of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities, of Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to service performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-**

contingent liability on account of representation or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such Claim or Interest has accepted the Plan.

B.      Releases by the Debtors.

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is deemed to be conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, as applicable, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, their Estates or Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or their Estates, the purchase, sale, or recission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Disclosure Statement, the Sale Transactions, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Filing of the Chapter 11 Cases, the Cash Collateral Order, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for actual fraud, gross negligence, or willful misconduct as determined by a Final Order.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, and Restructuring Transactions, or any

document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article IX.B of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article IX.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests;
(4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

C.    Releases by Holders of Claims and Interests.

As of the Effective Date, for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Debtor and Released Party from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or their Estates, the purchase, sale, or recission of the purchase or sale of any security or asset of the Debtors or the Debtor Affiliates, including, for the avoidance of doubt, any sale of any of the CAD Assets, the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Restructuring Transactions, the Sale Transactions, the Chapter 11 Cases, any Non-Debtor Insolvency Proceedings, the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Disclosure Statement, the Sale Transactions, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the Filing of the Chapter 11 Cases, the Cash Collateral Order, the pursuit of Confirmation, the pursuit of Consummation, the

administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for actual fraud, gross negligence, or willful misconduct as determined by a Final Order; *provided* that any right to enforce the Plan and Confirmation Order is not so released.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, and Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article IX.C of the Plan, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article IX.C of the Plan is: (1) in exchange for good and valuable consideration provided by the Released Parties; (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or their Estates conveying direct or derivative standing to any person or entity to pursue any claim, Cause of Action, or liability against any Released Party, or to assert any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

D.      Exculpation.

Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, claim, or interest arising from the Petition Date and on or before the Effective Date for any (a) prepetition act or omission in connection with, relating to, or arising out of, formulating, negotiation, or preparing the Plan, or (b) postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transactions, the formulation, preparation, dissemination, negotiation, Filing, or consummation of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the commencement of any Non-Debtor Insolvency Proceeding, the consummation of any transactions pursuant to any Non-Debtor Insolvency Proceeding, any transactions arising out of or in connection with the sale of any of the CAD Assets, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, the administration of the Plan or property to be distributed hereunder, or any other postpetition act or omission in connection with, relating to, arising out of, or in contemplation of the restructuring of the Debtors, except actions determined by Final Order

to have constituted actual fraud, or gross negligence, or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; *provided* that nothing in Article IX.D of the Plan shall operate as a release, waiver, or discharge of any causes of action or liabilities unknown to such Entity as of the Petition Date arising out of gross negligence, willful misconduct, fraud, or criminal acts of any such Exculpated Party as determined by a Final Order.

E.    Injunction.

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims or interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), that have been released, settled, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, except to the extent such assertions are used as a defense to claims or Causes of Action by the Debtors arising prior to the Effective Date, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of claims and interests and their respective current and former employees, agents, officers, directors, principals, and direct

**and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or reinstatement of such Allowed Claim or Allowed Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article IX.E of the Plan.**

F.    **Setoffs.**

Except as otherwise expressly provided for in the Plan, each Debtor and the Plan Administrator (as applicable), pursuant to the Bankruptcy Code (including section 552 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or the Plan Administrator of any such claims, rights and Causes of Action that such Debtor or the Plan Administrator may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the applicable Debtor or the Plan Administrator unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.

G.    **Release of Liens.**

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors to evidence the release of such Lien, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

### H.   Recoupment.

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date.

<div align="center">

**ARTICLE X.**
**RISK FACTORS**

</div>

Prior to voting on the Plan, Holders of Claims in Class 3 as well as entities in non-voting Classes, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.  See Article XI of this Disclosure Statement for a discussion of certain tax law considerations.

### A.   Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

1.   <u>The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims</u>.

If the Restructuring Transaction is not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' Estates.  The terms of any alternative restructuring proposal may be less favorable to holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors.  For example, it would adversely affect:

- The Debtors' liquidity;

- How the Debtors' businesses are viewed by regulators, investors, lenders, and credit ratings agencies;

- The Debtors' enterprise value; and

- The Debtors' business relationships with customers and vendors.

2.     <u>Parties in Interest May Object to the Plan's Classification of Claims and Interests</u>.

