# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CASA SYSTEMS, INC., *et al.*,[1] | Case No. 24-10695 (KBO) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION
## FOR ENTRY OF (I) AN ORDER
## (A) APPROVING BIDDING PROCEDURES;
## (B) APPROVING THE SELECTION OF THE CABLE
## STALKING HORSE PURCHASER; (C) APPROVING THE DEBTORS'
## ENTRY INTO THE CABLE STALKING HORSE APA AND APPROVING
## THE CABLE BID PROTECTIONS; (D) SCHEDULING AN AUCTION AND
## THE SALE HEARING; (E) APPROVING FORM AND MANNER OF SALE
## NOTICE; (F) APPROVING FORM AND MANNER OF POTENTIAL ASSUMPTION
## AND ASSIGNMENT NOTICE; (G) APPROVING FORM AND MANNER OF NOTICE
## OF SUCCESSFUL BIDDER; (H) APPROVING ASSUMPTION AND ASSIGNMENT
## PROCEDURES AND (I) GRANTING RELATED RELIEF; AND (II) AN ORDER
## (A) APPROVING THE SALE OF THE CABLE ASSETS FREE AND CLEAR OF LIENS,
## CLAIMS, INTERESTS AND ENCUMBRANCES; (B) APPROVING THE
## ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state the following in support of this motion (the "<u>Motion</u>"):[2]

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are Casa Systems, Inc. (8867), Casa Systems Securities Corporation (1151), and Casa Properties LLC (6767). The Debtors' service address is 100 Old River Road, Andover, MA 01810.

[2] A detailed description of the Debtors and their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Edward Durkin in Support of Chapter 11 Petitions and First Day Pleadings* (the "<u>Durkin Declaration</u>") and the *Declaration of Brian Whittman in Support of the Debtors' Motion to Use Cash Collateral, Approve Bidding Procedures, and Approve the Cloud/RAN Sale, and Other First Day Pleadings* (the "<u>Whittman Declaration</u>" and together with the Durkin Declaration, the "<u>First Day Declarations</u>") as applicable, filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the First Day Declarations and the Zubricki Declaration (as defined below), and as later defined herein, as applicable.

## PRELIMINARY STATEMENT

1.      The Debtors enter these chapter 11 cases with the support of the Ad Hoc Group[3] to pursue an expedited sale process designed to maximize value while creating a swift, efficient, and consensual path to confirming a chapter 11 plan.  The proposed sale process described herein is a continuation of the Company's several months-long prepetition sale processes and represents the only currently available path to ultimately consummate value-maximizing, job-saving transactions for the benefit of the Debtors' estates and their stakeholders.  Accordingly, through these chapter 11 cases and the proposed Bidding Procedures (as defined below), the Debtors are marketing the Cable business and related assets (collectively, the "Cable Assets").[4]

2.      In light of the Debtors' extensive prepetition marketing efforts and feedback received from the Ad Hoc Group, as well as key customers and potential purchasers of the Debtors' Cable Assets, the Debtors have determined, in the exercise of their business judgment, that the best way to maximize the value of these Cable Assets during these chapter 11 cases is to conduct a final market-test of the Cable Assets through an auction process and expedited sales to the highest and best bidder(s).  In connection therewith, the Debtors have selected Vecima Technology Inc. ("Vecima") or its designee to act as the stalking horse purchaser (the "Cable Stalking Horse Purchaser") with respect to the purchase of the Cable Assets, substantially on the terms agreed

---

[3] "Ad Hoc Group" means the informal group of certain unaffiliated holders of indebtedness under (i) that certain Superpriority Credit Agreement, dated as of June 15, 2023, among Casa Systems, Inc., as borrower, JPMorgan Chase Bank, N.A., as administrative agent, Delaware Trust Company as collateral agent, JPMorgan Chase Bank, N.A. as lead arranger and bookrunner, and each lender from time to time party thereto (as amended, restated, supplemented, or otherwise modified from time to time, the "Superpriority Credit Agreement") and (ii) that certain Credit Agreement, dated as of December 20, 2016, among Casa Systems, Inc., as borrower, JPMorgan Chase Bank, N.A., as administrative agent, JPMorgan Chase Bank, N.A. and Barclays Bank PLC as joint least arrangers and bookrunners, and each lender from time to time party thereto.

[4] As described in the First Day Declarations and the Zubricki Declaration, the Debtors separately seek to approve a sale of the Debtors' Cloud/RAN assets in the first approximately 21 days of these chapter 11 cases, the proceeds of which will fund the remainder of the cases including the proposed sale process described herein.  The Cloud/RAN assets are not included in the Assets subject to the relief requested in this Motion.

upon in the form of the Cable Stalking Horse APA (as defined below).  The Cable Stalking Horse APA will be subject to higher and better offers pursuant to the postpetition marketing process described herein, and the Debtors believe that this stalking horse designation will be value-accretive to the postpetition sale process and to the Debtors' estates and stakeholders, including by paving the pathway for retention of a significant majority of the Debtors' employees moving forward.

3.      The Debtors acknowledge that the timeline for their proposed marketing process is expedited.  However, a further extended timeline is simply not plausible given the Debtors' cash on hand.  In light of these extenuating circumstances, including the meaningful job preservation opportunity that hangs in the balance, and the extensive marketing processes completed prepetition, the Debtors respectfully submit that the postpetition marketing process described herein is sufficient to test whether higher or better bids are available for the Cable Assets.  Any alternative timeline creates the substantial risk of a value-destructive chapter 7 conversion, to the detriment of the Debtors' estates and their stakeholders.  Most notably, if the Debtors fail to obtain Court approval of the Bidding Procedures by April 24, 2024, secure Court approval of the proposed Sale Transaction by May 31, 2024, or consummate the Sale Transaction by June 6, 2024, any such failure would constitute a breach under the Debtors' Restructuring Support Agreement with the members of the Ad Hoc Group.

**RELIEF REQUESTED**

4.      The Debtors seek entry of an order (the "Bidding Procedures Order"), substantially in the form attached hereto as **Exhibit A** granting, among other things, the following relief:

a.      authorizing and approving the proposed bidding procedures (the "Bidding Procedures"), substantially in the form attached to the Bidding Procedures Order as Exhibit 1, in connection with a sale of the Cable Assets (a "Sale Transaction");

b. authorizing the Debtors to select Vecima or its designee as the Cable Stalking Horse Purchaser for the Cable Assets;

c. authorizing and approving the terms of and the Debtors' entry into an Asset Purchase Agreement by and among Casa Systems, Inc., certain non-Debtor subsidiaries of Casa Systems, Inc., and the Cable Stalking Horse Purchaser (as amended, supplemented, or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached thereto, the "Cable Stalking Horse APA"), substantially in form and substance attached to the Bidding Procedures Order as Exhibit 2, including approval of the Cable Bid Protections (as defined below);

d. scheduling an auction for the Sale Transaction (the "Auction"), if necessary, and a hearing to consider approval of the Sale Transaction (the "Sale Hearing");

e. authorizing and approving the form and manner of notice (the "Sale Notice"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3, of the Sale Transaction, the Auction, and the Sale Hearing;

f. authorizing and approving the form and manner of notice (the "Potential Assumption and Assignment Notice"), substantially in the form attached to the Bidding Procedure Order as Exhibit 4, to each non-Debtor counterparty (each, a "Counterparty," and collectively, the "Counterparties") to a relevant executory contract or unexpired lease relating to the Cable Assets (collectively, the "365 Contracts") regarding the potential assumption of certain 365 Contracts and the Debtors' calculation of the amount necessary to cure any monetary defaults under such 365 Contract (such amounts, the "Cure Amounts");

g. authorizing and approving the form and manner of notice (the "Notice of Successful Bidder"), substantially in the form attached to the Bidding Procedures Order as Exhibit 5, to parties in interest following the Auction (or cancellation thereof) which shall include (a) the highest or otherwise best bid for the Cable Assets (the "Successful Bid," and the maker of such bid, the "Successful Bidder") and the next-highest or otherwise second-best bid (the "Back-Up Bid," and the maker of such bid, the "Back-Up Bidder") and (b) the identity of the Successful Bidder and Back-Up Bidders;

h. authorizing and approving the procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain 365 Contracts in connection with the Sale Transaction, as applicable; and

i. granting related relief.

5.     The Debtors further seek entry of an order (the "Sale Order")[5] granting, among other things, the following relief:

a.     authorizing the sale of the Cable Assets free and clear of all liens, claims, interests, and encumbrances, except certain assumed liabilities and permitted encumbrances as determined by the Debtors and the Successful Bidder, with liens to attach to the proceeds of the Sale Transaction;

b.     authorizing the assumption and assignment of certain 365 Contracts in connection with the Sale Transaction; and

c.     granting related relief.

6.     In support of this Motion, the Debtors incorporate the statements contained in the First Day Declarations, each filed contemporaneously herewith.  In further support of this Motion, the Debtors submit the *Declaration of David S. Zubricki in Support of Debtors' Bidding Procedures Motion and Cloud/RAN Sale Motion* (the "Zubricki Declaration"), filed contemporaneously herewith.

## JURISDICTION AND VENUE

7.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot

---

[5] A copy of the Sale Order will be filed in advance of the Sale Hearing.

enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

## RELEVANT BACKGROUND

### A.      Overview

10.     The Debtors operate a global communications technology business that offers end-to-end physical, virtual, and cloud-native 5G infrastructure and customer premise networking equipment solutions.  These solutions, in turn, enable the Debtors' customers to transform and expand their public and private high-speed data and multi-service communications networks.  The Debtors' solutions are commercially deployed in more than 70 countries by more than 475 customers, including regional as well as some of the world's largest Tier 1 communications service providers, serving millions of subscribers globally.

11.     On April 3, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

12.     Additional information regarding the Debtors' business, capital structure and the circumstances preceding the Petition Date may be found in the First Day Declarations.

