### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| CASA SYSTEMS, INC., *et al.*,[1] | Case No. 24-10695 (KBO) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF BRIAN WHITTMAN
### IN SUPPORT OF THE DEBTORS' MOTIONS TO
### USE CASH COLLATERAL, APPROVE BIDDING PROCEDURES,
### AND APPROVE THE CLOUD/RAN SALE, AND OTHER FIRST DAY PLEADINGS

I, Brian Whittman, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.        I am a Managing Director in the Commercial Restructuring practice at Alvarez & Marsal North America, LLC ("A&M"), which serves as restructuring advisor to Casa Systems, Inc. ("Casa"), the ultimate parent of each of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") and their non-debtor affiliates (the "Non-Debtor Affiliates,"[2] and, together with the Debtors, the "Company"). I am over the age of 18 and authorized to submit this declaration (this "Declaration") on behalf of each of the Debtors.

2.        I have more than twenty-five years of experience serving as a financial advisor in distressed situations and providing restructuring and performance improvement services to

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are Casa Systems, Inc. (8867), Casa Systems Securities Corporation (1151), and Casa Properties LLC (6767). The Debtors' service address is 100 Old River Road, Andover, MA 01810.

[2] The Non-Debtor Affiliates are: Casa Systems Canada Ltd., Guangzhou Casa Communications Ltd., Casa Technologies Ltd., Casa Systems SAS, Casa Systems Communications Limited, Casa Systems B.V., Casa Communications Technology S.L. (f/k/a Nikaleia, S.L.), Casa Communications Holdings Pty Ltd, Casa Technologies Pty Ltd, NetComm Wireless Pty Ltd, NetComm Wireless (Germany) GmbH, NetComm Wireless (NZ) Limited, NetComm Wireless (UK) Limited, and NetComm Wireless Inc.

corporations, various creditor classes, equity owners, and directors of financially distressed companies across a wide range of industries, including the telecommunications equipment industry.  I have served as a Managing Director in A&M's Restructuring & Turnaround group since 2008 and the group's co-head of the Midwest region since 2019.  During my tenure at A&M I also served as interim chief financial officer of Horizon Global in 2018–19, chief restructuring officer of UCI International in 2016, and interim chief financial officer of PSAV, Inc. in 2014.  Prior to joining A&M in 2002, I spent seven years working as a director in restructuring at a former "Big Five" accounting firm.  I hold bachelor's degrees in Finance and Accountancy from the University of Illinois, am a Certified Public Accountant, and a Certified Insolvency and Restructuring Advisor.

3.      In my capacity as the lead Managing Director at A&M responsible for this engagement, I was closely involved in preparing the Debtors' chapter 11 filings, developing the Debtors' cash flow forecast, and providing diligence to and negotiating with certain of the Debtors' key constituencies.   In doing so, I have familiarized myself with the Debtors' day-to-day operations, financial affairs, and books and records through review of certain financial documents and discussions with management.  In addition, the statements made herein are based, in whole or part, upon my review of public and non-public documents and my discussions with other members of Casa's management team and advisors on whom I have relied.

4.      I am generally familiar with Casa's businesses, financial condition, day-to-day operations, and the circumstances leading to the commencement of these chapter 11 cases (the "Chapter 11 Cases").   Except as otherwise noted, I have personal knowledge of the matters set forth in this declaration (this "Declaration") or have gained knowledge of such matters from Casa's employees or retained advisers in the ordinary course of my responsibilities.  I believe, to

the best of my knowledge, that the facts and circumstances set forth herein are true and correct. References to bankruptcy, the chapter 11 process, and related legal matters are based on my understanding of such in reliance on the explanation provided by, and the advice of, counsel to Casa.  If called upon to testify, I would testify competently to the facts set forth herein.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I am submitting this Declaration for the purpose of apprising the Court and other parties in interest of the proposed use of Cash Collateral (as defined below), the Debtors' proposed sale transactions, and the First Day Motions (as defined below).  It is my understanding that the Debtors have filed a separate declaration with the Court providing the background information on the Debtors, the Debtors' prepetition capital structure, and the events leading to the filing of these Chapter 11 Cases.[3]  Together, the Debtors intend these declarations to constitute the "First Day Declarations" in these Chapter 11 Cases.

6.      To better assist the Court, this Declaration is organized in two sections.  Part I provides information regarding the Debtors' need for liquidity in these Chapter 11 Cases and support for (a) the Debtors' Cash Collateral Motion (as defined below) to approve the proposed use of Cash Collateral, (b) the Debtors' Cloud/RAN Sale Motion (as defined below) to approve a sale of the Debtors' Cloud/RAN assets (the "Cloud/RAN Sale Transaction") and (c) the Debtors' Bidding Procedures Motion (as defined below) to approve one or more value-maximizing sales of the Debtors' Cable assets (the "Cable Assets" and such transaction, the "Cable Sale Transaction") and certain other assets (the "Other Assets Sale Transactions" and together with the Cloud/RAN

---

[3] Concurrently herewith, the Debtors are also filing the *Declaration of Edward Durkin in Support of Chapter 11 Petitions and First Day Pleadings* (the "Durkin Declaration"), which provides background information regarding the Debtors and the filing of these Chapter 11 Cases.

Sale Transaction, and Cable Sale Transaction, the "Sale Transactions").  Part II sets forth the evidentiary basis for each of the first day pleadings (the "First Day Motions") and expresses the Debtors' belief that the Court should approve the same.

## Cash Collateral, Cloud/RAN Sale, and Bidding Procedures

7.    As discussed herein, I submit this Declaration in support of the following motions, filed contemporaneously herewith, in addition to the First Day Motions:[4]

a.  the *Debtors' Motion for Entry of an Order (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to Secured Lender, (III) Modifying Automatic Stay and (IV) Granting Related Relief* (the "Cash Collateral Motion");

b.  the *Debtors' Motion for Entry of an Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds, (II) Approving Assumption and Assignment Procedures in Connection Therewith, (III) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases to the Purchaser, and (IV) Granting Related Relief* (the "Cloud/RAN Sale Motion"); and

c.  the *Debtors' Motion for Entry of an Order (I)(A) Approving Bidding Procedures; (B) Approving the Selection of Stalking Horse Purchasers; (C) Approving the Debtors' Entry into the Stalking Horse APAs and Approving Bid Protections; (D) Scheduling Auctions and Sale Hearing; (E) Approving Form and Manner of Sale Notice; (F) Approving Form and Manner of Potential Assumption and Assignment Notice; (G) Approving the Form and Manner of Post-Auction Notice; (H) Approving Assumption and Assignment Procedures; and (II) Granting Related Relief* (the "Bidding Procedures Motion").