There is no guarantee that the Bankruptcy Court will agree with the classification of Claims and Interests as proposed by the Plan. Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a claim or an equity interest in a particular class only if that claim or interest is substantially similar to the other claims or interests in that class. As is described herein, the Debtors believes that the Plan's classification of Claims and Interests complies with the requirements under the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.     <u>The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral</u>.

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection in accordance with the terms of the RSA. Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses and the Wind-Down may be impaired materially.

4.     <u>The RSA May Be Terminated</u>.

As more fully described in the RSA, the RSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones, and breaches by the Debtors and/or the Consenting Term Loan Lenders of their respective obligations under the RSA. Any such termination could result in the loss of the use of cash collateral by the Debtors under certain circumstances. In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative.

5.     <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur</u>.

As more fully set forth in Article VIII of the Plan, the confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan or be forced to pivot to a chapter 7 liquidation.

6.     <u>The Debtors May Fail to Satisfy the Vote Requirements</u>.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction, subject to the terms of the RSA. There can

be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

7.      The Debtors May Not Be Able to Secure Confirmation of the Plan.

There is no guarantee that the Plan will be confirmed.  If the Plan, or a substantially similar plan, is not confirmed, the terms and timing of any plan of liquidation ultimately confirmed in the Chapter 11 Case, and the treatment of Claims and Interest will be unknown.  In addition, if the Plan is not confirmed, a significant risk exists that the Chapter 11 Cases may be converted to cases under chapter 7.  In that event, the Debtors believe that creditor recoveries would be substantially diminished.

8.      The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

9.      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and (c) the likelihood that the asset would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than conducting the Sale Transactions in a controlled manner.

10.     The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the RSA.  The

estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

      11.    <u>Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan</u>.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

      12.    <u>Releases, Injunctions, and Exculpation Provisions May Not Be Approved</u>.

The Debtors understand that certain parties may believe that they have valid objections to the release and exculpation provisions in the Plan. The Debtors and the Consenting Term Loan Lenders believe that any such objection is without merit; however, in the event that such objection is sustained by the Bankruptcy Court and such release and/or exculpation provisions are modified or stricken from the Plan, the Consenting Term Loan Lenders may withdraw their support for the Plan, which may result in the Debtors being unable to confirm the Plan or any other chapter 11 plan.

**B.    Allowance of Claims.**

This Disclosure Statement has been prepared based on preliminary information concerning the Debtors' books and records. The actual amount of Allowed Claims may differ from the Debtors' current estimates.

**C.    Risks Related to Recoveries Under the Plan.**

      1.    <u>The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims</u>.

The distributions available to Holders of Allowed Claims in Class 3 under the Plan can be affected by a variety of contingencies, including, without limitation, the amount of Allowed Administrative Claims, Priority Tax Claims, Other Secured Claims, and Other Priority Claims,

thereby reducing the amount of distributions available for other Holders of Allowed Claims. The Debtors cannot determine with any certainty at this time the number or amount of such Claims that will ultimately be Allowed. Thus, the projected recoveries for Holders of Allowed Claims in Class 3 disclosed in this Disclosure Statement are highly speculative.

2.     Any Valuation of Any Assets to be Distributed Under the Plan Is Speculative.

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Holders of Allowed Claims in Class 3.

3.     The Debtors Cannot Guarantee the Timing of Distributions.

The timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

4.     Certain Tax Implications of the Debtors' Bankruptcy.

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences of Consummation of the Plan," for a description of certain tax implications of the Plan and the Debtors' Chapter 11 Cases.

**D.     Risks Related to the Debtors' Businesses.**

1.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to consummate the Restructuring Transactions will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transaction specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to enter into a value maximizing Sale Transaction; (d) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (e) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' Sale Transactions. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the

Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

        2.    <u>Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.</u>

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' Sale Transactions and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the restructuring instead of focusing exclusively on maximizing the value of the assets through a sale. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' sale process.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The chapter 11 proceedings also require the Debtors to seek consensual use of the Debtors' cash collateral to fund operations. If the Debtors are unable to obtain final approval of such cash collateral use, the chances of conversion to a chapter 7 proceeding may be increased, and, as a result, creditor recoveries may be significantly impaired.