31517188.1

**B.      The Debtors' Prepetition Sale and Marketing Efforts**

13.      The Debtors have spent the majority of the last two years marketing their assets.  In August 2022, the Company retained Piper Sandler & Co. ("Piper Sandler") to explore a potential sale of the Company's CAD business and related assets (the "CAD Assets").  Durkin Declaration, ¶ 82.  That marketing process ultimately failed to produce an actionable proposal.  *Id.*

14.      In June 2023, the Debtors launched a targeted sale process to explore a potential sale of the Debtors' Cable Assets.  *Id.* at ¶ 83.  As part of this process, the Company contacted ten potential parties, with four such parties executing non-disclosure agreements.  *Id.*  While the Company did initially receive a non-binding indication of interest ("IOI") from three such parties, following additional diligence, two of such parties declined to continue in the process and the remaining party revised its IOI into a bid that the Debtors ultimately determined, in their business judgment, was not an actionable proposal.  *Id.*[6]

15.      In October 2023, as the Debtors' financial position continued to deteriorate, the Company decided to explore a wider range of transaction alternatives and engaged Ducera to provide restructuring, financing, and transaction advisory services.  In the months prior to the commencement of these chapter 11 cases, the Debtors pursued an extensive marketing process, and with the assistance of Ducera, contacted more than 26 third parties about potential interest in a sale transaction that could, in the Debtors' determination in consultation with their advisors, be consummated on the timeline dictated by the Debtors' declining liquidity position.  Zubricki Declaration, ¶ 10.  This outreach effort included parties who were interested in buying substantially all of the Debtors' assets as well as those who expressed interest in a more limited scope of assets. *Id.*  During this time, the Debtors ultimately held substantive discussions with more than 26 parties

---

[6] Contemporaneously with the Piper Sandler sale processes, the Debtors engaged Ducera Partners, LLC ("Ducera") to provide restructuring, financing and transaction advisory services.

in connection with potential sale transactions and the Debtors' management team, along with Ducera, engaged in dozens of diligence sessions and other transaction-related conversations with eight parties which expressed a more significant level of interest and requested such further information. *Id.* Each of these eight parties signed non-disclosure agreements and were provided access to a virtual dataroom which was populated with more than 3,400 documents comprised of more than 70,000 total pages containing information related to the Debtors' assets. *Id.* Additionally, the Debtors' management team conducted informal outreach and conversations with a significant number of additional interested parties. *Id.* This formal and informal outreach bore significant fruit as the Debtors secured the Cable Stalking Horse Bid (as defined below), which proved critical in garnering the Ad Hoc Group's support for these chapter 11 cases and the postpetition marketing process contemplated herein.

### C. The Debtors' Proposed Sale Process

16.    Through the Bidding Procedures outlined in this Motion, the Debtors intend to build upon their prepetition efforts by publicly marketing the Cable Assets. The postpetition marketing process is currently underway, and the Debtors and Ducera plan to contact more than 110 parties, including key parties from the prepetition processes as well as additional potential purchasers. *Id.* at ¶ 18. Pursuant to the Bidding Procedures, the Debtors intend that the postpetition marketing process will be an extensive and fulsome process to identify potential buyers for the Cable Assets and facilitate access to diligence materials. *Id.* at ¶ 19. Such materials include details of the proposed Bidding Procedures, a non-confidential presentation and, for those executing a non-disclosure agreement with the Debtors, access to a virtual data room (the "Data Room"), confidential presentation materials and, as appropriate, meetings with management. *Id.* This postpetition marketing process for the Cable Assets will include a broader universe of potential

buyers due to the public nature of the Bidding Procedures and the ability to sell the Cable Assets free and clear of claims and interests and provides the best path forward to consummating a value-maximizing transaction.  *Id.*

17.    Given the Debtors' liquidity situation and the robust prepetition marketing process, the Debtors have determined that their best opportunity to maximize the value of their estates for the benefit of all the Debtors' stakeholders relies on their ability to expeditiously proceed through these chapter 11 cases and consummate the Sale Transaction in a manner that minimizes administrative expenses and provides certainty to the Debtors' employees and customers.  *Id.* at 23.  Therefore, the expedited, efficient sale process, as provided for in this Motion, is necessary to generate the highest or otherwise best value for the Cable Assets while minimizing costs.

## THE PROPOSED BIDDING PROCEDURES[7]

18.    The Debtors request approval of the Bidding Procedures, which describe, among other things, the (a) Cable Assets available for sale, (b) manner in which bids (each a "Bid") become "qualified," (c) coordination of diligence efforts among the bidders and the Debtors, (d) receipt and negotiation of Bids received, (e) conduct of any Auction, (f) selection and approval of the Successful Bidder and the Back-Up Bidder, and (g) designation and approval of the Cable Stalking Horse Purchaser, Cable Stalking Horse APA, and Cable Bid Protections.  The Debtors designed the Bidding Procedures to promote a controlled, fair, and open sale process while ensuring that the highest or best Bids are generated for the Cable Assets.  The following is a summary of the proposed Bidding Procedures, as required by Local Rule 6004-1(c)(1).[8]

---

[7] Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

[8] Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.  To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Bidding Procedures

| Requirement | Description |
|---|---|
| Confidentiality Agreement | Unless otherwise waived by the Debtors (in consultation with the Consultation Parties (as defined below)), to participate in the bidding process, each person or entity must enter into with the Debtors, on or before the Bid Deadline (as defined below), a confidentiality agreement in form and substance reasonably acceptable to the Debtors based on a form to be provided by the Debtors (which form shall be reasonably acceptable to the Ad Hoc Group) (the "Confidentiality Agreement").  Each such person or entity that enters into a Confidentiality Agreement with the Debtors on or before the Bid Deadline, or for whom the requirement is waived by the Debtors, is hereinafter referred to as a "Potential Bidder."    After a Potential Bidder executes a Confidentiality Agreement, the Debtors shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information with respect to the Cable Assets.<br><br>After a Potential Bidder enters into a Confidentiality Agreement with the Debtors and provides preliminary proof, the adequacy of which the Debtors and their advisors will determine in their reasonable business judgment (in consultation with the Consultation Parties), of its bona fide interest in purchasing some of all of the Cable Assets and its financial capacity to potentially consummate a proposed Sale Transaction, the Debtors shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information with respect to the Cable Assets. |
| Determination by the Debtors | Following consultation with (a) any statutory committee appointed in these chapter 11 cases, if any (each a "Committee"), (b) the Ad Hoc Group, and (c) any other party that the Debtors deem appropriate, and counsel or financial advisors to any of the foregoing (collectively, the "Consultation Parties" and each, a "Consultation Party"), the Debtors shall (a) coordinate with Potential Bidders regarding the conduct of their respective due diligence, (b) evaluate Bids from Potential Bidders on any or all of the Cable Assets, (c) negotiate any Bid made to acquire any or all of the Cable Assets, and (d) make such other determinations as are provided and in accordance with the Bidding Procedures; *provided* that, notwithstanding anything to the contrary contained in this Motion or the Bidding Procedures, the Debtors shall not consult with a Consultation Party (or its advisors) that is |

reflected in Exhibit 1 to the Bidding Procedures Order, the terms and conditions of the Bidding Procedures shall control in all respects.

| | |
|---|---|
| | contemplating submitting a Bid for the Cable Assets unless and until the earlier of such Consultation Party (a) withdrawing as a Bidding Party (as defined below) and (b) failing to be either the Successful Bidder or the Back-Up Bidder following the completion of the Auction.[9]  Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Cable Assets to any party that is not a Potential Bidder or a Consultation Party.<br><br>The Debtors shall consult with the Consultation Parties in good faith regarding the sale process and, upon request, shall provide to the Consultation Parties and their advisors regular reports concerning the sale process, including parties contacted, buyer feedback, copies of letters of intent, drafts of definitive agreements, updates regarding purchase proposals, and any diligence and other information reasonably requested by the Consultation Parties. |
| Due Diligence | The Debtors established the Data Room into which substantial information about the Debtors and their business has been posted. Except to the extent a Confidentiality Agreement or other agreement provides otherwise, all Potential Bidders and the Consultation Parties will be granted full access to the Data Room. The Debtors, with the assistance of Ducera, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders and the Consultation Parties.  Any additional information that the Debtors determine to provide to any Potential Bidder will be reasonably provided to all Potential Bidders.<br><br>Subject to applicable confidentiality obligations, the Debtors will use commercially reasonable best efforts to provide copies of or access to any key materials delivered by any Potential Bidder to each Consultation Party, regardless of whether received prior or subsequent to the date of the Court's entry of the Bidding Procedures, as promptly as practicable upon receipt by the Debtors and/or their advisors of such materials. |
| No Communications Among Potential Bidders | There must be no communications between and amongst Potential Bidders related to any Bid for the Cable Assets, the Bidding Procedures, or the bidding process, unless the Debtors |

---

[9] For the avoidance of doubt, if one of the Ad Hoc Group members or a member of a Committee (or their affiliates, as applicable) is contemplating submitting a Bid for the Cable Assets (a "Bidding Party"), then (a) the remaining Ad Hoc Group members and members of the Committee other than the Bidding Party, as applicable, (b) the Ad Hoc Group's counsel, and (c) the Committee's counsel shall continue to be Consultation Parties, but shall not provide any information they receive as Consultation Parties to the Bidding Party, and notwithstanding anything to the contrary herein, the Bidding Party shall not be a Consultation Party, in each case, only for such time that such Consultation Party remains a Bidding Party as described in Section III of the Bidding Procedures.

| | |
|---|---|
| | have previously authorized such communications in writing (e-mail to be sufficient). For the avoidance of doubt, communications between and amongst Potential Bidders that occur in the ordinary course of business for such parties and are unrelated to any Bid for the Cable Assets, the Bidding Procedures, or the bidding process, are not prohibited. For the further avoidance of doubt, other than with respect to matters related to any Bid or the contents thereof, members of the Ad Hoc Group shall not be prohibited from communicating with other members of the Ad Hoc Group or counsel thereto solely on the basis of being deemed Potential Bidders or Qualified Bidders (as defined below). The Debtors reserve the right, in their reasonable business judgment, in consultation with the Consultation Parties, to disqualify any Potential Bidders that have communications between and amongst themselves in violation of the foregoing without the prior consent of the Debtors. For the avoidance of doubt, the joining of Bids between Potential Bidders or Qualified Bidders may be permitted by the Debtors, after consultation with the Consultation Parties; *provided*, that if any Potential Bidders or Qualified Bidders are interested in joining Bids, the Debtors' advisors may facilitate the communications between such parties and the potential joining of Bids. |
| Bid Deadline | On or before **May 13, 2024, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>"), a Potential Bidder that desires to make a Bid is required to deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to Ducera, Attn: Bradley Robins (brobins@ducerapartners.com), David Zubricki (dzubricki@ducerapartners.com), and Nicholas Bassi (nbassi@ducerapartners.com). The Debtors shall provide to the Consultation Parties copies of each Bid received by the Debtors as soon as reasonably practicable following receipt of such Bid. |
| Bid Requirements[10] | All Bids must comply with the following Bid Requirements, which the Debtors may, in consultation with the Consultation Parties, modify or waive at any time:<br><br>(a)    be accompanied by a letter or an email:<br><br>    (i)    fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or their advisors should contact (including any equity |