8.    The Debtors commenced these Chapter 11 Cases in order to facilitate an orderly sale and winddown of the Debtors' assets and operations with only enough cash on hand plus forecast receipts to survive to the end of April, and only after having failed to make a $5.6 million interest payment originally due on March 15, 2024 to the Prepetition Lenders.  Absent the relief described herein, the Debtors will be required to cease operations by the end of April.  With this

---

[4] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Durkin Declaration, the Cash Collateral Motion, the Cloud/RAN Sale Motion, or the Bidding Procedures Motion, as applicable.

background, after months of hard-fought arms'-length negotiations with an ad hoc group of the Debtors' Prepetition Lenders (the "Ad Hoc Group"), the Debtors have built consensus around a narrow path to avoid such liquidity shortfall and successfully commence and consummate these Chapter 11 Cases for the benefit of the Debtors' stakeholders. That consensus, as memorialized in the Restructuring Support Agreement, requires this Court's approval of (a) the Debtors' access and use of Cash Collateral and (b) the closing of the Cloud/RAN Sale Transaction in the first approximately 21 days of these Chapter 11 Cases, the proceeds of which are critical to fund the remainder of the cases, including a postpetition marketing process for a Cable Sale Transaction and Other Sale Transactions pursuant to the Bidding Procedures Motion. In the absence of such approval, the Debtors will not have sufficient funding to bring these Chapter 11 Cases to a successful conclusion, which would necessitate a value destructive chapter 7 conversion to the detriment of the Debtors' stakeholders.

9.      I submit this Declaration as evidence that the proposed use of the Debtors' cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral") (a) is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases and (b) provided that the Cloud/RAN Sale Transaction is approved, will grant the Debtors with access to sufficient working capital and liquidity to operate during these Chapter 11 Cases and to run a process to consummate the Cable Sale Transaction and Other Sale Transactions.[5]

10.      Absent the use of Cash Collateral and approval of the Cloud/RAN Sale Transaction, the Debtors will not have sufficient liquidity to continue operating in the ordinary course and would be forced to shut down operations prior to the consummation of the Cable Sale Transaction,

---

[5] Concurrently herewith, the Debtors are also filing the *Declaration of David S. Zubricki in Support of Debtors' Bidding Procedures Motion and Cloud/Ran Sale Motion* (the "Zubricki Declaration"), which describes the prepetition marketing process conducted with respect to the Company's assets and financing needs and provides support for the consummation of the proposed Sale Transactions.

which would be value destructive to the Debtors' stakeholders and result in the immediate loss of approximately 750 jobs, the vast majority of which would otherwise be preserved in connection with the Sale Transactions. Accordingly, obtaining the relief described herein is critical to the continued operations of the Debtors' business, maintaining their sale value, and providing the best outcome for the Company's stakeholders, including its employees, and immediate and irreparable harm will be caused to the Debtors and their estates if permission to use Cash Collateral and consummation of the Cloud/RAN Sale Transaction is not granted.

**I.      The Debtors' Immediate Need for Cash Collateral and Expedited Sale Timelines.**

11.      As set forth in the Durkin Declaration, the Debtors commenced these chapter 11 cases to facilitate a sale of substantially all of their assets and an orderly winddown process while preserving the jobs of its employees. In connection with the foregoing, the Debtors determined that their cash on hand from operations would be insufficient to fund such cases to a successful conclusion and that postposition financing would be necessary.[6] Accordingly, as set forth in the Zubricki Declaration, during the months preceding these chapter 11 cases, the Debtors, with the assistance of their advisors, canvassed any and all potential sources of case funding, including with an ad hoc group (the "Ad Hoc Group") of the Debtors' existing lenders (the "Prepetition Lenders") and third parties. Ultimately, I understand that the Prepetition Lenders indicated both an unwillingness to provide debtor-in-possession financing ("DIP Financing") and to consent to priming of their secured interests, and that no third-party lender was willing to provide postpetition financing on a junior basis or to seek DIP Financing approval on a nonconsensual priming basis.

---

[6] This determination remains true today. Based on my review of the Debtors' books and records, the Debtors had total unrestricted cash on hand of approximately $4.2 million as of the Petition Date, consisting of cash from operations. Such cash is insufficient to fund the Debtors' operations and process costs for the entirety of these Chapter 11 Cases, including costs associated with the Sale Transactions.

12.     As described in the Zubricki Declaration, facing the prospect of an imminent chapter 7 filing, the Debtors and the Ad Hoc Group to a path forward that would avoid a liquidity shortfall allowing the Debtors to successfully commence and consummate these Chapter 11 Cases—lender consent to the Debtors' access and use of their cash collateral ("Cash Collateral"), and the closing of the Cloud/RAN Sale Transaction in the first approximately 21 days of these Chapter 11 Cases, the proceeds of which would be used to fund the remainder of the cases, including a postpetition marketing process for the Cable Sale Transaction. Under the staggered sale construct, the Debtors and their estates receive a twofold benefit. The Cloud/RAN business was forecast to use $4.5 million of cash over the 5 weeks following the projected closing of the Cloud/RAN Sale Transaction, or approximately $900,000 per week. Accordingly, a near-term sale has the benefit of preserving cash on hand in addition to the injection of the sale proceeds. And, as further discussed in the Zubricki Declaration, the staggered sales also reflect the respective markets for the Cloud/RAN Assets and the Cable Assets; based on prepetition discussions and outreach, the Debtors and their advisors believe that a Cable Sale Transaction will generate significantly more interest from potential purchasers than a Cloud/RAN Sale Transaction.