        3.    <u>The Debtors' Business Is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.</u>

The Debtors' operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the recoveries set forth in the Plan.

        4.    <u>The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.</u>

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses for the benefit of maximizing value during the Sale Transactions.

        5.    <u>The Debtors Might Not Be Able to Satisfy Closing Conditions in Connection with the Sale Transactions.</u>

It is possible that the Debtors might not be able to satisfy the conditions for closing one or more asset sales in connection with the Restructuring Transactions or that counterparties in such

Sale Transactions could exercise any relevant termination rights in accordance with the terms thereof.  Further, it is possible that the Debtors might not receive any bids for the Cable Assets other than the Cable Stalking Horse Bid, or, in any case, might fail to reach an agreement on a Sale Transaction.

6.      The Sale Transactions Will Affect the Debtors' Operations.

Pursuant to the Sale Transactions, all or substantially all of the Assets of the Debtors may be sold pursuant to Bankruptcy Code sections 105, 363 and 365.  Any remaining assets of the Debtors will be wound down by the Plan Administrator in accordance with the Wind-Down Budget, and the Debtors will thereafter have no active ongoing operations.

**E.      Disclosure Statement Disclaimer.**

1.      The Financial Information Contained in This Disclosure Statement Has Not Been Audited.

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from that financial information, provided in this Disclosure Statement, and although the Debtors believe that the financial information herein fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any conclusions or estimates drawn therefrom, is without inaccuracies.

2.      Information Contained in This Disclosure Statement Is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      This Disclosure Statement Was Not Reviewed or Approved by the SEC.

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4.      This Disclosure Statement May Contain Forward Looking Statements.

This Disclosure Statement may contain "forward looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended.  Statements containing words such as "may," "believe," "anticipate," "expect," "intend," "plan," "project," "projections," "business outlook," "estimate," or similar expressions constitute forward-looking statements and may include, without limitations, information regarding the Debtors' expectations with respect to future events.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those risks described in this Article.

5.       No Legal or Tax Advice Is Provided to You by This Disclosure Statement.

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.       No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

7.       Failure to Identify Potential Objections.

No reliance should be placed on the fact that a particular Cause of Action or potential objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Plan Administrator may, pursuant to the Plan, object to applicable Claims or Interests after the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies a particular Cause of Action or objection to a Claim.

8.       No Waiver of Right to Object or Right to Recover Transfers and Assets.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

9.       Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors, including the Restructuring Advisors, have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of

all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

           11.    <u>No Representations Outside This Disclosure Statement are Authorized</u>.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

## ARTICLE XI.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Allowed Claims.  The following summary is based on the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>"), Treasury Regulations promulgated thereunder, judicial decisions, administrative rules and pronouncements as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein.  This summary addresses certain U.S. federal income tax consequences only to Holders of Claims that are entitled to vote (i.e., Holders of Claims in Class 3) and it does not address the U.S. federal income tax consequences to Holders of Interests or to Holders of Claims that are not entitled to vote on the Plan.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular facts and circumstances (such as the effects of Section 451(b) of the IRC conforming the timing of certain income accruals to financial statements).  In addition, this summary addresses only U.S. federal income taxes.  Thus, the following discussion does not address foreign, state, or local tax consequences, or any estate, gift, or other non-income tax consequences, of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Holders of Allowed Claims that are subject to special treatment under the IRC (such as Persons who are related to the Debtors within the meaning of the IRC, Holders liable for the alternative minimum tax, Holders whose functional currency is not the U.S. dollar, Holders that received their Claims as compensation, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships or S corporations and investors therein, and Holders of Claims who are themselves in bankruptcy).  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds an Allowed Claim, the tax treatment of a partner or other investor in such partnership will generally depend upon the status of the partner or investor and the activities of the partnership. If you are a partner or other investor in a partnership holding an Allowed Claim, you should consult your tax advisors.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of Allowed Class 3 Claims that is: (A) an individual citizen or resident of the United States for U.S. federal income tax purposes; (B) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (C) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (D) a trust (1) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in the IRC), and a "Non-U.S. Holder" is a Holder (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out. Furthermore, this discussion assumes that Holders of Allowed Claims only hold Claims in a single Class. This discussion further assumes that the various debt and other arrangements to which a Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service ("IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement. The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive and the U.S. federal income tax consequences to each Holder of an Allowed Claim will differ and will depend on factors specific to each such Holder, including (A) whether the Holder's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (B) the origin of the Holder's Allowed Claim; (C) whether the Holder reports income using the accrual or cash basis method; (D) whether the Holder receives distributions under the Plan in more than one taxable year; (E) whether the Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Claim; and (F) whether the Holder has previously taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed Claim. The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of an Allowed Claim. Accordingly, each Holder of an Allowed Claim is strongly urged to consult with its own

tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

**A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

1.    <u>U.S. Federal Income Tax Consequences of the Sale Transactions.</u>

The proposed Sale Transactions contemplated by the Plan are expected to be treated as a taxable sale of the Debtors' assets for U.S. federal income tax purposes. As a result, the Debtors generally will recognize taxable gain or loss equal to the "amount realized" on the Sale Transactions, less the aggregate adjusted basis in the assets that are subject to the Sale Transactions. Generally, the amount realized on the Sale Transactions will be equal to the cash proceeds from the Sale Transactions or, in the case of a credit bid, the fair market value of the assets transferred in the credit bid. The Debtors estimate that the aggregate adjusted basis in the assets that are subject to the Sale Transactions is greater than their fair market value and thus expect to recognize a loss. Therefore, the Debtors expect that no material U.S. federal income tax should arise as a result of the Sale Transactions.

2.    <u>Cancellation of Debt and Reduction of Tax Attributes.</u>

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("<u>COD Income</u>") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. Under section 108 of the IRC, a taxpayer will not, however, be required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "<u>Bankruptcy Exception</u>"). The Debtors expect the consummation of the Plan will produce COD Income. Because the cancellation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the Bankruptcy Court in such case and the cancellation of the Claims will be pursuant to the Plan, the Debtors will not be required to include any COD income realized as a result of the implementation of the Plan in taxable income under the Bankruptcy Exception.

Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) net operating losses and carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

The Debtors have not yet determined the amount of their tax attributes that will be reduced by COD Income. Assuming the Debtors are liquidated following consummation of the Plan, however, any such tax attributes are not expected to have meaningful value.

**B.     Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote on the Plan.**

    1.     <u>U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Voting Class</u>.

In accordance with the Plan, each Holder of Allowed Claims in 3 will receive the proceeds from the Sale Transactions, or, in the event that such Holder determines to exercise its right to credit bid its Allowed Claims, ownership of such assets.  Each U.S. Holder of Allowed Claim in Class 3 will recognize gain or loss upon consummation of the Plan equal to the difference between the "amount realized" by such U.S. Holder and such U.S. Holder's adjusted tax basis in his, her or its Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued original issue discount ("<u>OID</u>")).  The amount realized will include the amount of any Cash received from the Debtor (or, if such Holder receives the ownership of the assets acquired, the fair market value of such assets received), less the amount (if any) allocable to accrued but unpaid interest, as discussed below under the heading "Accrued Interest."  Any such gain or loss realized by a U.S. Holder generally should constitute capital gain or loss to such U.S. Holder, unless such Claim is not a capital asset in the hands of such U.S. Holder.   If an Allowed Claim in Class 3 is a capital asset and it has been held for more than one year, the U.S. Holder will realize long-term capital gain or loss.   The deductibility of capital losses is subject to limitations.

    2.     <u>Accrued Interest</u>.

A U.S. Holder of an Allowed Claim generally will recognize ordinary income to the extent that such Holder receives Cash or property that is allocable to accrued but unpaid interest that such Holder has not yet included in its income.  If an Allowed Claim includes interest, and if the U.S. Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the U.S. Holder must allocate the Plan consideration between principal and interest.  The Plan provides that all distributions to a U.S. Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder, and attributable to principal under the Plan, is properly allocable to interest. U.S. Holders of Allowed Claims are urged to consult their own tax advisors in this regard.  If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the U.S. Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

    3.     <u>Market Discount</u>.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the IRC.  In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.