---

[10] The Debtors will also consider proposals to acquire any and all of the Cable Assets through a chapter 11 plan. Should any such proposal be received prior to the Bid Deadline that the Debtors, in consultation with the Consultation Parties, conclude is in the best interest of the estates and their stakeholders, then the Debtors reserve the right to postpone the Auction and proceed toward the confirmation of a chapter 11 plan.

holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale Transaction) in the event that the Debtors or the Consultation Parties have any questions or wish to discuss the Bid submitted by the Potential Bidder, along with sufficient evidence that the Potential Bidder is legally empowered to complete the proposed sale on the terms contemplated in the Bid, including obtaining authorization or approval from its board of directors (or comparable governing body) and equityholders, if required, with respect to the submission of its Bid and the consummation of the Sale Transaction contemplated by such Bid;

(ii)     setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price, including (a) the source of cash consideration, including the cash and non-cash components of the purchase price, (b) funding commitments, and (c) confirmation that such consideration is not subject to any contingencies;

(iii)    stating with specificity the Cable Assets (including any 365 Contracts) such Potential Bidder wishes to bid on and the liabilities and obligations (including any applicable Cure Amounts), if any, to be assumed by the Potential Bidder in the Sale Transaction;

(iv)    identifying the Potential Bidder's position with regard to such Potential Bidder acquiring the Debtors' equity interests in any of the Non-Debtor Affiliates (as defined in the First Day Declarations);

(v)     providing, other than as may be exclusively applicable to the Cable Stalking Horse Purchaser, that the Bid is not subject to any bidding fee, break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of fee or reimbursement;

(vi)    providing, other than as may be exclusively applicable to the Cable Stalking Horse Purchaser, that such Potential Bidder will bear its own costs

|  | and expenses (including legal fees) in connection with the proposed transaction and expressly waiving any substantial contribution administrative expense claim under Section 503(b) of the Bankruptcy Code related to bidding for the Cable Assets; |
|--|--|
| (vii) | agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until the selection of the Successful Bidder; *provided*, that if such Potential Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the Sale Transaction with the Successful Bidder or, as applicable, the Back-Up Bidder; |
| (viii) | containing a commitment to close the contemplated transaction(s) as soon as practicable, but in no event later than June 6, 2024; |
| (ix) | providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence; |
| (x) | providing that to the extent a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale Transaction with cash on hand, such Bid must include committed financing documented to the Debtors' satisfaction that demonstrates such Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy such Bid and any obligations thereunder. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors in their reasonable business judgment; |
| (xi) | containing an acknowledgment that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Cable Assets, has relied solely upon its own independent review, |

| | investigation and/or inspection of any documents and any other information in making the Bid; |
|---|---|
| | (xii) providing that the Potential Bidder agrees to serve as the Back-Up Bidder with respect to the Cable Assets through the Closing Date, if selected as such; |
| | (xiii) setting forth each regulatory and third-party approval required for the Potential Bidder to consummate the Sale Transaction, if any, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of such regulatory or third-party approval is expected to take more than thirty days following the execution and delivery of the purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible); |
| | (xiv) providing specific information regarding (a) whether the Potential Bidder intends to hire all or some of the employees who are primarily employed in connection with the Cable Assets to be included in the Sale Transaction and, if so, specify which employees, (b) whether and to what extent it proposes to assume obligations and/or liabilities to pension plans and/or health plans, including but not limited to whether and to what extent the Bid proposes participation in such pension and health plans and (c) the impact on employees (if any), including the actual or potential elimination of (and/or reduction in value of) any employee benefits; and |
| | (xv) containing an acknowledgement that such Potential Bidder submits to the jurisdiction of the Court and waives any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction (if held), the construction and enforcement of the Bidding Procedures, any Definitive Sale Documents (as defined in the Bidding Procedures), and consummation of a Sale Transaction (including pursuant to confirmation of a chapter 11 plan in connection therewith), as applicable; |

(b)    be accompanied by (i) an executed purchase agreement based on the form purchase agreement provided in the Data Room, which, for the avoidance of doubt, may be the final version of the Cable Stalking Horse APA, and otherwise in form and substance reasonably satisfactory to the Debtors, in consultation with the Consultation Parties (a "Qualified Bid Purchase Agreement"), and (ii) a redline of the executed Qualified Bid Purchase Agreement to reflect any proposed amendments and modifications to the Cable Stalking Horse APA, as applicable, and the form purchase agreement provided in the Data Room, as applicable, and any applicable schedules and exhibits;

(c)    be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), which may include (i) information demonstrating (in the Debtors' reasonable business judgment and in consultation with the Consultation Parties) that the Potential Bidder has the financial capacity to consummate the proposed Sale Transaction, (ii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and (iii) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.  By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any 365 Contracts potentially being assumed and assigned in connection with the Sale Transaction and the Consultation Parties in the event that the Debtors determine such bid to be a Qualified Bid (as defined below);

(d)    be accompanied by (i) a cash deposit by wire transfer, payable to the Debtors, in the amount of ten percent (10%) of the cash consideration of the Bid, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "Good Faith Deposit"), and (ii) written evidence, documented to the Debtors' satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidder with respect to the Cable Assets (*provided*, *however*, that the closing shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtors may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence, or credit committee approvals (*provided*, *further*, that such commitments may have covenants and conditions acceptable to the Debtors).  The Debtors reserve the right to increase the Good Faith

Deposit for one or more Qualified Bidders in consultation with the Consultation Parties, including by requiring Qualified Bidders to provide a Good Faith Deposit for any non-cash consideration based on such Qualified Bidder's estimate of the value of any such non-cash consideration. To the extent a Qualified Bid is modified before, during or after the Auction in any manner that increases the proposed purchase price contemplated by such Qualified Bid, the Debtors reserve the right, after consultation with the Consultation Parties, to require that such Qualified Bidder increase its Good Faith Deposit so that it equals ten percent (10%) of the increased proposed purchase price.

All Bids must provide consideration to the Debtors of at least the sum of (1) the consideration set forth in the Cable Horse APA (the "Cable Stalking Horse Bid"), (2) the amount of the Cable Bid Protections, *__plus__* (3) a minimum overbid amount (the "Minimum Overbid Amount") equal to or greater than $150,000 or such other amount determined by the Debtors in consultation with the Consultation Parties.

The Debtors, in consultation with the Consultation Parties, will review each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above. A Bid received from a Potential Bidder for any portion of the Cable Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder."

The Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, reserve the right to reject any Bid if such Bid, among other things: (a) requires any indemnification of the Potential Bidder in any Qualified Bid Purchase Agreement submitted as part of the Bid; (b) is not received by the Bid Deadline; (c) does not comport with the Bid Requirements; (d) is subject to any contingencies (including representations, warranties, covenants and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the Cable Assets; or (e) does not include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtors' estates or the Auction.

Any Bid rejected pursuant to the foregoing shall not be deemed to be a Qualified Bid; *provided* that the Debtors have the right to work with any Potential Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid and shall keep the Consultation Parties reasonably apprised of any proposed cures to

such deficiencies. The Debtors shall inform Qualified Bidders that their Bids have been designated as Qualified Bids no later than May 14, 2024. The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Cable Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders will be treated as a single Qualified Bidder for purposes of selecting the Successful Bidder or Back-Up Bidder). For the avoidance of doubt, the Cable Stalking Horse Bid is deemed a Qualified Bid and the Cable Stalking Horse Purchaser is deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.

The Debtors will be authorized to approve joint Bids, in their reasonable business judgment and in consultation with the Consultation Parties, on a case-by-case basis, *provided*, however, that prior to any two (2) or more Potential Bidders or Qualified Bidders communicating regarding a joint Bid, they must have received written consent (e-mail to be sufficient) from the Debtors.

By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the sale process, or the Auction (if held), after conclusion of the selection of the Successful Bidder. By submitting its Bid, each Potential Bidder is agreeing to comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law.

In order to be deemed a Qualified Bidder, all Potential Bidders must provide a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues with respect to any applicable laws or regulatory requirements.

| | |
|---|---|
| Cable Bid Protections | The Cable Bid Protections, if payable, shall be promptly paid in accordance with the Cable Stalking Horse APA and the Bidding Procedures Order. |
| Starting Bid | If at least two Qualified Bids are received by the Bid Deadline with regard to the Cable Assets (which shall include, for the avoidance of doubt, the Cable Stalking Horse Bid), the Debtors, in consultation with the Consultation Parties, will conduct the Auction with respect to the Cable Assets and shall determine, in consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for purposes of constituting the opening bid at the Auction for the Cable Assets |

| | |
|---|---|
| | (the "Starting Bid").  The Starting Bid shall include the amount provided for in the Cable Stalking Horse Bid **_plus_** the amount of the Cable Bid Protections **_plus_** the Minimum Overbid Amount. The Starting Bid will be provided to Qualified Bidders prior to the commencement of the Auction.<br><br>The determination of which Qualified Bid constitutes the Starting Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things, the following: (a) the amount and nature of the consideration, including any obligations to be assumed; (b) the 365 Contracts, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning 365 Contracts necessitated by such Bid; (c) the number, type and nature of any changes to the Cable Stalking Horse APA requested by each Qualified Bidder; (d) the extent to which such modifications are likely to delay closing of the Sale Transaction and the cost to the Debtors of such modifications or delay; (e) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (f) the net benefit to the Debtors' estates (including after taking account of the Cable Bid Protections, if any); (g) the tax consequences of such Qualified Bid; and (h) the impact on employees and the proposed treatment of employee obligations. |
| Auction | The Auction, if required, will be conducted on May 15, 2024, starting at 10:00 a.m. (prevailing Eastern Time) at the offices of Sidley Austin, LLP, 787 Seventh Avenue, New York, NY 10019 or, if determined by the Debtors (in consultation with the Consultation Parties) to be necessary or convenient, via teleconference and/or videoconference.  Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties (including their professionals), the U.S. Trustee, any creditor of the Debtors (_provided_, that such creditor provides the Debtors with two-days' written notice (e-mail to be sufficient)), and any other parties the Debtors (in consultation with the Consultation Parties) deem appropriate in their reasonable business judgment shall be permitted to attend and observe the Auction.  Each Qualified Bidder participating in the Auction will be required to confirm, in writing (e-mail to be sufficient), which may include its Qualified Bid, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the bidding process, and (b) its |

Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

Bidding at the Auction for the Cable Assets (or a subset thereof) that are subject to Qualified Bids will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round (a) at least one Qualified Bidder submits a Qualified Bid that improves on such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (b) the Debtors determine, in consultation with the Consultation Parties, that such Subsequent Bid is (i) for the first round, a higher or otherwise better offer than the Starting Bid, and (ii) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each Subsequent Bid at the Auction shall provide additional net value to the estates over the Starting Bid or the Leading Bid in an amount equal to or greater than the Minimum Overbid Amount. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe in their reasonable business judgment (in consultation with the Consultation Parties) to be the highest or otherwise best offer for the Cable Assets (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures as set forth below.

The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make Subsequent Bids, the Minimum Overbid Amount, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bidding Procedures; *provided* that such rules are disclosed to each Qualified Bidder during the Auction and are not materially inconsistent with the Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, or any order of the Court.  The bidding at the Auction shall be transcribed, and the Debtors shall maintain a transcript of all Bids made and announced at the Auction.

Prior to the conclusion of the Auction, the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, will, for the Cable Assets (or subset thereof) that were subject to the Auction: (a) determine, consistent with the Bidding Procedures, which Qualified Bid constitutes the Successful Bid; and (b) notify all Qualified Bidders at the Auction for the Cable Assets, prior to its conclusion, of the name of the

|  | Successful Bidder with respect to the Cable Assets, and the amount and other material terms of the Successful Bid. |
|---|---|
|  | The Debtors may, in their reasonable business judgment, and in consultation with the Consultation Parties, designate the Back-Up Bid (and the corresponding Back-Up Bidder) to close with respect to the Cable Assets in the event that the Successful Bidder does not close the Sale Transaction. The identity of the Back-Up Bidder and the amount and material terms of the Back-Up Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the Successful Bid. |
|  | The Auction shall be deemed closed at the conclusion of all bidding, in the Debtors' reasonable business judgment in consultation with the Consultation Parties, and the Debtors need not take any additional action to formally close the Auction. Following the closing of the Auction, neither the Debtors nor their representatives will initiate contact with, solicit, or encourage proposals from any person with respect to the Cable Assets that are the subject of the Successful Bid or the Back-Up Bid; *provided*, that nothing herein shall prevent the Debtors or their respective governing bodies from exercising their respective fiduciary duties under applicable law. |
| Back-Up Bidder(s) | If the Successful Bidder does not close the Sale Transaction by the date agreed upon by the Debtors and the Successful Bidder, then the Back-Up Bidder shall be obligated to close, and the Debtors shall be authorized, but not required, to close with the Back-Up Bidder. |
| Modification of Bidding Procedures | The Debtors (in their sole discretion) may amend the Bidding Procedures or the bidding process at any time and from time to time in any manner that it determines in good faith will best promote the goals of the process and does not conflict with the Bankruptcy Code, Bankruptcy Rules, or Local Rules, including extending or modifying any of the dates described herein; *provided*, that (i) the Debtors may not amend the Bidding Procedures or the bidding process to reduce or otherwise modify their obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court; and (ii) the Debtors may not change the Minimum Overbid Amount for the Cable Assets without consultation with the Cable Stalking Horse Purchaser. |
| Return of Good Faith Deposit | The Good Faith Deposits of all Qualified Bidders will be held in escrow and while held in escrow shall not become property of the Debtors' bankruptcy estates unless released from escrow to the Debtors pursuant to terms of the applicable escrow agreement or pursuant to further order of the Court. At the closing of a Sale |

|  | Transaction contemplated by a Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided. The Good Faith Deposits of any Back-Up Bidder shall be retained until three (3) business days after the Closing Date. The Good Faith Deposits of any other Qualified Bidders will be returned as soon as practicable but no later than seven (7) business days following the Auction. |
|---|---|

19.     As set forth in the Bidding Procedures, the Debtors further request authorization to, in their reasonable business judgment and in consultation with the Consultation Parties, modify the Bidding Procedures, including, without limitation, to extend the deadlines set forth therein (in consultation with the Cable Stalking Horse Purchaser), modify bidding increments, waive terms and conditions set forth therein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Sale Hearing; *provided* that (a) the Debtors may not amend the Bidding Procedures or the bidding process to reduce or otherwise modify their obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court, and (b) the Debtors may not change the Minimum Overbid Amount for the Cable Assets without consultation with the Cable Stalking Horse Purchaser. The Debtors will use reasonable best efforts to communicate all such modifications and additional rules in advance to each of the Consultation Parties, Potential Bidders and Qualified Bidders; *provided*, that, to the extent such modifications occur at the Auction, disclosure of such modifications may be limited to those in attendance at the Auction. Any modification to the Bidding Procedures, or adoption of new rules, procedures and deadlines, is without prejudice to the Ad Hoc Group's right to seek relief from the Court that such modification, or adoption of new rules, procedures and deadlines, is inconsistent with this paragraph or the Bidding Procedures.

## THE CABLE STALKING HORSE APA AND RELATED BID PROTECTIONS

20.     Following arm's-length and good faith negotiations, the Debtors and the Cable Stalking Horse Purchaser have agreed in principle upon the Cable Stalking Horse APA, attached to the Bidding Procedures Order as Exhibit 2, whereby the Cable Stalking Horse Purchaser will purchase the Cable Assets.  The Debtors submit that the Cable Stalking Horse APA promotes competitive bidding and maximization of the value of the Cable Assets by establishing a baseline bid in connection with the Bidding Procedures.

21.     The material terms of the Cable Stalking Horse APA are summarized in the following table pursuant to Local Rule 6004-1(b)(iv):[11]

| Cable Stalking Horse APA | |
|---|---|
| **Requirement** | **Description** |
| **Purchase Price** | The aggregate consideration for the purchase of the Transferred Assets shall be (a) $20 million, plus (b) the assumption of the Assumed Liabilities, including Determined Cure Costs.<br><br>*See* Cable Stalking Horse APA at §§ 2.3, 2.8. |
| **Purchased Assets** | The Transferred Assets include, among other things, certain Transferred Accounts Receivable, Inventory, Permits, Assigned Contracts, books and records, equipment, Transferred Intellectual Property, certain Avoidance Actions, goodwill, and certain other assets, interests or rights, in each case relating to or used in the Cable business.<br><br>*See id.* at § 2.1 (a)–(q). |
| **Assumed Liabilities** | The Assumed Liabilities consist of all Liabilities (other than Taxes) arising under the Assigned Contracts incurred or arising exclusively with respect to the period after the Closing, all Determined Cure Costs, certain Taxes, and any Liabilities relating to or resulting from the employment or engagement or termination of employment or engagement by the Cable Stalking Horse Purchaser of any Continuing Employee or |

---

[11] The following summary is provided for convenience purposes only.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings ascribed such terms in the Cable Stalking Horse APA, attached to the Bidding Procedures Order as Exhibit 2.  To the extent any of the terms below are inconsistent with the Cable Stalking Horse APA, the Cable Stalking Horse APA shall control in all respects.

| | |
|---|---|
| | Continuing Contractor exclusively arising after the Closing Date.<br>*See id. at* § 2.3 (a)–(d). |
| **Termination Rights** | The Cable Stalking Horse APA may be terminated at any time prior to the Closing as follows:<br><br>• by mutual written consent of the Cable Stalking Horse Purchaser and Debtor Casa Systems, Inc. (the "<u>Casa Seller</u>");<br><br>• by the Cable Stalking Horse Purchaser or the Casa Seller if (i) the Court enters an Order approving a Competing Bid or any sale or other disposition of all or substantially all of the Transferred Assets to a Person other than the Cable Stalking Horse Purchaser (each, an "<u>Alternate Transaction</u>") or (ii) upon the Casa Seller or any of its Subsidiaries entering into a definitive agreement with respect to an Alternate Transaction;<br><br>• by the Cable Stalking Horse Purchaser, if (i) the Casa Seller withdraws the Motion, (ii) the Casa Seller moves to voluntarily dismiss the Bankruptcy Cases or the Court otherwise orders, (iii) the Casa Seller moves for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code or the Court otherwise orders, (iv) the Casa Seller moves for appointment of an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases or the Court otherwise orders, (v) the Cable Stalking Horse Purchaser is not selected as the Successful Bidder or the Back-Up Bidder at the conclusion of the Auction or (vi) there is in effect a Final Order of a Governmental; Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Transactions;<br><br>• by the Cable Stalking Horse Purchaser if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Sellers in the Cable Stalking Horse APA, and such breach or inaccuracy would result in a failure of certain closing conditions and is incapable of being cured or, if capable of being cured, has not been cured by the Sellers prior to the earlier of (i) 20 Business Days after receipt of written notice from the Cable Stalking Horse Purchaser requesting such breach or |