13.     In connection with extensive arms'-length negotiations with the Ad Hoc Group regarding the terms and conditions of the Debtors' consensual use of Cash Collateral, the Debtors have formulated an initial 10-week forecast, set forth in the approved Cash Collateral budget (the "Approved Budget"), which includes all reasonable and foreseeable expenses to be incurred by the Debtors for the applicable period. Given the Debtors' extremely limited cash on hand, the proceeds from the Cloud/RAN Sale Transaction and the elimination of ongoing expenses associated with the Cloud/RAN Assets from the Debtors' cash flows, in the initial weeks of these Chapter 11 Cases are critical for the Debtors to continue to operate in the ordinary course, ensure

a smooth transition for the Company's employees, and preserve the Debtors' asset sale values in connection with the Cable Sale Transaction, the marketing process for which commenced prepetition and is contemplated to continue postpetition. Absent the approval of the Cloud/RAN Sale Transaction, the Debtors will not have sufficient liquidity for these Chapter 11 Cases or to complete the Cable Sale Transaction and would be forced to cease operations, terminate their employees, and liquidate their assets in piecemeal fashion through value destructive chapter 7 proceedings.

14.     Indeed, the Ad Hoc Group has consented to the use of the Cash Collateral, including Cash Collateral in the form of the Cloud/RAN sale proceeds, in order to consummate the Cable Sale Transaction. Specifically, the Debtors enter chapter 11 having secured a stalking horse bidder for the Debtors' Cable assets, whose bid will be subject to higher and better bids pursuant to a section 363 sale process and the bidding procedures to be approved by the Court. As set forth in the Bidding Procedures Motion, the Debtors contemplate an expedited sale timeline with a closing of the Cable Sale Transaction on or prior to June 6, 2024.

15.     I believe that, given the Debtors' postpetition liquidity situation, the only value-maximizing path forward involves Court approval of the Cloud/RAN Sale Transaction and the Debtors' access to Cash Collateral in order to expeditiously consummate the Cable Sale Transaction and any Other Sale Transactions. Accordingly, the proposed respective timelines to consummate both the Cloud/RAN Sale Transaction and the Cable Sale Transaction (in addition to any Other Sale Transactions) are not only appropriate, but necessary. The Debtors cash needs during these Chapter 11 Cases are significant, and they cannot afford to extend the duration of such cases, nor can the Debtors afford to consummate the Cloud/RAN Sale Transaction on the same timeline as the Debtors' other Sale Transactions. The Debtors vigorously negotiated with

the Ad Hoc Group regarding postpetition funding and the use of the Cash Collateral, and an expedited close of the Cloud/RAN Sale Transaction presents the only actionable path to fund these Chapter 11 Cases.

16.     While I believe the Cash Collateral (including the Cloud/RAN Sale Transaction proceeds) is sufficient to operate through the anticipated closing of the Cable Sale Transaction on the timeline set forth in the Bidding Procedures Motion, in light of the limited amount of the Cash Collateral and the Debtors' cash flow forecast, absent consummation of the Cable Sale Transaction and Other Sale Transactions on the proposed timeline, I believe that the Debtors' business would almost certainly be subject to a value destructive chapter 7 conversion, which would be detrimental to the Debtors' estates and stakeholders.

17.     Accordingly, the Debtors have an immediate and critical need to (a) use the Cash Collateral (including the proceeds of any Cloud/RAN Sale Transaction) in order to, among other things, (i) pay the fees, costs and expenses incurred in connection with these Chapter 11 Cases, (ii) permit the orderly continuation of the operation of their business, including the Company's global operations, (iii) maintain business relationships with the Company's customers, vendors and suppliers, (iv) make the Company's payroll, and (v) satisfy other working capital and operational needs of the Company; and (b) pursue consummation of the Cable Sale Transaction on the timeline proposed in the Bidding Procedures. This use of Cash Collateral, and the proposed timelines to close both the Cloud/RAN Sale Transaction and Cable Sale Transaction, are necessary and vital to the preservation and maintenance of the Debtors' estate value and the wellbeing of the Company's employees.

## II.     The Cash Collateral Budget.

18.     For purposes of the Cash Collateral Budget, the Cash Collateral available to the Debtors during the applicable period constitutes all cash held in any Bank Account (as defined in

the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief*, filed contemporaneously herewith (the "Cash Management Motion")) other than collateral held by the Debtors in the Collateral Accounts (as defined in the Cash Management Motion), which hold restricted collateral pursuant to standby letters of credit for certain customer contracts, and for the leases for the Debtors' leased properties.

19.     Pursuant to the proposed interim order (the "Cash Collateral Order") approving the Debtors' use of Cash Collateral, as adequate protection to the Prepetition Lenders for the Debtors' use of Cash Collateral, the Prepetition Lenders will receive Adequate Protection Liens and be granted Adequate Protection Claims (each as defined in the Cash Collateral Order).  In addition, pursuant to the Cash Collateral Order, the Debtors will be obligated to pay the reasonable and documented fees and expenses of the Ad Hoc Group Professionals (as defined in the Cash Collateral Order).

20.     The Debtors are permitted to use Cash Collateral in compliance with the Approved Budget subject to Permitted Variances.   I worked with the Debtors and their advisors to formulate the Approved Budget, which was shared with and agreed upon by the Prepetition Lenders and their advisors.  The Approved Budget considers certain assumptions and risks with respect to the Debtors' accounts receivable collection efforts, among other factors, in light of the commencement of these Chapter 11 Cases.  In my view, when taking into account such assumptions and risks, the Approved Budget represents a reasonable forecast of available cash and expenses to be incurred during the applicable period. The Permitted Variances were also subject to vigorous negotiations with the

Prepetition Lenders and their advisors and represent the best outcome available to the Debtors under the circumstances.

21.     In addition, the Debtors negotiated a Carve-Out for professional fees during these Chapter 11 Cases to be used to pay the fees of the Clerk of the Court, the United States Trustee, professionals retained by any statutory committee of unsecured creditors, and professionals retained by the Debtors in the Chapter 11 Cases.   Based on my experience, the terms of the Carve-Out are customary and do not deviate significantly from widely accepted standard terms.

**First Day Motions**

22.     In addition to the Cash Collateral Motion and contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief, each as described further below.