Under the market discount rules, the U.S. Holder is required to treat any gain on the sale, exchange, retirement or other disposition of the Allowed Claim (other than in respect of a Claim for accrued but unpaid interest) as ordinary income to the extent of the market discount that the U.S. Holder has not previously included in income and which is treated as having accrued on the Allowed Claim at the time of its payment or disposition.

4.      Bad Debt Deduction.

A U.S. Holder who receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under IRC Section 166(a).  The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed.  U.S. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote on the Plan**

Whether a Non-U.S. Holder of Allowed Claims in Class 3 realizes gain or loss on the consummation of the Plan and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders under the Article VI.B.

1.      Gain Recognition.

Any gain recognized by a Non-U.S. Holder of Allowed Claims in Class 3 generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claim, unless:

- such Non-U.S. Holder is engaged in a trade or business in the United States to which such gain is "effectively connected" for U.S. federal income tax purposes (and, if required, by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment or fixed base in the United States to which gain is attributable); or

- if such Non-U.S. Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Gain described in the first situation above generally will be subject to U.S. federal income tax on a net income basis at the regular rates.  A Non-U.S. Holder that is a foreign corporation also may be subject to a branch profits tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second situation above will be subject to U.S. federal income tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty), which may be offset by certain U.S. source capital losses of the Non-U.S. Holder (even though the individual

is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

Non-U.S. Holders should consult their tax advisors regarding any applicable income tax treaties that may provide for different rules.

2.    Interest on Allowed Claims.

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest on its Claim generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(i)     the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtors' stock entitled to vote (after application of certain attribution rules);

(ii)    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors as described in Section 881(c)(3)(C) of the IRC;

(iii)   the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

(iv)    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed base of the Non-U.S. Holder (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax pursuant to clauses (i)–(iv) above generally will be subject to withholding of U.S. federal income tax on such interest or imputed interest at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty).  To claim such treaty exemption, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established.  For purposes of providing a properly executed IRS Form W-8BEN or W-BENE, special procedures are provided under applicable

Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**D.      Information Reporting and Back-Up Withholding.**

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless you are an exempt recipient. Additionally, a Holder may be subject to backup withholding at applicable rates, unless the Holder (1) is a person exempt from backup withholding and, when required, demonstrates this or (2) timely provides a correct taxpayer identification number ("TIN") (generally in the form of a properly executed IRS Form W-9 (or a suitable substitute form) for a U.S. Holder, or applicable IRS Form W-8 (or a suitable substitute form) for a Non-U.S. Holder (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption) and timely provides the other information, makes the representations required by such form and complies with the other requirements of the backup withholding rules. A Holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund from the IRS or a credit against your U.S. federal income tax liability provided the required information is properly furnished to the IRS.

**E.      FATCA.**

Under Sections 1471 to 1474 of the Tax Code (commonly referred to as the Foreign Account Tax Compliance Act ("FATCA")), unless otherwise subject to an exception, foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to 30% withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including interest), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules, including the availability of an exemption on such Non-U.S. Holder's ownership of the consideration being received under the Plan.

### F.     Importance of Obtaining Professional Tax Assistance.

The foregoing is intended to be only a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The U.S. federal, state, local, and foreign income and other tax consequences of the Plan are complex and in some cases uncertain. Such consequences may also vary based on the individual circumstances of each Holder of an Allowed Claim. Accordingly, each Holder of an Allowed Claim is strongly urged to consult with his, her, or its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

## ARTICLE XII.
## ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance, reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. The Debtors will file all exhibits to the Plan with the Bankruptcy Court and make them available for review by no later than seven days before the deadline to object to Confirmation.

## ARTICLE XIII.
## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims in Class 3, the only Class entitled to vote on the Plan, to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

*[Remainder of page intentionally left blank.]*

Dated: April 3, 2024

Respectfully submitted,

/s/ *Edward Durkin*

By: Edward Durkin
Chief Financial Officer
Casa Systems, Inc.

**Exhibit A**

**Joint Plan of Liquidation of Casa Systems, Inc. and Its Debtor Affiliates**

## **Exhibit B**

**Restructuring Support Agreement**

**<u>Exhibit C</u>**

**Corporate Organization Chart**