|  | inaccuracy be cured or (ii) the Outside Date (defined below); |
|---|---|
|  | • by the Casa Seller if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Cable Stalking Horse Purchaser in the Cable Stalking Horse APA, and such breach or inaccuracy would result in a failure of certain closing conditions and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Cable Stalking Horse Purchaser prior to the earlier of (i) 20 Business Days after receipt of written notice from the Casa Seller requesting such breach or inaccuracy be cured or (ii) the Outside Date; |
|  | • by the Cable Stalking Horse Purchaser or the Casa Seller if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; or |
|  | • by the Cable Stalking Horse Purchaser or the Casa Seller if the Closing has not occurred on or prior to the Outside Date; *provided, however*, that the Party exercising this right to terminate shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in the Cable Stalking Horse APA; |
|  | *provided, however*, that certain of these termination rights shall not be available to the Party seeking to terminate if actions or omissions of such Party has contributed to or primarily caused the applicable triggering event. |
|  | *See id.* at § 9.1(a)–(g). |
| **Bid Protections** | Any Cable Bid Protections that are payable to the Cable Stalking Horse Purchaser upon the consummation of an Alternate Transaction shall, to the extent applicable, be paid from the proceeds of the Alternate Transaction at the closing thereof and such proceeds equal to the amount of such Cable Bid Protections shall be expressly carved-out from the collateral of the Term Lenders.  If the Alternate Transaction is the result of a Successful Bid without a cash component sufficient to pay |

| | |
|---|---|
| | all or a portion of such Cable Bid Protections, then, to the extent applicable, any resulting unpaid portion of such Cable Bid Protections shall be payable at the closing of such Alternate Transaction as a carve-out from the collateral of the Term Lenders.  For the avoidance of doubt, the foregoing applies whether the Alternate Transaction is consummated pursuant to section 363 of the Bankruptcy Code or pursuant to a plan.<br><br>Additionally, under certain termination events not involving consummation of an Alternate Transaction, (i) within one (1) business day of such termination, the Debtors shall pay $375,000 of the Expense Reimbursement Amount to the Cable Stalking Horse Purchaser as a carve-out from the collateral of the Term Lenders without further order of the Court; and (ii) $125,000 of the Expense Reimbursement Amount, which shall be an allowed administrative expense claim under section 503(b) of the Bankruptcy Code, (I) on or after the effective date in accordance with the terms of a confirmed chapter 11 plan; or (II) paid in the order of priority in any case converted to chapter 7 of the Bankruptcy Code, in each case of clauses (i) and (ii), by wire transfer of immediately available funds, without further order of the Court.<br><br>*See id.* at § 9.2 (b)–(d). |
| **Sale to Insider**<br>Local Rule 6004-1(b)(iv)(A) | The Cable Stalking Horse Purchaser is not an insider of the Debtors. |
| **Agreements with Management**<br>Local Rule 6004-1(b)(iv)(B) | The Cable Stalking Horse Bidder has not entered into any agreements with management. |
| **Releases**<br>Local Rule 6004-1(b)(iv)(C) | Effective as of the Closing:<br><br>• the Sellers, on behalf of themselves, their Affiliates and each of their respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (each of the foregoing, a "<u>Seller Releasing Party</u>"), hereby fully, irrevocably and unconditionally releases and forever discharges the Cable Stalking Horse Purchaser, any subsidiary of the Cable Stalking Horse Purchaser, and their respective Affiliates and each of the foregoing's respective past, present and/or future directors (and Persons in similar positions), managers, officers, |

employees, agents, general or limited partners, management companies, stockholders, members, equity holders, controlling Persons, other representatives and Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing, from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity with respect to the Transferred Assets and Assumed Liabilities, whether existing as of the Closing or arising thereafter, that a Seller Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date, except to the extent such actions or omissions constitute Fraud or willful misconduct; and

- the Cable Stalking Horse Purchaser, on behalf of itself, its Affiliates and each of their respective past, present and/or future officers, directors (and Persons in similar positions), employees, agents, general or limited partners, managers, management companies, members, advisors, stockholders, equity holders, controlling Persons, other representatives, or any heir, executor, administrator, successor or assign of any of the foregoing (each of the foregoing, a "Purchaser Releasing Party"), hereby fully, irrevocably and unconditionally releases and forever discharges the Sellers, any Subsidiary of the Sellers, and their respective Affiliates and each of the foregoing's respective past, present and/or future directors (and Persons in similar positions), managers, officers, employees, agents, general or limited partners, management companies, stockholders, members, equity holders, controlling Persons, other representatives and Affiliates, or any heir, executor, administrator, successor or assign of any of the foregoing, from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, all

| | |
|---|---|
| | claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity with respect to the Excluded Assets and Excluded Liabilities, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date, except to the extent such actions or omissions constitute Fraud or willful misconduct.<br><br>The foregoing is not a release or waiver by any Seller Releasing Party or Purchaser Releasing Party of any Action it may have under the Cable Stalking Horse APA or any of the other Related Documents.<br><br>*See id.* at § 10.16. |
| **Private Sale / No Competitive Bidding**<br>Local Rule 6004-1(b)(iv)(D) | An Auction is contemplated with respect to the Cable Assets. Pursuant to the Cable Stalking Horse APA, the Casa Seller shall use its commercially reasonable efforts to hold the Auction, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures, on or before the date that is 55 days following the Petition Date.<br><br>*See id.* at § 5.2(b). |
| **Closing and Other Deadlines**<br>Local Rule 6004-1(b)(iv)(E) | Key Closing and other deadlines in the Cable Stalking Horse APA include:<br><br>• The Cable Stalking Horse APA may be terminated by the Cable Stalking Horse Purchaser or the Casa Seller if the Closing has not occurred on or prior to June 6, 2024 (the "Outside Date"); *provided*, *however*, that the Party exercising such right to terminate shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in the Cable Stalking Horse APA.<br><br>• No later than 7 Business Days prior to the expected Closing Date, Purchaser shall offer employment in writing to each of the Offer Employees it has selected and offer engagement in writing to each Scheduled |

|  | Contractor it has selected, in each case, in its sole discretion, effective as of the Closing. |
|  | • If the Cable Stalking Horse Purchaser is chosen as the Back-up Bidder, the Cable Stalking Horse Purchaser will be required to keep its bid to consummate the Transactions on the terms and conditions set forth in the Cable Stalking Horse APA (as may be amended with Casa Seller's written consent prior to or at the Auction) open and irrevocable until the first to occur of (a) 15 days after the entry of the Sale Order, (b) consummation of the Transactions with the Successful Bidder, (c) the Cable Stalking Horse Purchaser's receipt of notice from the Casa Seller releasing the Cable Stalking Horse Purchaser from its obligation to serve as the Back-up Bidder, and (d) June 15, 2024.<br><br>*See id.* at §§ 5.2(c), 7.4(c), 9.1(g). |
| **Good Faith Deposit**<br>Local Rule 6004-1(b)(iv)(F) | Within one (1) Business Day of the execution of the Cable Stalking Horse APA, the Cable Stalking Horse Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount (i.e., $2 million) into the Deposit Escrow Account to be established and maintained by Escrow Agent pursuant to the Escrow Agreement.<br><br>*See id.* at § 2.8(c). |
| **Interim Arrangements with Proposed Buyer**<br>Local Rule 6004-1(b)(iv)(G) | As soon as reasonably practicable after the date of the Cable Stalking Horse APA, and in any event prior to the Closing, the Cable Stalking Horse Purchaser, the Sellers, and the purchaser of the Sellers' Cloud/RAN assets (the "Other Purchaser") shall cooperate in good faith to finalize the Transition Services Agreement. Promptly following the date of date of the Cable Stalking Horse APA, the Sellers shall introduce the Cable Stalking Horse Purchaser to the Other Purchaser to facilitate discussions regarding the Transition Services Agreement. The Cable Stalking Horse Purchaser and the Sellers also agree to negotiate in good faith with each other and the Other Purchaser with respect to the Transition Services Agreement. The Sellers shall require the Other Purchaser to agree in the Other Agreement to negotiate in good faith with Purchaser and the Sellers with respect to the Transition Services Agreement. Delivery of an executed Transition Services Agreement is a condition to the Closing.<br><br>The Sellers shall also require the Other Purchaser to agree in the Other Agreement that, to the extent the closing of the |

| | |
|---|---|
| | transactions contemplated by the Other Agreement occurs prior to the Closing, the Sellers will need continued access to the Shared Assets to continue to operate the Business in the ordinary course pending the Closing, and following such closing and until the Closing, the Other Purchaser shall provide transition services to the Sellers sufficient to allow the Sellers to operate the Business in the ordinary course.<br><br>*See id.* at §§ 2.7(a), 6.12. |
| **Use of Proceeds**<br>Local Rule 6004-1(b)(iv)(H) | Any Cable Bid Protections that are payable to the Cable Stalking Horse Purchaser upon the consummation of an Alternate Transaction shall, to the extent applicable, be paid from the proceeds of the Alternate Transaction at the closing thereof and such proceeds equal to the amount of such Cable Bid Protections shall be expressly carved-out from the collateral of the Term Lenders. If the Alternate Transaction is the result of a Successful Bid without a cash component sufficient to pay all or a portion of such Cable Bid Protections, then, to the extent applicable, any resulting unpaid portion of such Cable Bid Protections shall be payable at the closing of such Alternate Transaction as a carve-out from the collateral of the Term Lenders. For the avoidance of doubt, the foregoing applies whether the Alternate Transaction is consummated pursuant to section 363 of the Bankruptcy Code or pursuant to a plan.<br><br>Additionally, under certain termination events not involving consummation of an Alternate Transaction, (i) within one (1) business day of such termination, the Debtors shall pay $375,000 of the Expense Reimbursement Amount to the Cable Stalking Horse Purchaser as a carve-out from the collateral of the Term Lenders without further order of the Court; and (ii) $125,000 of the Expense Reimbursement Amount, which shall be an allowed administrative expense claim under section 503(b) of the Bankruptcy Code, (I) on or after the effective date in accordance with the terms of a confirmed chapter 11 plan; or (II) paid in the order of priority in any case converted to chapter 7 of the Bankruptcy Code, in each case of clauses (i) and (ii), by wire transfer of immediately available funds, without further order of the Court.<br><br>*See id.* at § 9.2 (b)–(d). |
| **Tax Exemption**<br>Local Rule 6004-1(b)(iv)(I) | It is the intention of the Cable Stalking Horse Purchaser and the Sellers that any Transactions closing after the Petition Date be exempt from all transfer, documentary, sales, use, excise, stock transfer, stamp, recording, registration and other similar taxes, levies and fees (including any penalties, fines and interest), |