**I.     Procedural Motions.**

**A.     Joint Administration Motions.**

23.     Pursuant to the *Debtors' Motion for Entry of an Order (I) Authorizing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion"), the Debtors request entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief.  Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each Debtor entity.  The entry of an order directing joint administration of these Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  I believe that parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.  Accordingly, I believe that the joint administration of

these chapter 11 cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, I believe the Joint Administration Motion should be granted.

### B. Creditor Matrix and Sealing Motion.

24. Pursuant to the *Debtors' Motion for Entry of an Order (I) Authorizing Debtors To (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Creditors, and (C) Redact Certain Personal Identification Information, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Granting Related Relief* (the "Creditor Matrix and Sealing Motion"), the Debtors seek entry of an order (a) authorizing the Debtors to (i) file a list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (ii) file a consolidated list of the Debtors' thirty largest creditors; (iii) redact certain personal identification information; (b) modifying the requirement to file a list of equity security holders; and (c) granting related relief.

25. Local Rule 2002-1(f)(v) requires each debtor or each debtor's duly retained agent to maintain a separate creditor mailing matrix in jointly administered cases. Local Rule 1001-1(c) permits modification of the Local Rules by the Court "in the interest of justice." The Debtors submit that permitting them to maintain a single consolidated list of creditors (the "Creditor Matrix"), in lieu of maintaining a separate creditor matrix for each Debtor, is warranted. Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be unnecessarily burdensome and result in duplicative mailings.

26. Here, the requirements to file a list of, and to provide notice directly to, equity security holders should be waived as to Casa Systems, Inc. Casa Systems, Inc.'s common stock is publicly-traded on NASDAQ, with approximately 100,000,000 outstanding shares of common stock as of the Petition Date, and cannot be readily traced to specific individual holders. Casa Systems, Inc. only maintains a list of its registered equity security holders and therefore must

13

obtain the names and addresses of its beneficial shareholders from a securities agent.  Preparing and submitting such a list with last known addresses for each such equity security holder would be expensive, time consuming, and serve little or no beneficial purpose in these Chapter 11 Cases. As such, I believe cause exists to waive the requirement to file the list of equity security holders in these Chapter 11 Cases.

27.     Additionally, I believe that cause exists under section 107(c) to redact the personally identifying information of individuals and other natural persons, including individuals who are employees, directors, officers, or individual equity holders of the Debtors, because such information could be used to perpetuate identity theft or create other risks to the individuals' safety and welfare. The Debtors propose to provide an unredacted version of the Creditor Matrix, the schedules of assets and liabilities, and the statement of financial affairs to the Court, the U.S. Trustee, and to any official committee of unsecured creditors appointed in these Chapter 11 Cases, which I believe is sufficient to satisfy the rules and requirements of the Bankruptcy Code. Accordingly, I believe the Creditor Matrix and Sealing Motion should be granted.

### C.     Claims Agent Application.

28.     Pursuant to the *Debtors' Application for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective as of the Petition Date, and (II) Granting Related Relief* (the "Claims Agent Application"), the Debtors seek entry of an order appointing Epiq Corporate Restructuring, LLC ("Epiq") as the claims and noticing agent for the Debtors in their Chapter 11 Cases to assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases, pursuant to the provisions of the Engagement Agreement (as defined therein).

29.     Although the Debtors have not yet filed their schedules of assets and liabilities and statements of financial affairs, they anticipate that there will be thousands of parties to be noticed and that many of these parties will filed claims.  In view of the number of anticipated parties and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Office of the Clerk of the Bankruptcy Court, of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of the Debtors' estates and their creditors.  Accordingly, I believe the Claims Agent Application should be granted.

## II.    Operational Motions.

### A.    Cash Management Motion.

30.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief* (the "Cash Management Motion"), the Debtors seek entry of an order (a) authorizing the Debtors to (i) continue to operate their Cash Management System and maintain their existing Bank Accounts (each as defined therein); (ii) honor certain prepetition or postpetition obligations related thereto; (iii) maintain existing Business Forms (as defined therein); and (iv) continue to perform the Intercompany Transactions (as defined therein) consistent with past practice; and (b) granting related relief.

31.     The Company's Cash Management System includes twenty-eight (28) bank accounts (collectively, the "Bank Accounts").  The Bank Accounts are maintained by eight (8) Debtor entities and twenty (20) are owned and controlled by the Debtors' non-debtor affiliates (the "Non-Debtor Bank Accounts").  Three (3) of the Debtor Bank Accounts are inactive (the "Inactive Accounts"), though one of the Inactive Accounts will be used as the Debtors' adequate

15

assurance deposit account in these Chapter 11 Cases (as further described below and in the Utilities

Motion). The Bank Accounts are held at three (3) financial institutions: Bank of America, N.A.

("BoA"); Bank of China Ltd ("BoC"); and Ping An Bank Co. ("Ping An") (collectively, the "Cash

Management Banks").  As of the Petition Date, the Debtors have $2.03 million in cash that is

collateralizing certain lines of credit.  The Debtors maintain all of their Bank Accounts and have

the largest amount of funds on balance with BoA.  In sum, the Debtors use the Bank Accounts to

organize and monitor cash flows across the Debtors' entities and to centralize procurement for

general administrative and operating expenses.

32.     In addition, The Debtors incur periodic service charges and other fees in connection

with the maintenance of the Cash Management System (collectively, the "Bank Fees").  As of the

Petition Date, the Debtors estimate that they owe the Cash Management Banks approximately

$20,000 in unpaid Bank Fees, the entirety of which will come due and payable within 21 days of

the Petition Date.  The Debtors seek authority to continue paying Bank Fees, including the

prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical

practices.

33.     The Debtors also use corporate credit cards issued by American Express

(collectively, the "Corporate Credit Cards").  The Credit Cards are reimbursed by the Debtors.

The Credit Cards issued under the Corporate Credit Card Program are used by certain of the

Debtors' employees to cover certain payments for travel expenses, such as meals and other

necessary and approved company expenditures including facilities upkeep, office supplies,

software subscriptions, and utilities.  The Debtors estimate that monthly expenses paid using the

Credit Card amount to approximately $100,000 and that approximately the same amount is due

and payable as of the Petition Date.  The Debtors seek authority to continue making payments on

account of the Corporate Credit Cards, including charges incurred prepetition, in the ordinary course on a postpetition basis, consistent with historical practices.