| | |
|---|---|
| | together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with the Cable Stalking Horse APA and the Transactions other than Irish stamp duty provided to be for the account of the Cable Stalking Horse Purchaser under the Cable Stalking Horse APA (collectively, "<u>Transfer Taxes</u>") pursuant to Section 1146(a) of the Bankruptcy Code.<br><br>*See id.* at § 2.9. |
| **Record Retention**<br>Local Rule 6004-1(b)(iv)(J) | Until the earlier of the closure of the Bankruptcy Cases and two (2) years after the Closing Date, the Cable Stalking Horse Purchaser and its Affiliates shall (i) afford the Sellers and their representatives reasonable access, during normal business hours, upon reasonable advance notice and under reasonable circumstances, to the books and records of the Business to the extent relating to periods prior to the Closing for purposes relating to the Bankruptcy Cases or the wind-down of the operations of the Casa Seller and shall permit the Sellers and their representatives to examine and copy such books and records to the extent reasonably requested by the Sellers for such purpose, subject to certain conditions.<br><br>The Excluded Assets, which shall be retained by the Sellers and in which the Cable Stalking Horse Purchaser and its designees shall acquire no right, title or interest include "<u>Excluded Books and Records,</u>" which means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of the Sellers and the Business: (i) all corporate minute books (and other similar corporate records) and stock records of the Sellers, (ii) any books and records relating to the Excluded Assets or Taxes paid or payable by the Sellers (excluding such books and records related solely to the Transferred Assets), (iii) all Tax Returns of the Sellers (excluding such Tax Returns related solely to the Transferred Assets), (iv) any records, documents or other information solely to the extent related to any current or former employee of the Sellers and the Business who is not a Scheduled Employee or does not become a Continuing Employee, or (v) any books, records or other materials that the Sellers (x) are required by Law to retain (copies of which, to the extent permitted by Law, will be made available to the Cable Stalking Horse Purchaser upon the Cable Stalking Horse Purchaser's reasonable request), (y) reasonably believe are necessary to enable them to prepare or file Tax Returns (copies of which will be made available to the Cable Stalking Horse Purchaser upon the Cable Stalking |

| | Horse Purchaser's reasonable request) or (z) are prohibited by Law from delivering to the Cable Stalking Horse Purchaser.<br><br>*See id.* at §§ 2.2(f) 7.1(a) |
|---|---|
| **Sale of Avoidance Actions**<br>Local Rule 6004-1(b)(iv)(K) | The Transferred Assets that the Cable Stalking Horse Purchaser seeks to purchase include all Avoidance Actions, (i) relating to the Transferred Assets, the Assumed Liabilities, the Continuing Employees, the Continuing Contractors or the acquisition, ownership, management, operation, use, function or value of the Business or any Transferred Asset; or (ii) against any counterparty to a US Assigned Contract or Permit or any Affiliate of such counterparty.<br><br>*See id.* at § 2.1(i). |
| **Requested Findings as to Successor Liability**<br>Local Rule 6004-1(b)(iv)(L) | The Parties agree that the Sale Order shall provide that to the fullest extent permitted under Section 363(f) of the Bankruptcy Code, (a) the Cable Stalking Horse Purchaser shall not be liable for any Liability or Lien (other than Assumed Liabilities and Permitted Liens) against the Debtors or any of their predecessors; and (b) the Cable Stalking Horse Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Transferred Assets or any Liabilities of the Debtors arising on or prior to the Closing Date.<br><br>*See id.* at § 5.4. |
| **Sale Free and Clear of Unexpired Leases**<br>Local Rule 6004-1(b)(iv)(M) | Subject to the terms and conditions of the Cable Stalking Horse APA and the Sale Order, at the Closing, the Cable Stalking Horse Purchaser shall purchase, assume and accept from the Sellers, and the Sellers shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) the Transferred Assets to the Cable Stalking Horse Purchaser, free and clear of all Liens (other than the Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.<br><br>*See id.* at § 2.1. |
| **Credit Bid**<br>Local Rule 6004-1(b)(iv)(N) | The Cable Stalking Horse APA does not allow, disallow or affect in any manner, credit bidding pursuant to Bankruptcy Code section 363(k); however, if Debtors consummate an Alternate Transaction that is the result of a Successful Bid without a cash component sufficient to pay all or a portion of the Cable Bid Protections, then, to the extent applicable, any |

| | resulting unpaid portion of such Bid Protections shall be payable at the closing of such Alternate Transaction as a carve-out from the collateral of the Term Lenders. *See id.* at § 9.2(c). |
|---|---|
| **Relief from Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | The Debtors are seeking a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h) with respect to the Bidding Procedures Order. The Debtors will also be seeking such a waiver with respect to the Sale Order. |

22.     The Debtors submit that the consideration provided in the Cable Stalking Horse APA is the result of extensive, good-faith, arm's-length negotiations and is currently the highest and best proposal for the Cable Assets.  The Debtors' proposed entry into the Cable Stalking Horse APA is in the best interest of the Debtors' estates and constitutes a sound exercise of the Debtors' business judgment.

23.     The Cable Stalking Horse APA contains (a) a provision for reimbursement of reasonable and documented fees and expenses not to exceed $500,000 (*i.e.*, 2.7% of the applicable purchase price) (the "Cable Expense Reimbursement") following the termination of the Cable Stalking Horse APA under certain circumstances, and (b) a break-up fee equal to $600,000 (*i.e.*, 3% of the applicable purchase price) (the "Cable Break-Up Fee," and together with the Cable Expense Reimbursement, the "Cable Bid Protections"), payable in the event that the Cable Stalking Horse APA is terminated under certain circumstances.  Based on the marketing process and arm's-length negotiations between the Debtors and the Cable Stalking Horse Purchaser, the Debtors have determined that the Cable Bid Protections are necessary to retain the Cable Stalking Horse Purchaser's commitment to consummate a Cable Assets Sale Transaction.

## NOTICE PROCEDURES FOR THE SALE,
## BIDDING PROCEDURES, AUCTION AND SALE HEARING

24.     The Debtors also request approval of the Sale Notice, substantially in the form

attached to the Bidding Procedures Order as Exhibit 3.

25.     As soon as practicable after the entry of the Bidding Procedures Order, the Debtors

will serve the Sale Notice by email, if available, or otherwise by first class mail upon the following;

*provided*, *however*, that the Debtors need not serve the Sale Notice on any party for whom the

Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the

entry of the Bidding Procedures Order; *provided*, *further* that the Debtors shall not be obligated to

provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to

the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was

sent to the applicable email or physical address on file in the Debtors' books and records and no

other email or physical address could be obtained after reasonable diligence: (a) the U.S. Trustee;

(b) the United States Securities and Exchange Commission; (c) the United States Department of

Justice; (d) the Federal Communications Commission; (e) JPMorgan Chase Bank, N.A., or its

successor as administrative agent under the Superpriority Credit Agreement; (f) Delaware Trust

Company; (g) counsel to the Ad Hoc Group; (h) counsel to any Committee; (i) all state attorneys'

general and consumer protection agencies in jurisdictions in which the Cable Assets are located;

(j) the parties included on the Debtors' list of thirty (30) largest unsecured creditors; (k) all parties

who are known by the Debtors to assert liens against the Cable Assets, if any; (l) all non-Debtor

parties to the 365 Contracts; (m) any party known or reasonably believed to have expressed an

interest in acquiring some or all or substantially all of the Cable Assets; (n) all known and

reasonably identifiable creditors of the Debtors; (o) counsel to the Cable Stalking Horse Purchaser;

and (p) all parties who, as of the filing of this Motion, have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (collectively, "Sale Notice Parties").

26.     The Debtors will also cause the Sale Notice to be published once in the national edition of *The New York Times* or another publication with similar national circulation, and post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' proposed claims and noticing agent, Epiq Corporate Restructuring, LLC, which may be found at https://dm.epiq11.com/CasaSystems. The Sale Notice will include, among other things, the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the Sale Transaction, once they are set by the Court.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

27.     The Debtors also request that the Court approve the form of the Potential Assumption and Assignment Notice (as attached as Exhibit 4 to the Bidding Procedures Order) and the Assumption and Assignment Procedures described below. The Debtors submit that service of the Potential Assumption and Assignment Notice on the applicable Counterparties is proper and sufficient to provide notice to the Counterparties of the Assumption and Assignment Procedures and the proposed Cure Amounts associated with their contract(s).

28.     To facilitate the Sale Transaction, the Debtors seek authority to assume and assign the applicable 365 Contracts to the Successful Bidder in accordance with the following Assumption and Assignment Procedures:

   a. The Debtors shall file with the Court, post on the case website at https://dm.epiq11.com/CasaSystems, and serve on each Counterparty to a 365 Contract a Potential Assumption and Assignment Notice on or prior to April 24, 2024 (the "Potential Assumption and Assignment Notice Deadline").

   b. The Potential Assumption and Assignment Notice shall include, without limitation: (i) a list of applicable 365 Contracts; and (ii) the Cure Amounts, if any, that the Debtors believe are required to be paid. If a Counterparty objects to the Cure

Amounts, the Counterparty must file with the Court and serve on each of (a) counsel to the Debtors, (b) counsel to the Ad Hoc Group, (c) counsel to the Committee, if any, (d) the U.S. Trustee, and (e) counsel to the Cable Stalking Horse Purchaser, a written objection (a "<u>Cure Objection</u>") on or before **May 8, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Cure Objection Deadline</u>"), *provided* that with respect to any Cure Objection for any 365 Contract included on any subsequent Potential Assumption and Assignment Notice filed by the Debtors, if any, such Cure Objections must be filed on or prior to the Adequate Assurance Objection Deadline (defined below).  Any Cure Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Rules; and (iii) state with specificity the grounds for such objection, including, without limitation, the fully liquidated Cure Amount and the legal and factual bases for any unliquidated Cure Amount that the Counterparty believes is required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable 365 Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

c.  If, after the Potential Assumption and Assignment Notice Deadline, and prior to the Auction, if any, or cancellation thereof, additional executory contracts or unexpired leases of the Debtors are determined to be potential 365 Contracts in connection with a Sale Transaction, or the Debtors seek to modify the previously stated Cure Amount associated with any 365 Contract, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties a supplemental or amended Potential Assumption and Assignment Notice.