34.      Finally, in the ordinary course of operating the Cash Management System, the Debtors maintain an intercompany accounting module within the Debtors' integrated accounting system that provides a method for tracking and allocating receivables and payables across the corporate enterprise (the "Intercompany System").   Through the Intercompany System, the Debtors maintain relationships with each other in the ordinary course of business that result in intercompany payables among the Debtors (the "Intercompany Transactions").   The Debtors can ascertain, trace, and account for all Intercompany Transactions through their general ledger and enterprise resources planning system, and the Debtors will continue to do so on a postpetition basis.

35.      The Intercompany Transactions are an essential component of the Debtors' operations, and they are crucial to the Debtors' ability to process payroll and payments to third-party vendors, provide enterprise-wide management and support services, and otherwise facility daily operations.   The Debtors would be unduly burdened both financially and logistically if they were required to halt Intercompany Transactions or otherwise make material changes to the Intercompany System.   If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors' estates, their creditors, and other stakeholders.

36.      I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' businesses.   Maintaining the current Cash Management System will facilitate the Debtors transition into chapter 11 by minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.   Requiring the Debtors to adopt a new, segmented

cash management system during these Chapter 11 Cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.  Importantly, the Cash Management System provides the Debtors with the ability to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.  The Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' respective treasury departments.  I believe that any disruption of the Cash Management System could have a negative adverse effect on the Debtors' restructuring efforts. Indeed, requiring the Debtors to adopt a new, segmented cash management system would needlessly reduce the value of the Debtors' business enterprise.  Accordingly, I believe the Cash Management Motion should be granted.

### B.      Employee Wage Motion.

37.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefit Programs, and (II) Granting Related Relief* (the "Employee Wage Motion"), the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, each as set forth herein; and (b) granting related relief, including scheduling a final hearing to consider approval of the Motion on a final basis.

38.     Like many similarly-situated companies, the Debtors maintain certain compensation and benefits programs and pay various administrative fees and insurance premiums in connection therewith (collectively, the "Employee Compensation and Benefits"), including the following (each as defined in the Employee Wage Motion): Employee Wages, Contractor

Obligations, Additional Compensation Obligations, Withholding Obligations, Payroll Processing Fees, Reimbursable Expenses, Employee Benefit Obligations, and Severance Obligations.  The Debtors estimate that they will owe approximately $1,737,850 in connection with the Employee Compensation and Benefits programs during the pendency of these Chapter 11 Cases, and that approximately $1,692,400 of such amount may come due within the first (30) days following the Petition Date.

39.     As of the Petition Date, the Debtors employ approximately 245 employees, working in both full- and part-time positions (the "Employees").  During these Chapter 11 Cases, the Employees will continue to interface with customers and counterparties and respond to inquiries and concerns regarding the business, ongoing marketing efforts, and administration of these Chapter 11 Cases.  Continued support from these Employees is essential to ensure a smooth transition into chapter 11 and preservation of the value of the Debtors' business.

40.     In the ordinary course of business, the Debtors incur obligations to their Employees for wages, overtime, on-call support, and similar obligations (the "Employee Wages").  The Debtors process payroll bi-weekly and Employees are paid close to current utilizing Automatic Data Processing, Inc. ("ADP") payroll management software.  As of the Petition Date, the Debtors believe all Employees have been paid through April 7, 2024, with limited exceptions. Prepetition Employee Wages may be due and owing as of the Petition Date because of, among other things, outstanding over-time and on-call adjustments or potential discrepancies that, upon resolution, may reveal additional amounts are owed to Employees for prepetition pay periods. The average gross payroll on account of Employees for each pay period is approximately $2,100,000.  The Debtors estimate that, as of the Petition Date, they owe approximately $100,000 in Employee Wages to their Employees on account of adjustments or potential discrepancies, all of which will

become due and owing within the first thirty (30) days after the Petition Date (the "Interim Period").

41.     In addition to the Employees, the Debtors supplement their workforce with the services of approximately eight independent contractors (collectively, the "Contractors").  The Contractors, along with the Debtors' Employees, are critical to the success of the Debtors' business and are responsible for ensuring, among other things, that the Debtors' operations continue to run smoothly and effectively.  As of the Petition Date, the Debtors estimate that approximately $100,000 remains due and owing to the Contractors, all of which is due and payable in the Interim Period.

42.     The Debtors provide various forms of additional compensation to certain Employees and Contractors, including (i) additional commission-based compensation and/or bonuses (the "Sales Commissions and Bonuses") to approximately forty-seven (47) non-insider Employees and three (3) Contractors based on sales of the Debtors' hardware, software, or services pursuant to certain incentive compensation plans; (ii) referral bonuses, which are provided to Employees who refer someone to be employed with the Debtors; (iii) relocation bonuses, which are provided to new Employees who have to relocate as a result of being employed by the Debtors, (iv) sign-on bonuses, which are provided to new Employees who have joined the Company; and (v) spot bonuses, which are provided to Employees for exemplary performances (collectively, the "Additional Compensation Plans").

43.     As of the Petition Date, the Debtors do not believe that there are any outstanding amounts with respect to the Sales Commissions and Bonuses, referral bonuses and the spot bonuses.  The Debtors do have a contingent Sign-On Bonus obligation to one (1) Employee in the amount of $50,000, which will remain contingent during the Interim Period but may become due

and payable during the pendency of these chapter 11 cases.  Therefore, the Debtors respectfully request that the Court authorize the Debtors to partially pay the $50,000 Sign-On Bonus described herein if and when it becomes payable in an amount not to exceed the statutory cap of $15,150 with respect to the applicable Employee.

44.     In connection with the wages and salaries paid to Employees, the Debtors are required by federal, state, and local law to withhold certain amounts for federal, state, and local income taxes, garnishments, and withholdings in connection with various employee benefits and other employee programs (collectively, the "Withholding Obligations") and to remit the withheld amounts to the appropriate taxing and other governmental authorities.  As part of administering payroll, the Withholding Obligations are deducted directly from the Debtors' payroll account to remit to the appropriate taxing authorities.  As of the Petition Date, the Debtors estimate that approximately $100,000 remains due and owing on account of the Withholding Obligations.