d.  Following the Auction, if any, the Debtors shall file with the Court and serve a Notice of Successful Bidder on the applicable Counterparties.

e.  Any time prior to the Closing Date, the Debtors (subject to the terms of the Cable Stalking Horse APA or Successful Bid, if and as applicable) reserve the right, and are authorized but not directed, to: (i) add previously omitted 365 Contracts as contracts to be assumed and assigned to a Successful Bidder in accordance with the definitive agreement for a Sale Transaction; (ii) remove a 365 Contract from the Potential Assumption and Assignment Notice that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction; or (iii) modify the previously stated Cure Amount associated with any 365 Contract.  The Debtors shall promptly provide notice of such addition, removal, or modification to such applicable Counterparties and shall take such other actions as are necessary in the Court to effectuate such addition or modification.

f.  The Counterparties shall file any objections to the adequate assurance of future performance by the Successful Bidder (an "<u>Adequate Assurance Objection</u>" and together with any Cure Objection, an "<u>Assignment Objection</u>"), on or prior to May 24, 2024 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Adequate Assurance Objection Deadline</u>").  Unless otherwise provided, any Adequate Assurance Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and Local

Rules; (iii) be filed via ECF on or before the Adequate Assurance Objection Deadline; and (iv) state with specificity the grounds for such objection.

g.  At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Successful Bidder of those 365 Contracts that have been selected by such Successful Bidder to be assumed and assigned.  The Debtors and their estates reserve any and all rights with respect to any 365 Contracts that are not ultimately designated.

h.  If no Assignment Objection is timely filed with respect to a 365 Contract: (i) the Counterparty to such 365 Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the 365 Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the 365 Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Cure Amount set forth in the applicable Potential Assumption and Assignment Notice for such 365 Contract; and (iii) the Counterparty shall be forever barred from asserting any other claims related to such 365 Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Cure Objections and the Sale Order.

i.  To the extent that the parties are unable to consensually resolve any Cure Objection prior to the commencement of the Sale Hearing, the Debtors, with the consent of the Successful Bidder (not to be unreasonably withheld or delayed), may (i) assume the applicable 365 Contract prior to the resolution of the Cure Objection; *provided* that the Debtors shall (A) pay to the applicable Counterparty the undisputed portion of the Cure Amount within five (5) business days after entry of the Sale Order and (B) reserve cash in an amount sufficient to pay the disputed portion of the Cure Amount reasonably asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty and the Debtors) (the "Reserve Amount"), or (ii) adjourn their request to assume the 365 Contract pending resolution of the Cure Objection (an "Adjourned Cure Dispute"); *provided further* that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the Debtors, the Debtors, with the consent of the Successful Bidder (such consent not to be unreasonably withheld or delayed), may withdraw the proposed assumption of the applicable 365 Contract after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code.  The Debtors shall file notice of their intention to reserve for a Cure Amount or to adjourn their request for assumption.  Except as otherwise provided in the Cable Stalking Horse APA, an Adjourned Cure Dispute may be resolved after the Closing Date of the Sale Transaction in the Debtors' discretion, with the consent of the Successful Bidder (not to be unreasonably withheld or delayed).

## KEY SALE PROCESS DATES

29.     The following is a summary of the proposed key dates for the sale process:

| Date | Deadline/Event |
|---|---|
| April 24, 2024, at a time TBD | Bidding Procedures Hearing |
| April 24, 2024 | Potential Assumption and Assignment Notice Filing Deadline |
| May 8, 2024 at 4:00 p.m. (ET) | Cure, Contract, and Sale Objection Deadline |
| May 13, 2024, at 4:00 p.m. (ET) | Bid Deadline |
| May 14, 2024 | Deadline for Debtors to notify Potential Bidders of whether their Bids are Qualified Bids |
| May 15, 2024, starting at 10:00 a.m. (ET) | Auction (if necessary) |
| May 24, 2024, at 4:00 p.m. (ET) | Adequate Assurance Objection Deadline |
| May 29, 2024 | Sale Objection Reply Deadline |
| May 31, 2024, at a time TBD | Sale Hearing |
| On or prior to June 6, 2024 | Targeted Closing |

30.     The Debtors respectfully submit that the timeline set forth above is necessary under the circumstances of the chapter 11 cases.  Such timeline provides a 40-day period between the filing of this Motion and the Bid Deadline and is comparable to other timelines recently approved in this district.  *See, e.g.*, *In re Winc, Inc.*, Case No. 22-11238 (LSS) (Bankr. D. Del. Dec. 22, 2022) (approving a sale timeline that provided an approximate five-week period between the filing of the motion and the bid deadline); *In re Fast Radius, Inc.*, Case No. 22-11051 (JKS) (Bankr. D. Del. Nov. 14, 2022) (approving a sale timeline that provided an approximate three-week period between the filing of the motion and the bid deadline); *In re Clarus Therapeutics Holdings Inc.*, Case No. 22-10845 (Bankr. D. Del. Sept. 22, 2022) (approving a sale timeline that provided a five-week

period between the filing of the motion and the bid deadline).  This timeline, which builds off of multiple bespoke week and month-long marketing processes conducted prepetition by the Debtors, with the assistance of their advisors, will allow Potential Bidders sufficient time to evaluate the Cable Assets, given the nature and complexity of the Cable Assets, and formulate bids.  In addition to the Debtors' prepetition marketing efforts, the Debtors will actively market the Cable Assets postpetition, including by contacting potential purchasers that may be interested in both certain business segments or Cable Assets and/or a going concern sale.  Moreover, relevant information regarding the Debtors' business has been made available prepetition and (subject to the execution of a confidentiality agreement) in the Data Room, allowing Potential Bidders to immediately conduct due diligence on the Cable Assets.

31.     Any further extended timeline is not tenable in these chapter 11 cases given the Debtors' liquidity situation.  In the absence of additional commitments from third parties to fund an extended in-court sale process, the timeline contemplated herein is the only path for the Debtors to avoid a value-destructive chapter 7 conversion to the detriment of their stakeholders.  Given the extensive prepetition marketing processes run to date, the timeline set forth herein is reasonable and appropriate given the extenuating circumstances present in these chapter 11 cases.

**THE PROPOSED SALE ORDER**

32.     Any Sale Order will contain those certain provisions that require disclosure under Local Rule 6004-1.  The Debtors anticipate that a draft Sale Order for the Sale Transaction will be filed no later than May 20, 2024, and that a Sale Hearing shall take place on May 31, 2024, subject to the Court's availability.

31517188.1

## BASIS FOR RELIEF REQUESTED

**A. Approval of the Sale Transaction Is Warranted Under Section 363(b) of the Bankruptcy Code**

33.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Debtors must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

34.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

    a.     whether a sound business justification exists for the sale;

    b.     whether adequate and reasonable notice of the sale was given to interested parties;

    c.     whether the sale will produce a fair and reasonable price for the property; and

    d.     whether the parties have acted in good faith.

*In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

35.     When a debtor demonstrates a valid business justification for a decision, a strong presumption arises "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re*

31517188.1

40

*Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

36.    The Debtors submit that their decision to pursue a Sale Transaction on the terms set forth in this Motion represents a reasonable exercise of the Debtors' business judgment and, accordingly, the Sale Transaction should be approved under section 363(b) of the Bankruptcy Code.  The Debtors intend that the postpetition marketing process will be an extensive and fulsome process to identify potential buyers for the Cable Assets.  Zubricki Declaration, ¶ 19.  The open and fair Auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors receive the highest or best value available for the Cable Assets (by allowing the market to dictate the value of the Cable Assets) to the benefit of the Debtors' estates as compared to any other available alternative process.  *Id.* at ¶ 21.  Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Successful Bidder and establish that the Debtors and the Successful Bidder proceeded in good faith.  *Id*.

37.    Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale Transaction, the terms and conditions of the Sale Transaction, the time and place of the Auction, and the deadline for filing any objections.  The Debtors assert that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Sale Transaction, the Auction, and the Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Cable Assets.

31517188.1

38.     Pursuit of the Sale Transaction, conducted in accordance with the Bidding Procedures, will provide the Debtors with the best opportunity to generate maximum value for the Debtors' estates, and represents the best path forward for maximizing recoveries. *Id.* at ¶ 19.  The Debtors submit that ample business justification exists for the consummation of the Sale Transaction and therefore request that the Court approve the Bidding Procedures.

## B.  The Sale of the Cable Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code

39.     The Debtors request approval to sell the Cable Assets free and clear of any and all pledges, liens, security interests, encumbrances, claims, charges, options, and interests ("Encumbrances") in accordance with section 363(f) of the Bankruptcy Code.  Pursuant to section 363(f), a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (b)     such entity consents;
>
> (c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d)     such interest is in bona fide dispute; or
>
> (e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

40.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of the Debtors' assets free and clear of any claims against the Debtors.  *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003)

(holding that successor liability claims are "interests in property" within the meaning of section 363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573 (4th Cir. 1996) (same).

41.     The Debtors submit that the sale of the Cable Assets free and clear of the Encumbrances will satisfy the requirements of section 363(f) of the Bankruptcy Code.  The Debtors also assert that the service of the Sale Notice in accordance with the terms set forth in this Motion will afford creditors sufficient notice of the Sale Transaction and therefore provides additional justification for approval of the Sale Transaction free and clear of all Encumbrances.

**C. The Sale Transaction Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code**

42.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  *See* 11 U.S.C. § 363(m).

43.     In approving the Sale Transaction free and clear of Encumbrances, the Debtors request that the Court find and hold that the purchaser of the Cable Assets purchased in accordance with the Bidding Procedures are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that the selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  Zubricki Declaration, ¶ 20; *see Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620

(Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

## D.  The Court Should Approve the Bidding Procedures

44.     The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtors "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm.*, 330 F.3d at 573 (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the Debtor's assets").