45.     Certain Withholding Obligations for the Debtors' Employees are processed and administered by ADP.  In the three-month period before the Petition Date, the Debtors incurred a monthly average of approximately $4,000 on account of these payroll processing and application hosting services.  As of the Petition Date, the Debtors estimate they owe approximately $9,000 to ADP on account of prepetition payroll processing services (the "Payroll Processing Fees").

46.     Certain Employees for the benefit of the Debtors pay for business expenses (collectively, the "Reimbursable Expenses") with the understanding that they will be reimbursed upon the submission of a receipt or claim itemizing expenses in accordance with the Debtors' reimbursement policy.  During the three-month period before the Petition Date, the Debtors incurred a monthly average of approximately $200,000 on account of Reimbursable Expenses. Due to the timing of when Employees submit Reimbursable Expenses, it is difficult for the Debtors

to precisely estimate the amount of prepetition Reimbursable Expenses outstanding as of the Petition Date.  Based on historical practice, however, the Debtors estimate that as of the Petition Date, they owe approximately $300,000 on account of Reimbursable Expenses.  Additionally, the Debtors utilize Concur as their reimbursement administrator, in which Concur incurs approximately $2,000 a month in administrative expenses.

47.     In the ordinary course of business, the Debtors maintain various employee benefit plans and policies, including, but not limited to, medical plans, dental plans, vision plans, life insurance plans, short-term and long-term disability plans, other paid time off, and a 401(k) plan (collectively, the "Employee Benefit Obligations").  The Employee Benefit Obligations are, in each case, available to all Employees who work the requisite hours per week for a given benefit or who otherwise satisfy the eligibility requirements for any of the Employee Benefit Obligations (the "Eligible Employees" and, with respect to each plan or program in which they participate, the "Plan Participants").  Failure to continue the Employee Benefit Obligations could cause Employees to experience severe hardship and make it difficult to retain the Debtors' workforce. As of the Petition Date, the Debtors estimate that they owe approximately $1,083,400 on account of the Employee Benefit Obligations.

48.     In the offer letters for two of their non-insider Employees, the Debtors are obligated to pay a one-time payment in the event of each such Employee's termination (each a "Severance Payment," and collectively, the "Severance Obligations").  Each of these two employees have a job title and corresponding job grade of vice president or below, and who are not considered insiders.  The Debtors therefore request authorization, but not direction, to honor these Severance Obligations on a postpetition basis in the ordinary course of business and pay prepetition Severance Obligations that may become due and owing during these chapter 11 cases

in an aggregate amount not to exceed $30,300 pursuant to the Final Order. For the avoidance of doubt, the Debtor does not request authorization to honor any severance amounts with regard to any Insiders.

49.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and absent the payment and maintenance of the Employee Compensation and Benefits to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. I believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. I therefore believe that authorization to continue, modify, change, and discontinue the Employee Compensation and Benefits in the ordinary course of business during these chapter 11 cases, and authorization to pay and honor prepetition amounts outstanding under or related to the Employee Compensation and Benefits programs in the ordinary course of business is necessary and critical to the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors proceed through these Chapter 11 Cases. Accordingly, I believe the Employee Wage Motion should be granted.

### C.     Trade Claimants Motion.

50.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Critical Vendor Claims, 503(b)(9) Claims, Lien Claims, and Foreign Vendor Claims in the Ordinary Course of Business and (II) Granting Related Relief*] (the "Trade Claimants Motion") the Debtors seek entry of an order (a) authorizing them to pay in full in their discretion and in the ordinary course of business, allowed prepetition claims of creditors (the "Trade Claimants") that provide goods or services related to the Debtors' operations

23

(collectively, the "Trade Claims"); and (b) authorizing the Debtors to satisfy such obligations; and (c) granting related relief.

51.     The Debtors operate a global communications technology business that offers end-to-end physical, virtual, and cloud-native 5G infrastructure and customer premise networking equipment solutions.  I believe that these operations, and in turn the success of these chapter 11 cases, depend on the ability of the Debtors to retain the goods and services of its Trade Claimants, whose goods and services are critical to the Debtors' operations.

52.     The Debtors estimate that the prepetition amount owing to the Trade claimants in the aggregate is approximately $2,310,000 and of such amount, $1,950,000 is due and payable within thirty (30) days after the Petition Date.

| Relief Requested | | | |
|---|---|---|---|
| *Category* | *Description of Claims* | *Interim* | *Final* |
| Critical Vendor Claims[7] | Claims of certain creditors that are essential to maintaining the value of the Debtors' enterprise in connection with the sale of the Debtors' assets. | $1,500,000 | $1,800,000 |
| 503(b)(9) Claims | Claims entitled statutory priority under section 503(b)(9) of the Bankruptcy Code. | $150,000 | $150,000 |
| Lien Claims | Claims held by common carriers, warehousemen, toll processors, mechanics, and freight forwarders, in each case that may have or may be capable of asserting liens against the Debtors' property. | $40,000 | $50,000 |
| Foreign Vendor Claims | Claims held by suppliers, service providers, and distributors based outside the United States. | $260,000 | $310,000 |
| **Total** | | $1,950,000 | $2,310,000 |

53.     The Trade Claimants are integrated into the Debtors' highly sophisticated, global supply chain, making it difficult for the Debtors to replace them in a timely manner.  The nature

---

[7] The 503(b)(9) Claims are also Critical Vendor Claims, Lien Claims, Foreign Vendor Claims, and amounts owed on account of such claims are captured in the other categories of claims in this Motion.

of the Debtors' business also requires them to obtain specialized materials and devices that are often available from single (or a limited pool of) suppliers.  Further, the Debtors operate in a highly regulated industry and their products are subject to extensive quality control, which is tested at multiple stages in the production process.  Any substitution, alteration, or other change in supplier could impact the regulatory compliance of the Debtors' products and therefore the Debtors' ability to run their business.  Without the goods and services provided by such Trade Claimants, I believe the Debtors' ability to operate their global communications technology business would be imperiled, to the detriment of the Debtors' stakeholders.   Accordingly, I believe the Trade Claimants Motion should be granted.