45.     The Debtors and their professional advisors have designed the Bidding Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors' estates and stakeholders, all within the confines of the Debtors' dire liquidity situation.  Zubricki Declaration, ¶ 20.  The Bidding Procedures will allow the Debtors to extend and enhance the prepetition marketing process to a broader universe of potential buyers and conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Cable Assets.  *Id.* at ¶ 19.  Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors and their independent fiduciaries and professional advisors to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtors' estates and their stakeholders. *Id.* at ¶ 20.  As a baseline bid, the Cable Stalking Horse Bid fosters competitive bidding—a process through which the Debtors could potentially achieve significant improvements in the consideration for the Cable Assets—and provides a

meaningful degree of comfort to employees regarding a potential path to continued employment. *Id.* at ¶ 26. These factors all serve to promote the Debtors' goal of maximizing value for the benefit of all stakeholders.

46. Given the Debtors' liquidity situation and their robust prepetition marketing process (which included initiating a formal outreach and holding discussions with more than 26 parties in connection with potential sale transactions and included parties who were interested in buying substantially all of the Debtors' assets as well as those who expressed interest in a more limited scope of assets), the Debtors have determined that approval of the Cable Stalking Horse Bid alongside an expeditious sale process represents their best, and perhaps only, opportunity to maximize the value of their estates for the benefit of all the Debtors' stakeholders and preserve jobs. *Id.* at ¶ 23. Therefore, the Debtors submit that the expedited, efficient sale process, as provided for in this Motion and in accordance with the Bidding Procedures, is necessary to generate the highest or otherwise best value for the Cable Assets while minimizing costs and saving jobs.

47. The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or best Bids for the Cable Assets. Therefore, the Debtors request that the Court approve the Bidding Procedures.

**E. The Court Should Authorize Entry Into the Cable Stalking Horse APA and Approve the Cable Bid Protections.**

48. The Court should authorize the Debtors' entry into the Cable Stalking Horse APA, including the proposed Cable Bid Protections set forth therein. To determine whether a debtor's sale of assets outside of the ordinary course of business satisfies the "business judgement" standard under section 363(b) of the Bankruptcy Code, courts consider whether "(1) there is a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided

adequate and reasonable notice; and (4) the buyer has acted in good faith." *In re Exaeris Inc.*, 380

B.R. 741, 744 (Bankr. D. Del. 2008) (citing *In re Delaware Hudson Railway Co.*, 124 B.R. 169,

176 (D. Del. 1991)); *see also In re Elpida Memory, Inc.*, 2012 WL 6090194, at *5 (Bankr. D. Del.

Nov. 20, 2012) ("The section 363(b) standard is well-settled.  A debtor may sell assets outside the

ordinary course of business when it has demonstrated that the sale of such assets represents the

sound exercise of business judgment.").  If a debtor demonstrates a valid business justification for

a decision, such as preserving the value of the estate for the benefit of all stakeholders, "courts will

generally not entertain objections" and "a strong presumption follows that the agreement was

negotiated in good faith and is in the best interests of the estate." *In re Culp*, 545 B.R. 827, 844

(D. Del. 2016), *aff'd,* 681 F. App'x 140 (3d Cir. 2017).  Courts have found that a debtor's decision

to sell assets on an expedited timeline, when failing to expeditiously conclude the sale process

would create a substantial risk of default under a secured credit facility and threaten to substantially

diminish creditor recoveries, constitutes a valid business reason for such a sale.  *See, e.g.*, *In re

Blitz U.S.A., Inc*, 2009 WL 10817513, at *3 (Bankr. D. Del. Jan. 30, 2009).

49.    Courts have acknowledged that the approval of break-up fees and expenses in

connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful

acquirer whose initial offer served as the basis and catalyst for higher or better offers.  *See In re

Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of

[bid protections] . . . depends upon the requesting party's ability to show that the fees [a]re actually

necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original);

*In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (same); *In re O'Brien Env't

Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999) (same); *In re Women First Healthcare, Inc.*, 332

B.R. 115, 121–23 (Bankr. D. Del. 2005) (same).

50.     Courts have identified at least two instances in which bid protections may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy*, Inc., 181 F.3d 527, 533 (3d Cir. 1999).  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *See id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse purchaser to remain committed to a purchase).

51.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.   the presence of self-dealing or manipulation in negotiating the break-up fee;

b.   whether the fee harms, rather than encourages, bidding;

c.   the reasonableness of the break-up fee relative to the purchase price;

d.   whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.   the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.   the correlation of the fee to a maximum value of the debtor's estate;

g.   the support of the principal secured creditors and creditors' committees of the break-up fee;

h.   the benefits of the safeguards to the debtor's estate; and

      i.    the adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

52.     Here, the Debtors' entry into the Cable Stalking Horse APA, including the proposed Cable Bid Protections set forth therein, is an appropriate exercise of the Debtors' business judgment. First, the Cable Stalking Horse APA, including the Cable Break-Up Fee and Cable Expense Reimbursement are necessary to successfully pursue the sale of the Cable Assets, and will not chill bidding. Zubricki Declaration, ¶ 29. Second, by setting a floor for the value of the Cable Assets and establishing acceptable baseline terms for the sale, the Cable Stalking Horse APA encourages potential buyers to bid for the Cable Assets, thereby maximizing the realizable value of such assets for the benefit of the Debtors' estates, creditors and other parties-in-interest. *Id.* Third, the Bidding Procedures require that any competing bid for the Cable Assets must exceed the Cable Stalking Horse Bid by an amount in excess of the applicable break-up fee and expense reimbursement, and therefore, in the event that the Debtors consummate a Sale Transaction with a bidder other than the Cable Stalking Horse Purchaser, the payment of the Cable Bid Protections will not diminish the Debtors' estates. *Id.* at ¶ 30. Finally, without the Cable Bid Protections, the Debtors might lose the opportunity to obtain the highest and best offer for the Cable Assets and would certainly lose the downside protection that will be afforded by the existence of the Cable Stalking Horse Purchaser. *Id.* For the foregoing reasons, the Debtors submit that the Cable Bid Protections reflect a sound business purpose and request Court approval thereof.

53.     Additionally, similarly sized break-up fees and expense reimbursements have been approved by a number of courts in this and other jurisdictions. *See, e.g.*, *In re Orexigen Therapeutics, Inc.*, Case No. 18- 10518 (KG) (Bankr. D. Del. Apr. 23, 2018) (approving a break-up fee of 4.7% and expense reimbursement of 2.7% of purchase price); *In re SunEdison, Inc.*, Case

No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2016) (approving a break-up fee of 3.8% and expense reimbursement of 3.1%); *In re Earth Fare, Inc.*, Case No. 20-10256 (KBO) (Bankr. D. Del. Feb. 14, 2020) (approving a break-up fee of 3%); *In re Celadon Grp., Inc.*, Case No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) (approving a break-up fee of 3%); *In re Hosp. Acquisition LLC*, Case No. 19-10998 (BLS) (Bankr. D. Del. June 27, 2019) (approving break-up fee of 3%); *In re BPS US Holdings Inc.*, et al., No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016) (approving break-up fee of 3.5%); *In re Neighbors Legacy Holdings, Inc.*, Case No. 18-33836 (MI) (Bankr. S.D. Tex. Aug. 8, 2018) (approving a break-up fee of 5%); *In re Geokinetics Inc.*, Case No. 18-33410 (DRJ) (Bankr. S.D. Tex. Jul. 2, 2018) (same); *In re Verity Health System of California, Inc.*, No. 18-20151 (ER) (Bankr. C.D. Cal. Oct. 31, 2018) (approving a break-up fee of 4.0%).

54. Accordingly, for the reasons set forth above, the Debtors respectfully submit that the Court grant the Debtors the authority to enter into the Cable Stalking Horse APA and incur and pay the Cable Bid Protections in order to preserve the value of the Debtors' estates.

**F. The Assumption and Assignment of the 365 Contracts Satisfies Section 365 of the Bankruptcy Code**

55. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); *see also In re Market*

*Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court").

56.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).   Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

57.     Under section 365(f) of the Bankruptcy Code, a debtor, after assuming a contract, may assign its rights under the contract to a third party.  11 U.S.C. § 365(f); *see also In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the Debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtors' assets).  Section 365(f)(2)(B) requires that the non-debtor contract counterparty be given adequate assurance of future performance by an assignee.  11 U.S.C. § 365(f)(2)(B).  The purpose of the adequate assurance requirement is to protect the interests of the non-debtor party to an assigned contract, as section 365(k) of the Bankruptcy Code relieves a debtor from liability for any breach of a contract that may occur after

an assignment. *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001). Adequate assurance of future performance is not required for every term of an executory contract or unexpired lease, but only such terms that are "material and economically" significant. *In re Fleming Cos., Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

58.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.,* 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment."). Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from a debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

59.     The assumption and assignment of certain executory contracts and unexpired leases is an appropriate exercise of the Debtors' business judgment. Additionally, the Debtors submit that the notice provisions and the objection deadline for counterparties to raise objections to the assumption and assignment of the 365 Contracts as proposed in this Motion are adequate to protect the rights of counterparties to the Debtors' contracts and leases. Furthermore, the Debtors will demonstrate adequate assurance of future performance at the Sale Hearing.

## **REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS**

60.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to

Bankruptcy Rule 6004(h).   As explained above and in the First Day Declarations, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximization process.   Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **RESERVATION OF RIGHTS**

61.    Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.   Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## **NOTICE**

62.    Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) JPMorgan Chase Bank, N.A., or its successor as administrative agent under the Superpriority Credit Facility; (d) Delaware Trust Company; (e) counsel to the Ad Hoc Group; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue

Service; (h) the Securities and Exchange Commission; (i) the Federal Communications Commission; (j) the Cable Stalking Horse Purchaser; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**WHEREFORE**, the Debtors respectfully request entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated: April 3, 2024
Wilmington, Delaware

/s/ *Joseph M. Mulvihill*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Joseph M. Mulvihill (Del. Bar No. 6061)
Timothy R. Powell (Del. Bar No. 6894)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jbarry@ycst.com
        jmulvihill@ycst.com
        tpowell@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIDLEY AUSTIN LLP**
Stephen E. Hessler (*pro hac vice* pending)
Patrick Venter (*pro hac vice* pending)
Margaret R. Alden (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: shessler@sidley.com
        pventer@sidley.com
        malden@sidley.com

Ryan L. Fink (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: ryan.fink@sidley.com

Julia Philips Roth (*pro hac vice* pending)
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 595-9500
Facsimile: (310) 595-9501
Email: julia.roth@sidley.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*