### D.     Customer Programs Motion.

54.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief* (the "Customer Programs Motion"), the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to maintain and administer their prepetition Customer Contracts and Customer Programs (each as defined below) in the ordinary course on a postpetition basis and honor certain prepetition obligations related thereto and (b) granting related relief.

55.     The Debtors' business operations are also highly dependent on certain short- and long-term contracts with their customers, pursuant to which the Debtors provide networking solutions (the "Customer Contracts").   The Debtors' customers are the lifeblood of their businesses.  Maintaining the Customer Contracts is therefore critical to the Debtors' long-term success and viability.  Any interruption, including discontinuation, reduction, loss, or impairment of the Debtors' telecommunication services or changes to the existing rates and terms of conditions that govern the Debtors' relationships with the customers would diminish the Debtors' stream of

revenue, could lead to significant capital expenditures, and be irreparably detrimental to the Debtors' estate.

56.     The Debtors provide certain warranties, discounts, and other accommodations to customers to develop and maintain positive customer relationships (collectively, the "Customer Programs").   In particular, the Debtors' Customer Programs include: the Warranties, Support Services Agreements, Price Adjustments, and the CSF Program (each as defined therein).   The Customer Programs promote and maintain customer satisfaction, which, in turn, increases the Debtors' goodwill and the value of their brand.   In such a competitive industry, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations and the preservation and maximization of stakeholder value.   Accordingly, I believe the Customer Programs Motion should be granted.

### E.     Taxes Motion.

57.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion"), the Debtors seek entry of an order (a) authorizing the Debtors, in their sole discretion, to remit and pay certain accrued and outstanding prepetition taxes, including sales and use taxes, income taxes, regulatory taxes, and similar taxes and fees; and (b) granting related relief, including scheduling a final hearing to consider approval of the motion on a final basis.

58.     In the ordinary course of their business, the Debtors are subject to a variety of sales and use taxes, regulatory taxes, and/or various other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").   The Debtors pay the Taxes and Fees to various federal, state, and local taxing, regulatory, and governmental authorities (collectively, the "Taxing Authorities") through checks and electronic funds transfers that are processed through their banks. The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis—monthly, quarterly, or

annually, as applicable, depending on their nature and incurrence.  In certain instances, the Debtors

negotiate with the Taxing Authorities to determine the amount of Taxes and Fees due and owing.

Some of the Debtors' most significant Taxes and Fees include:

a.  Income Taxes.   The Debtors incur and are required to pay various state, local, and federal income taxes (collectively, the "Income Taxes") in the jurisdictions where the Debtors operate.  The Debtors generally remit Income Taxes on an annual basis. In 2023, the Debtors remitted approximately $4,900,000 in the aggregate in Income Taxes to the applicable Taxing Authorities.  As of the Petition Date, the Debtors estimate they owe approximately $3,100,000 in the aggregate to the applicable Taxing Authorities on account of prepetition Income Taxes.  The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Income Taxes that may become due and owing in the ordinary course of business during their chapter 11 cases.

b.  Sales and Use Taxes.   The Debtors incur, collect, and remit sales and use taxes to the Taxing Authorities in connection with the sale, purchase, and use of goods and services (collectively, the "Sales and Use Taxes").   The Debtors generally remit Sales and Use Taxes on a monthly, quarterly, semi-annual, and annual basis, as applicable.  In 2023, the Debtors paid approximately $1,100,000 in the aggregate in Sales and Use Taxes to the Taxing Authorities.  As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $160,000 in the aggregate in Sales and Use Taxes that have not been submitted to the relevant Authorities.  The Debtors request authority, but not direction, to satisfy amounts owed on account of such Sales and Use Taxes that may become due and owing in the ordinary course of business during their chapter 11 cases.

c.  Regulatory and Other Taxes and Fees.   The Debtors incur, in the ordinary course of business, certain regulatory assessments, permitting, licensing and other operational fees, including fees related to certain regulations, franchise taxes, and other miscellaneous taxes and fees (collectively, the "Regulatory and Other Taxes and Fees").   The Debtors typically remit Regulatory and Other Taxes and Fees to the relevant Taxing Authorities on a monthly, quarterly, or annual basis, as applicable.  In 2023, the Debtors paid approximately $300,000 in the aggregate in Regulatory and Other Taxes and Fees.  As of the Petition Date, the Debtors estimate that approximately $300,000 in the aggregate in Regulatory and Other Taxes and Fees will have accrued and remain unpaid to the relevant Taxing Authorities.  The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Regulatory and Other Taxes and Fees that may become due and owing in the ordinary course of business during their chapter 11 cases.

59.     The Debtors estimate that the pre-petition amount owing to the Taxing Authorities in the aggregate is approximately $3,560,000.  Of such amount, approximately $1,530,000 is due and payable within thirty (30) days after the Petition Date.

60.     I believe the continued payment of the prepetition Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates.  If such obligations are not timely paid, the Debtors' business operations may be suspended or the Debtors may incur additional fees, and the Debtors will be required to expend time and money to resolve these issues. Accordingly, I believe the Taxes Motion should be granted.

### F.     Utilities Motion.

61.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (II) Approving Proposed Adequate Assurance of Payment, (III) Establishing Proceduers for Resolving Requests for Additional Assurance of Payment, and (IV) Granting Related Relief* (the "Utilities Motion"), the Debtors seek entry of an order (a) prohibiting the Utility Providers (as defined below) from altering, refusing, or discontinuing utility service on account of any outstanding amounts for services rendered prepetition; (b) determining that adequate assurance of payment for postpetition Utility Services (as defined below) has been furnished to the Utility Providers; (c) establishing procedures for resolving future requests by Utility Providers for additional assurance of payment; and (d) granting related relief, including scheduling a final hearing to consider approval of the Motion on a final basis.

62.     In connection with the operation of their business, the Debtors obtain electricity, gas, water, internet, telecommunications services, waste services, and similar utility services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Providers").  Should any Utility Provider refuse or discontinue service, even for a brief period, the

Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts. As global communications technology providers, the Debtors are heavily reliant on the Utility Providers, particularly their electricity providers, to continue providing Utility Services. It is essential that the Utility Services continue uninterrupted during these Chapter 11 Cases.

63. Historically, the Debtors have maintained a satisfactory payment history with the Utility Providers and payments have been made on a regular and timely basis. To the best of the Debtors' knowledge, there are no defaults or arrearages of any significance for the Debtors' undisputed invoices for prepetition Utility Services as of the Petition Date. Based on their monthly average cost for the 12-month period before the Petition Date, the Debtors estimate that their cost of Utility Services for the next 30 days will be approximately $165,000.

64. To provide additional assurance of payment, the Debtors propose to deposit $81,883 (the "Adequate Assurance Deposit") into one of the Debtors' bank accounts (the "Adequate Assurance Account") within 20 days of the Petition Date. The Adequate Assurance Deposit represents an amount equal to approximately one-half of the Debtors' average utility balances per month for the Debtors' operational locations. The Adequate Assurance Deposit will be held for the benefit of the Utility Providers in the Adequate Assurance Account for the duration of these Chapter 11 Cases and may be applied to any postpetition defaults in payment to the Utility Companies. The Adequate Assurance Deposit will be held by the Debtors, and no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account. I believe the Adequate Assurance Deposit, in conjunction with cash on hand, cash flow from operations, and the proposed use of cash collateral, demonstrate their ability to pay for future Utility Services in

the ordinary course of business and constitutes sufficient adequate assurance to the Utility Providers.  Accordingly, I believe the Utilities Motion should be granted.

### G.   Insurance Motion.

65.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Enter into New Financing Agreements in the Ordinary Course of Business; and (II) Granting Related Relief* (the "Insurance Motion"), the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to: (i) pay their obligations under prepetition insurance policies; (ii) continue to pay certain brokerage fees; (iii) renew, supplement, modify, or purchase insurance coverage in the ordinary course; and (iv) enter into new premium financing agreements in the ordinary course of business; and (b) granting related relief, including scheduling a final hearing to consider approval of the Motion on a final basis.

66.     The Debtors (and certain of their non-Debtor affiliates) maintain approximately twenty-four (24) insurance policies (collectively, the "Insurance Policies") that are administered by multiple third-party insurance carriers (collectively, the "Insurance Carriers").  In connection with the operation of their businesses and management of their properties, the Insurance Policies provide the Debtors with coverage for, among other things, director and officer liability, property, general liability, automobile liability, crime liability, employment practices liability, and errors and omissions liability.  In addition, certain of the Insurance Policies include several layers of excess liability coverage.

67.     As of the Petition Date, the aggregate annual premium for the Insurance Policies totaled approximately $2.44 million, plus applicable taxes and surcharges (the "Insurance Expenses").  The majority of Insurance Policy premiums are paid in a single lump sum that is due

on an annual basis, depending on the Insurance Policy.  Premiums for the Debtors' property, general liability, automobile liability, and workers' compensation Insurance Policies, however, are all paid in quarterly installments.  As of the Petition Date, the Debtors have paid the first two installments for each of the aforementioned policies, and expect the remaining payments to come due in June and September.  Of such remaining payments, approximately $100,000 is due in the aggregate, none of which is due or payable within thirty (30) days of the Petition Date.

68.     The Debtors obtain Insurance Policies through an insurance broker, Sullivan Insurance Group, Inc. (the "Insurance Broker").  The Insurance Broker helps the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates.  The Insurance Broker is compensated through the Premium Payments themselves.  As of the Petition Date, the Debtors do not believe there are any unpaid prepetition obligations due and owing to the Insurance Broker.

69.     Continuation and renewal of the Insurance Policies and entry into new Insurance Policies is essential to preserving the value of the Debtors' businesses, properties, and assets. Moreover, in many cases, the coverage provided by the Insurance Policies is required by applicable regulations, laws, credit documents, customer contracts, and other arrangements that govern the Debtors' operations, as well as the Bankruptcy Code and the requirements of the U.S. Trustee. Accordingly, I believe the Insurance Motion should be granted.

**H.     Global Automatic Stay Motion**

70.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and* Ipso Facto *Protections of the Bankruptcy Code, (II) Approving the Form and Manner of Notice, and (III) Granting Related Relief* (the "Global Automatic Stay Motion"), the Debtors seek entry of an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso*

*facto* protections of the Bankruptcy Code; (b) approving the form and manner of notice related thereto; and (c) granting related relief.

71.     The Debtors, together with their non-Debtor affiliates, are part of a corporate group whose operations and organizational structure span the globe.  Certain of the non-Debtor affiliates are incorporated or formed under the laws of a number of foreign countries, including Canada, China, England and Wales, and Ireland.  In connection with operating its business, the Company necessarily engages with numerous foreign customers, suppliers, and other vendors, as well as foreign regulators and other foreign governmental units.  Such foreign entities supply critical goods and services, which are necessary to preserve the value of the Company's business, inuring to the benefit of the Company's stakeholders and their estates.  These goods and services are essential to the Company's business operations.

72.     Due to the global nature of the Company's business, the Company has regular dealings with foreign creditors and other third parties that may be unfamiliar with the protections afforded to chapter 11 debtors under the Bankruptcy Code.  This includes non-U.S. counterparties who could attempt to terminate certain leases or executory contracts with the Debtors upon the commencement of these chapter 11 cases pursuant to *ipso facto* provisions, violating sections 362 and 365 of the Bankruptcy Code.  Similarly, governmental units outside the United States may deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, franchises, or other similar grants held by a chapter 11 debtor and required for the Company's ongoing business operations, violating section 525 of the Bankruptcy Code.

73.     Because of the worldwide scope of the Debtors' business, and the essential nature of the goods and services provided by foreign entities, entry of an order confirming certain

protections afforded under the Bankruptcy Code is critical in ensuring the Debtors' continued operations.  Accordingly, I believe the Global Automatic Stay Motion should be granted.

[*Remainder of page left intentionally blank*.]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  April 3, 2024

_/s/ Brian Whittman_
Brian Whittman
Managing Director
Alvarez & Marsal North America, LLC