# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CASA SYSTEMS, INC., *et al.*,[1] | Case No. 24-10695 (KBO) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR
## ENTRY OF AN ORDER (I) APPROVING THE
## SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE
## AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES,
## WITH SUCH INTERESTS TO ATTACH TO THE PROCEEDS,
## (II) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES IN
## CONNECTION THEREWITH, (III) AUTHORIZING THE ASSUMPTION
## AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
## LEASES TO THE PURCHASER, AND (IV) GRANTING RELATED RELIEF

The above captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully state the following in support of this motion (this "Motion"):

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are Casa Systems, Inc. (8867), Casa Systems Securities Corporation (1151), and Casa Properties LLC (6767). The Debtors' service address is 100 Old River Road, Andover, MA 01810.

[2] Capitalized terms used but not defined herein have the meanings provided in the *Declaration of Edward Durkin in Support of Chapter 11 Petitions and First Day Pleadings* (the "Durkin First Day Declaration"), *Declaration of Brian Whittman in Support of Chapter 11 Petitions and First Day Pleadings* (the "Whittman First Day Declaration" and together with the Durkin First Day Declaration, the "First Day Declarations"), the *Declaration of David Zubricki in Support of Debtors' Bidding Procedures Motion and Cloud/RAN Sale Motion* (the "Zubricki Declaration" and together with the First Day Declarations, the "Declarations"), or the Cloud/RAN Purchase Agreement (as defined herein), as applicable.

## Preliminary Statement

1.      The proposed sale of the Debtors' Cloud/RAN business is the culmination of a lengthy prepetition marketing process and essential to the Debtors' path forward in these chapter 11 cases to maximize value for all stakeholders.  Over the past several months, the Debtors have explored all strategic alternatives to address their declining liquidity situation, including extensive discussions with Verizon, a key customer for the Debtors' Cloud/RAN business, an exhaustive DIP marketing process seeking case financing from existing lenders and third parties, and far-reaching searches for prospective purchasers for the Debtors' other assets, while maintaining a dialogue with the Debtors' Prepetition Lenders.

2.      Without any source of committed case funding and a severely strained liquidity position, the Debtors, in consultation with their Prepetition Lenders, have determined that the best path forward to preserve jobs and maximize value is an expeditious sale of the Debtors' Cloud/RAN business, which will provide a liquidity runway sufficient to allow time for an auction process for the sale of the Debtors' remaining business—which the Debtors believe is substantially more likely to attract competing bids—later in these chapter 11 cases.  The closing of the Cloud/RAN Sale Transaction, approximately twenty-one days from the Petition Date, is the only path to fund the Debtors while in chapter 11 to allow time for a value-maximizing auction process for the Debtors' Cable assets.

3.      Given the extensive and fulsome prepetition marketing process, the Debtors believe the Cloud/RAN Sale Transaction to be the highest and best offer achievable for the Debtors' Cloud/Ran Assets.  The Cloud/Ran Purchase Agreement is the product of weeks of arm's-length, good faith negotiations.  Critically, the Cloud/RAN Sale Transaction has garnered the support of an ad hoc group of the Debtors' Prepetition Lenders (the "Ad Hoc Group"), who collectively hold 98% of the Debtors' funded debt, including approximately 98% of the Superpriority Term Loans and 100% of the Stub Term Loan.

4.      Without the Cloud/RAN Sale Transaction, there is no feasible or value-maximizing alternative path forward for the Debtors through these chapter 11 cases.  Absent Court approval of the Cloud/RAN Sale Transaction on an expedited timeline, the Debtors will be required to shut down their operations, hundreds of employees will lose their jobs, and any going-concern value will be destroyed by a chapter 7 liquidation.  Accordingly, the Debtors submit this Motion and seek approval of the Cloud/RAN Sale Transaction in order to ensure that the Debtors can pursue these chapter 11 cases for the benefit of all stakeholders.

### Relief Requested

5.      By this Motion, the Debtors seek entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, (a) approving the sale of the Debtors' Cloud/RAN Assets to Lumine Group US Holdco Inc. (the "Purchaser"), free and clear of liens,

claims, and encumbrances, with such interests to attach to the proceeds, on the terms of the Proposed Order and pursuant to that certain Asset Purchase Agreement by and between Casa Systems, Inc. (the "Debtor Seller"), certain of its Non-Debtor Affiliates (collectively, the "International Sellers" and, together with the Debtor Seller, the "Sellers"), and the Purchaser, a copy of which is attached as Exhibit 1 to the Proposed Order (including any and all amendments, addenda, exhibits, schedules, and assignments thereto, the "Cloud/RAN Purchase Agreement");[3] (b) authorizing and approving the procedures (the "Assumption and Assignment Procedures") for the assumption and assignment by the Debtors to the Purchaser of certain executory contracts and unexpired leases (the "365 Contracts"); (c) authorizing and approving the assumption and assignment of certain of the 365 Contracts to the Purchaser on the terms and conditions set forth in the Cloud/RAN Purchase Agreement and (d) granting related relief. In support of this Motion, the Debtors rely on and incorporate by reference the Durkin First Day Declaration, the Whittman First Day Declaration, and the Zubricki Declaration.

---

[3] The Cloud/RAN Purchase Agreement also provides for the sale, assignment, transfer, purchase, or assumption of certain assets and liabilities of the International Sellers (collectively, the "Non-Debtor Cloud/RAN Assets"). For the avoidance of doubt, the relief sought in this Motion does not apply to the sale, assignment, transfer, purchase, or assumption of such Non-Debtor Cloud/RAN Assets.

## Jurisdiction and Venue

6.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, and 1112(b) of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

## Background

9.     The Debtors operate a global communications technology business that offers end-to-end physical, virtual, and cloud-native 5G infrastructure and customer premise networking

equipment solutions. These solutions, in turn, enable the Debtors' customers to transform and expand their public and private high-speed data and multi-service communications networks. The Debtors' solutions are commercially deployed in over 70 countries by more than 475 customers, including regional as well as some of the world's largest Tier 1 communications service providers, serving millions of subscribers globally.

10.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under sections 101–1532 of the Bankruptcy Code in the Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

11.     Additional information regarding the Debtors' business, capital structure and the circumstances preceding the Petition Date may be found in the First Day Declarations.

**I.      The Prepetition Marketing Process.**

12.     The Debtors historically have been a provider of Cable networking hardware, but since 2016 have invested over $130 million to develop cloud-native software and have invested additional funds to develop the RAN business. Durkin Decl. ¶ 8. Despite this investment, the Cloud/RAN business is still in its early stages, with one customer, Verizon, making up over 80 percent of its revenue. At present, the Cloud/RAN business requires significant investment to

reach break-even and is a drain on the Debtors' liquidity, costing approximately $900,000 per week to maintain operations.  Whittman Decl. ¶ 12.

13.     During the months preceding these chapter 11 cases, the Debtors undertook an extensive asset sale marketing process.  In conjunction with the Cable and CAD assets marketing processes, which are described in further detail in the First Day Declarations and the Bidding Procedures Motion[4] filed contemporaneously herewith, the Debtors pursued an extensive marketing process for the Cloud/RAN Assets, which Cloud/RAN Assets were exposed to the market for approximately six months prior to the Petition Date.

14.     As described in further detail in the Declarations, beginning in October 2023, the Debtors, with the assistance of Ducera, contacted more than 26 third parties about potential interest in a sale transaction that could, in the Debtors' determination in consultation with their advisors, be consummated on the timeline dictated by the Debtors' declining liquidity position. Zubricki Declaration, ¶ 10.  This outreach effort included parties who were interested in buying

---

[4] "Bidding Procedures Motion" means the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures; (B) Approving the Selection of the Cable Stalking Horse Purchaser; (C) Approving the Debtors' Entry into the Cable Stalking Horse APA and Approving the Cable Bid Protections; (D) Scheduling an Auction and the Sale Hearing; (E) Approving Form and Manner of Sale Notice; (F) Approving Form and Manner of Potential Assumption and Assignment Notice; (G) Approving Form and Manner of Notice of Successful Bidder; (H) Approving Assumption and Assignment Procedures and (I) Granting Related Relief; and (II) an Order (A) Approving the Sale of the Cable Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief.*

substantially all of the Debtors' assets as well as those who expressed interest in a more limited scope of assets. *Id*. During this time, the Debtors initiated a formal outreach, with Ducera providing formal process letters outlining key process information and deadlines, and held discussions with more than 26 parties in connection with potential sale transactions. *Id.* Additionally, the Debtors' management team conducted informal outreach and conversations with a significant number of additional interested parties. *Id*. In the following weeks, the Debtors' management team and Ducera engaged in dozens of diligence sessions and other transaction-related conversations, including telephone calls, in-person meetings between and among senior management, interacting with numerous parties' business and legal teams and various advisors and, for those parties who signed non-disclosure agreements, access to a virtual dataroom populated with more than 3,400 documents comprising more than 70,000 pages total. *Id*.

15. Despite the Debtors' marketing efforts, the Debtors received only one actionable indication of interest for the Cloud/RAN Assets: the indication of interest submitted by the Purchaser. *Id*. As there were no other offers, upon receiving interest from the Purchaser, the Debtors, certain of their Non-Debtor affiliates, and the Purchaser began negotiations for the sale of the Cloud/RAN Assets. These substantial arm's-length negotiations between the Purchaser and the Debtors have resulted in the transaction contemplated pursuant to the terms of the Cloud/RAN Purchase Agreement (the "Cloud/RAN Sale Transaction").

## II.     Exploration of Alternatives.

16.     In January and February 2024, the Debtors engaged in several discussions with key members of Verizon's management team to, among other things, solicit a potential additional investment into the Debtors' estates to help facilitate a viable path forward, as part of a value maximizing in-court or out-of-court transaction. *Id.* at ¶ 11. Despite these determined efforts, the Debtors and Verizon were ultimately unable to agree to terms for a broader restructuring proposal centered on Verizon's new money capital injection or DIP financing. *Id.*

17.     As a result of the Debtors' tightening liquidity position, simultaneously with the asset sale marketing process, the Debtors, with the assistance of their advisors, canvassed potential sources of liquidity in order to continue to be able to operate and run a sale process for the Debtors' remaining assets and provide the Debtors runway to close the Cloud/RAN Sale Transaction. In January 2024, the Debtors, with the assistance of Ducera, undertook an extensive outreach to the market to assess whether any financing would be available from a third-party lender. *Id.* at ¶ 12. In addition to substantial outreach and engagement with the Debtors' Prepetition Lenders, Ducera considered a wide variety of potential alternative lenders, including third-party financial institutions experienced in distressed lending and financings, initiating outreach to 70 parties to see if they had any interest in providing postpetition financing, of which 33 signed a non-disclosure agreement and were provided access to a virtual dataroom with further information on the Debtors'

assets and businesses. *Id.* However, the Debtors' Prepetition Lenders had not committed to provide financing for these chapter 11 cases and no third-party lender was willing to provide postpetition financing on a junior basis to the Prepetition Superpriority Loans or to seek approval to provide a nonconsensual priming DIP. *Id.*

**III.    Necessity for Expedited Sale.**

18.    As noted above and in further detail in the First Day Declarations, the Debtors commenced these chapter 11 cases to facilitate an orderly sale and wind-down of the Debtors' assets and operations during a liquidity crisis. Whittman Decl. ¶ 8. Even as the Prepetition Lenders have foregone a $5.6 million interest payment due to them on March 15, 2024, the Debtors' cash on hand and forecast receipts extend, at best, to the end of April. Absent consummation of the Cloud/RAN Sale Transaction within approximately 21 days of the Petition Date, the Debtors will be required to cease operations on or before April 30, 2024. *Id.* ¶ 8.

19.    As the Debtors closed in on finalization of the Cloud/RAN Purchase Agreement and a stalking horse agreement for the Debtors' Cable business, the Debtors, in consultation with the Ad Hoc Group, determined that the only path forward to avoid the acute liquidity shortfall while continuing to pursue a value-maximizing sale of the Debtors' remaining assets was commencement of these chapter 11 cases with consensual use of cash collateral, which would allow for the closing of the Cloud/RAN Sale Transaction in the first approximately 21 days of

these chapter 11 cases, and thereafter a continued marketing process for the cable assets followed by a court-supervised auction.  The proceeds of the Cloud/RAN Sale, which are part of the Prepetition Lenders' collateral, could then be used to fund these chapter 11 cases, albeit only on an expedited timeline.  Whittman Decl. ¶ 15.

20.      Under the staggered sale construct, the benefit to the Debtors and their estates is twofold.  As described above, the Cloud/RAN Assets are a start-up business, which has yet to reach the break-even point, and putting the Cloud/RAN Sale Transaction on the same timeline as the Cable sale would burn an additional amount of approximately $4.5 million in cash.  Whittman Decl. ¶ 12.  Accordingly, a near-term sale has the benefit of preserving cash on hand in addition to the injection of sale proceeds.  *Id.*  ¶ 12.  The staggered sale construct also reflects the respective markets for the Cloud/RAN Assets and the Cable assets; based on prepetition discussions and outreach, the Debtors and their advisors believe that a Cable Sale Transaction will generate significantly more interest from potential purchasers than a Cloud/RAN Sale Transaction.  Zubricki Decl. ¶ 14.  Absent consummation of the Cloud/RAN Sale Transaction within approximately 21 days of the Petition Date, the Debtors will be required to cease operations on or before April 30, 2024.  Whittman Decl. ¶ 8.

21.      The Cloud/RAN Purchase Agreement is the product of agreement between Casa Systems, Inc., certain of its Non-Debtor Affiliates, the Purchaser, and is supported by the Ad Hoc

Group, who collectively hold 98% of the Debtors' funded debt, including approximately 98% of the Superpriority Term Loans and 100% of the Stub Term Loan.  This agreement was reached through weeks of arm's-length, good faith negotiations, and is expected to close shortly after the receipt of Bankruptcy Court approval.  Whittman Decl. ¶ 8; Zubricki Decl. ¶ 15.  The proceeds of the Cloud/RAN Sale Transaction, and the elimination of ongoing expenses associated with the Cloud/RAN Assets from the Debtors' balance sheet, are critical to the remainder of these chapter 11 cases.  Absent the Debtors' ability to access these funds, the Debtors will have insufficient funding for these chapter 11 cases, and the Debtors will have no choice but to cease operations and terminate its employees.  Whittman Decl. ¶ 13.

22.    Under these circumstances, the Debtors believe that the expedited sale of the Cloud/RAN Assets to the Purchaser pursuant to the terms and conditions of the Cloud/RAN Purchase Agreement is both appropriate and in the best interest of the Debtors, the estates, and their creditors.  Given the extensive prepetition marketing process of all assets, including the Cloud/RAN Assets, and other efforts to date, and to avoid a value-destructive chapter 7 conversion to the detriment of all stakeholders, the Debtors believe a sale process on an expedited timeline is appropriate.  Whittman Decl. ¶ 12; Zubricki Decl. ¶ 23.  For the avoidance of doubt, however, the Debtors and their advisors will continue to solicit and consider any viable proposals for the Cloud/RAN Assets, and, to the extent such proposals might constitute higher and better offers for

the subject assets, the Debtors will, in consultation with their secured lenders and any Committee (if one is appointed), entertain any such proposals.[5]  Zubricki Decl. ¶ 17.

### Summary of Proposed Terms of the Cloud/RAN Purchase Agreement

23.     The principal terms of the Cloud/RAN Purchase Agreement are as follows:[6]

| Local Rule 6004-1 Disclosure | Cloud/RAN Purchase Agreement Terms |
| --- | --- |
| **Debtor Seller** | Casa Systems, Inc.<br><br>*See* Cloud/RAN Purchase Agreement, Preamble. |
| **International Sellers** | Casa Communications Ltd., Guangzhou Casa Communications Ltd, Casa Technologies Limited, Casa Communications Technology S.L.U., Casa Systems Canada Limited, and Casa Systems B.V.<br><br>*See id.* |

---

[5] To facilitate such proposals, this Motion will be served on all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Cloud/RAN Assets within one (1) year prior to the Petition Date, a sale notice substantially in the form attached hereto as **Exhibit B** (the "Sale Notice") will be provided to, among others, all persons known or reasonably believed to the same individuals and to all known and reasonably identifiable creditors of the Debtors and will be published, substantially in the form attached hereto as **Exhibit C** (the "Publication Notice") in the *New York Times* or another publication with similar national circulation. Additionally, the Debtors, with the assistance of Ducera, are currently engaged in outreach to parties previously or otherwise identified as potential purchasers, highlighting, among other things, the terms of the Cloud/RAN Purchase Agreement, the transaction's expected closing date, and key information regarding the Cloud/RAN Assets.

[6] The description of the Cloud/RAN Purchase Agreement provided herein is an overview of the significant terms of the document.  To the extent that the description of the Cloud/RAN Purchase Agreement discussed in this Motion is inconsistent with the terms of such document, the terms of the Cloud/RAN Purchase Agreement shall govern. Furthermore, as noted above, the transaction contemplated in the Cloud/RAN Purchase Agreement includes the sale or assignment of certain Non-Debtor Cloud/RAN Assets.  For the avoidance of doubt, the Debtors are not seeking this Court's approval for any provisions of the Cloud/RAN Purchase Agreement to the extent they relate solely to the International Sellers or any Non-Debtor Cloud/RAN Assets.

| Local Rule 6004-1 Disclosure | Cloud/RAN Purchase Agreement Terms |
|---|---|
| **Purchaser** | Lumine Group US Holdco Inc.<br><br>*See id.* |
| **Purchase Price** | The aggregate consideration for the purchase of the Transferred Assets shall be (a) $15 million, plus (b) the assumption of the Assumed Liabilities, minus (c) the Debtor Seller's *pro rata* share of the Determined Cure Costs for a $222,087.54 Invoice #269385, dated 12/28/23, issued to Debtor Seller by Spirent Communications Inc. based upon the number of days elapsed in 2024 as of the Closing.<br><br>*See id.* at § 2.8. |
| **Transferred Assets** | The Transferred Assets include, among other things:<br><ul><li>supplies and other inventories,</li><li>the Seller Permits,</li><li>Assigned Contracts,</li><li>Business Records,</li><li>Equipment,</li><li>Transferred Intellectual Property,</li><li>certain refunds, credits, prepaid expenses, and deposits,</li><li>accounts receivable, and</li><li>certain other assets, interests or rights,</li></ul>in each ease related primarily or exclusively to the Cloud/RAN business or the Assumed Liabilities or necessary to fulfill obligations under the Assigned Contracts.<br><br>*See id.* at § 2.1. |

| Local Rule 6004-1 Disclosure | Cloud/RAN Purchase Agreement Terms |
|---|---|
| **Assumed Liabilities** | The Assumed Liabilities consist of:<br>• pre-Closing and post-Closing Liabilities (other than Taxes) arising under the Assigned Contracts (including Determined Cure Costs with respect to Designated US Contracts), and<br>• the following tax Liabilities relating to the Cloud/RAN Sale Transaction:<br>    ○ fifty percent (50%) of Transfer Taxes (defined below),<br>    ○ one hundred percent (100%) of Recoverable VAT,<br>    ○ fifty percent (50%) of Non-Recoverable VAT, and<br>    ○ one hundred percent (100%) of post-Closing Asset Taxes.<br><br>*See id.* at §§ 2.3, 2.9, 7.3(c), 7.3(h). |

| Termination Rights | The Cloud/RAN Purchase Agreement may be terminated at any time prior to the Closing as follows: |
|---|---|
| | • by mutual written consent of Purchaser and the Debtor Seller; |
| | • by Purchaser if the Debtor Seller (i) withdraws this Motion, (ii) moves to voluntarily dismiss the chapter 11 cases, (iii) moves for conversion of the chapter 11 cases to chapter 7 of the Bankruptcy Code, or (iv) moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in chapter 11 cases; |
| | • by Purchaser if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Sellers in the Cloud/RAN Purchase Agreement, and such breach or inaccuracy would result in a failure of certain closing conditions and is incapable of being cured or, if capable of being cured, has not been cured by the Sellers prior to the earlier of (i) 15 Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; |
| | • by the Debtor Seller if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in the Cloud/RAN Purchase Agreement, and such breach or inaccuracy would result in a failure of certain closing conditions and is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) 15 Business Days after receipt of written notice from the Debtor Seller requesting such breach be cured or (ii) the Outside Datet; |
| | • by Purchaser or the Debtor Seller if any Governmental Authority of competent jurisdiction shall have issued an |

| Local Rule 6004-1 Disclosure | Cloud/RAN Purchase Agreement Terms |
|---|---|
| | Order, enacted any Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Cloud/RAN Sale Transaction and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; or<br><br>• by Purchaser or the Debtor Seller if the Closing has not occurred on or prior to Outside Date (defined below);<br><br>*provided*, *however*, that certain of these termination rights shall not be available to the Party seeking to terminate if actions or omissions of such Party has contributed to or primarily caused the applicable triggering event.<br><br>*See id.* at § 9.1(a)–(f). |
| **Sale to Insider**<br>Local Rule 6004-1(b)(iv)(A) | The Purchaser is not an insider of the Debtors. |
| **Agreements with Management**<br>Local Rule 6004-1(b)(iv)(B) | None. |

| Releases | Effective as of the Closing: |
|---|---|
| Local Rule 6004-1(b)(iv)(C) | • the Sellers, on behalf of themselves, their Affiliates and each of their respective successors and assigns (each of the foregoing, a "<u>Seller Releasing Party</u>"), shall fully, irrevocably and unconditionally release and forever discharge Purchaser and its respective past and present directors, managers, officers, employees, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity with respect to the Transferred Assets and Assumed Liabilities, whether existing as of the Closing or arising thereafter, that a Seller Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date.; and<br><br>• Purchaser, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "<u>Purchaser Releasing Party</u>"), shall fully, irrevocably and unconditionally release and forever discharge the Sellers, the Seller's Affiliates and each of their respective past and present directors, managers, officers, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known |

| Local Rule 6004-1 Disclosure | Cloud/RAN Purchase Agreement Terms |
|---|---|
| | or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing is not a release or waiver by any Seller Releasing Party or Purchaser Releasing Party of any Action it may have under the Cloud/RAN Purchase Agreement or any of the other Related Documents. *See id.* at § 10.16. |
| **Private Sale / No Competitive Bidding** Local Rule 6004-1(b)(iv)(D) | An auction is not contemplated for the Cloud/RAN Assets. For the avoidance of doubt, however, the Debtors are not foreclosing any alternatives or limiting shopping that might be put forth for the Cloud/RAN Assets. |

| **Closing and Other Deadlines**<br><br>Local Rule 6004-1(b)(iv)(E) | Key Closing and other deadlines in the Cloud/RAN Purchase Agreement include: |
|---|---|
| | <ul><li>Debtor Seller shall: (i) file a motion seeking entry of a Conforming Cash Collateral Order by the earlier of: (a) one day after the Petition Date, and (b) 5:00 pm EDT on April 3, 2024; and (ii) obtain entry by the Bankruptcy Court of a Conforming Cash Collateral Order within fifteen (15) days of the Petition Date.</li></ul><ul><ul><li>"<u>Conforming Cash Collateral Order</u>" means an order that is entered by the Court (a) to which holders of any Lien referenced in such order shall have consented and (b) is acceptable to Purchaser in its reasonable discretion, that: (i) approves the $750,000 Expense Reimbursement Amount as an administrative expense under section 503(b) of the Bankruptcy Code; (ii) provides for and directs the payment of $375,000 of the Expense Reimbursement Amount on a senior basis to the Liens of the Term Lenders; (iii) provides for any remaining portion of the Expense Reimbursement Amount to be paid in accordance with the priority of an administrative expense under the Bankruptcy Code; *provided* that such remaining portion shall only be payable on or after the effective date of a confirmed chapter 11 plan; *provided further* that in the event of a chapter 7 liquidation, claims with respect to such amount shall be considered valid administrative claims against the estate; and (iv) provides sufficient liquidity to Sellers to operate the Cloud/RAN business until the Closing Date.</li></ul></ul><ul><li>The Cloud/RAN Purchase Agreement may be terminated by the Purchaser or the Debtor Seller if the Closing has not occurred on or prior to May 20, 2024 (the "<u>Outside Date</u>");</li></ul> |

| Local Rule 6004-1 Disclosure | Cloud/RAN Purchase Agreement Terms |
|---|---|
| | *provided*, *however*, that the Party exercising such right to terminate shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in the Cloud/RAN Purchase Agreement.<br><br>• At least fifteen (15) days prior to the expected Closing Date, Purchaser shall deliver to those certain Offer Employees selected at the Purchaser's discretion a written offer of employment. Each Offer Employee who accepts such offer on or prior to the Closing Date, successfully fulfills the conditions of such offer, as determined in Purchaser's sole discretion, and commences employment with Purchaser on the first Business Day following the Closing will be a "<u>Continuing Offer Employee</u>" (together with each Automatic Transfer Employees who becomes employed by Purchaser, the "<u>Continuing Employees</u>").<br><br>*See id.* at §§ 5.1(c), 6.9(b), 9.1(f). |
| **Good Faith Deposit**<br><br>Local Rule 6004-1(b)(iv)(F) | Within five (5) Business Days of the execution of the Cloud/RAN Purchase Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the $750,000 into the Deposit Escrow Account.<br><br>*See id. at* § 2.8(c). |
| **Interim Arrangements with Proposed Buyer**<br><br>Local Rule 6004-1(b)(iv)(G) | Prior to Closing, Purchaser and the Sellers shall negotiate reasonably and in good faith a short form transition services agreement or other reasonable commercial arrangement that will provide the Sellers with such continued access necessary to operate the Cable business.<br><br>*See id.* at § 6.10(a). |

| Local Rule 6004-1 Disclosure | Cloud/RAN Purchase Agreement Terms |
|---|---|
| **Use of Proceeds**<br><br>Local Rule 6004-1(b)(iv)(H) | The Cloud/RAN Purchase Agreement does not contain any provision pursuant to which the Debtors propose to release sale proceeds on or after the Closing without further Court order, or to provide for a definitive allocation of sale proceeds between or among various sellers or collateral. |
| **Tax Exemption**<br><br>Local Rule 6004-1(b)(iv)(I) | It is the intention of the Purchaser and the Sellers that the Cloud/RAN Sale Transaction be exempt from all transfer, documentary, sales, use, excise, stock transfer, stamp, recording, registration and other similar taxes (excluding VAT), levies, duties and fees (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with the Cloud/RAN Purchase Agreement and the Cloud/RAN Sale Transactions (collectively, "Transfer Taxes") pursuant to Section 1146(a) of the Bankruptcy Code.<br><br>*See id.* at § 2.9. |
| **Record Retention**<br><br>Local Rule 6004-1(b)(iv)(J) | Sellers shall be entitled to retain copies of any transferred Business Records, subject to the confidentiality obligations of the Sellers under the Confidentiality Agreement, and only to the extent such Business Records (i) are reasonably necessary for compliance with applicable Law, (ii) are reasonably expected to be required in an examination by any Governmental Authority, or (iii) are reasonably required for the liquidation and dissolution of the Sellers following the Closing.<br><br>*See id.* at § 2.1(e). |
| **Sale of Avoidance Actions\**<br><br>Local Rule 6004-1(b)(iv)(K) | None.<br><br>*See id.* at § 2.2(i). |

| Local Rule 6004-1 Disclosure | Cloud/RAN Purchase Agreement Terms |
|---|---|
| **Requested Findings as to Successor Liability**<br><br>Local Rule 6004-1(b)(iv)(L) | The Debtor Seller shall use best efforts to pursue the entry by the Court of the Proposed Order providing for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code.<br><br>*See id.* at § 5.1(a). |
| **Sale Free and Clear of Unexpired Leases**<br><br>Local Rule 6004-1(b)(iv)(M) | The transferred Cloud/RAN Assets of the Debtor Seller shall be transferred to the Purchaser free and clear of all Liens (other than any Permitted Liens or other exceptions under the Cloud/RAN Purchase Agreement), to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.<br><br>*See id.* at § 2.1. |
| **Credit Bid**<br>Local Rule 6004-1(b)(iv)(N) | The Cloud/RAN Purchase Agreement does not allow, disallow or affect in any manner, credit bidding pursuant to Bankruptcy Code section 363(k). |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>Local Rule 6004-1(b)(iv)(O) | The Proposed Order provides for a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h). |

### Assumption and Assignment Procedures for the Cloud/RAN Sale Transaction

24.     The Debtors also request that the Court approve the Assumption and Assignment Procedures described below.  The Debtors submit that service of the Motion and the Potential Assumption and Assignment Notice attached hereto as **Exhibit D** on the applicable contract counterparties to the 365 Contracts is proper and sufficient to provide notice to the counterparties

of the Assumption and Assignment Procedures and the proposed Cure Amounts associated with their contract(s).

25.     To facilitate the Cloud/RAN Sale Transactions, the Debtors seek authority to assume and assign the applicable 365 Contracts to the Purchaser in accordance with the following Assumption and Assignment Procedures:

    a.  The Debtors shall file with the Court, post on the case website at https://dm.epiq11.com/CasaSystems, and serve on each Counterparty to a 365 Contract a Potential Assumption and Assignment Notice on or prior to April 4, 2024 (the "Potential Assumption and Assignment Notice Deadline").

    b.  The Potential Assumption and Assignment Notice shall include, without limitation: (i) a list of applicable 365 Contracts; and (ii) the Debtors' calculation of the amount necessary to cure any monetary defaults under such 365 Contracts, if any, that the Debtors believe are required to be paid (such amounts, the "Cure Amounts"). If a Counterparty objects to the Cure Amounts, the Counterparty must file with the Court and serve on each of (a) counsel to the Debtors, (b) counsel to the Committee, if any, (c) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (d) counsel to the Ad Hoc Group, and (e) counsel to the Purchaser, a written objection (a "Cure Objection") on or before **April 17, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "Cure Objection Deadline"), *provided* that with respect to any Cure Objection for any 365 Contract included on any subsequent Potential Assumption and Assignment Notice filed by the Debtors, if any, such Cure Objections must be filed on or prior to the Adequate Assurance Objection Deadline (defined below). Any Cure Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Rules; and (iii) state with specificity the grounds for such objection, including, without limitation, the fully liquidated Cure Amount and the legal and factual bases for any unliquidated Cure Amount that the Counterparty believes is required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable 365 Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

c.  If, after the Potential Assumption and Assignment Notice Deadline, and prior to the Cloud/RAN Sale Hearing, additional executory contracts or unexpired leases of the Debtors are determined, in consultation with the Ad Hoc Group, to be potential 365 Contracts in connection with the Cloud/RAN Sale Transaction, or the Debtors seek to modify the previously stated Cure Amount associated with any 365 Contract, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable counterparty to the 365 Contract a supplemental or amended Potential Assumption and Assignment Notice.

d.  Any time after the date of service of the Potential Assumption and Assignment Notice and prior to the Cloud/RAN Sale Hearing, the Debtors, in consultation with the Purchaser and the Ad Hoc Group, reserve the right, and are authorized but not directed, to: (i) add previously omitted 365 Contracts as contracts to be assumed and assigned to the Purchaser in accordance with the definitive agreement for the Cloud/RAN Sale Transaction; (ii) remove a 365 Contract from the Potential Assumption and Assignment Notice that the Purchaser proposes be assumed and assigned to it in connection with the Cloud/RAN Sale Transaction; or (iii) modify the previously stated Cure Amount associated with any 365 Contract.  The Debtors shall promptly provide notice of such addition, removal, or modification to such applicable counterparty to the 365 Contracts.

e.  The counterparties to the 365 Contracts shall file any objections to the adequate assurance of future performance by the Purchaser (an "Adequate Assurance Objection" and together with any Cure Objection, an "Assignment Objection"), on or prior to April 17, 2024 at 4:00 p.m. (prevailing Eastern Time) (the "Adequate Assurance Objection Deadline").  Unless otherwise provided, any Adequate Assurance Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and Local Rules; (iii) be filed via ECF on or before the Adequate Assurance Objection Deadline; and (iv) state with specificity the grounds for such objection.

f.  At the Cloud/RAN Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Purchaser of those 365 Contracts that have been selected by such Purchaser to be assumed and assigned.  The Debtors and their estates reserve any and all rights with respect to any 365 Contracts that are not ultimately designated.

g.  If no Assignment Objection is timely filed with respect to a 365 Contract: (i) the Counterparty to such 365 Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Purchaser of the 365 Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Purchaser); (ii) any and all defaults under the 365 Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Cure Amount set forth in the applicable Potential Assumption and Assignment Notice for such 365 Contract; and (iii) the Counterparty shall be forever barred from asserting any other claims related to such 365 Contract against the Debtors and their estates or the Purchaser, or the property of any of them, that existed prior to the entry of the order resolving the Cure Objections and the Sale Order (as defined below).

h.  To the extent that the parties are unable to consensually resolve any Cure Objection prior to the commencement of the Cloud/RAN Sale Hearing, the Debtors, in consultation with the Cloud/RAN Purchaser and the Ad Hoc Group, may (i) assume the applicable 365 Contract prior to the resolution of the Cure Objection; *provided* that the Debtors shall (A) pay to the applicable Counterparty the undisputed portion of the Cure Amount within five (5) business days after entry of the applicable Sale Order and (B) reserve cash in an amount sufficient to pay the disputed portion of the Cure Amount reasonably asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty and the Debtors) (the "Reserve Amount"), or (ii) adjourn their request to assume the 365 Contract pending resolution of the Cure Objection (an "Adjourned Cure Dispute"); *provided further* that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the Debtors, the Debtors, with the consent of the Purchaser (such consent not to be unreasonably withheld or delayed), may withdraw the proposed assumption of the applicable 365 Contract after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code. The Debtors shall file notice of their intention to reserve for a Cure Amount or to adjourn their request for assumption. An Adjourned Cure Dispute may be resolved after the

Closing Date of the Cloud/RAN Sale Transaction in the Debtors' discretion, in consultation with the Purchaser.

## Basis for Relief

I.      **The Debtors Have Demonstrated a Sound Business Justification for the Sale.**

26.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

27.     The sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code where the transaction represents an exercise of the debtor's sound business judgment.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

28.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:   (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See, e.g., Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (D. Del. 1987).

29.     Once a debtor articulates a valid business justification, its decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence," as courts are loath to interfere with corporate decisions absent such a showing.  *See id.* at 656; *see also In re Promise Healthcare Group, LLC, et al.*, Case No. 18-12491 (CSS) [D.I. 770] (order approving the private sale of healthcare facilities upon the debtors showing they properly exercised their business judgment and set forth sound business justifications for pursuing such a sale, having marketed the private sale and showing that the purchaser was the only bidder for the facilities that could close a sale promptly on terms favorable to the Debtors); *In re Celadon Group, Inc.*, et al., Case No. 19-12606 (KBO) [D.I. 417, 418, and 766] (orders approving private sales of the Debtors' nonresidential real property upon the Debtors' showing they properly exercised their business judgment and set forth sound business justifications for pursuing such private sales, having marketed the private sales and showing that the purchasers were the only bidders that could close a sale promptly on terms favorable to the Debtors); *In re Taronis Fuels, Inc.*, et al., Case No. 22-11121 (BLS) [D.I. 135] (order approving

28

the private sale of one geographical region of the Debtors' retail operations outside of the ordinary course of business).

30.     There is a strong business justification for the sale of the Cloud/RAN Assets without a postpetition auction process.  Proceeds from the Cloud/RAN Sale Transaction are *the only* source of liquidity that can be obtained in time to fund these chapter 11 cases, stave off a chapter 7 liquidation, and, critically, fund the Debtors' operations in any respect.

31.     As discussed above, the Debtors have been evaluating potential strategic alternatives for months.  An exhaustive prepetition marketing process has not yielded any other actionable offers for the Cloud/RAN Assets or any other means of financing an orderly, going-concern sale of the Debtors' business.  If the Debtors' receipt of proceeds from the Cloud/RAN Sale Transaction is delayed or eliminated, the Debtors will be forced to immediately shutter operations, terminate hundreds of employees, and completely liquidate assets through a chapter 7 proceeding.  Accordingly, the Debtors have determined, in the exercise of their business judgment, that entry into the Cloud/RAN Purchase Agreement, without any added time and risk associated with a public auction, is in the best interests of the Debtors and their stakeholders.

32.     Further, as discussed above, the Cloud/RAN Purchase Agreement (including the Purchase Price obtained by the Debtors) is the result of an exhaustive prepetition marketing process and of weeks of extensive, round-the-clock, arm's-length negotiations.  While the Debtors

will provide extensive notice of the Cloud/RAN Sale Transaction (including through service of the motion, publication notice, and Ducera's outreach) on a postpetition basis, the Cloud/RAN Purchase Agreement represents the highest and best offer that could reasonably be obtained for the Cloud/RAN Assets under the circumstances.

33.     In the instant case, (a) adequate justification exists for the approval of the Cloud/RAN Sale Transaction; (b) the Cloud/RAN Purchase Agreement was negotiated at arm's length and in good faith; (c) the Purchase Price represents a fair and reasonable price for the Cloud/RAN Assets; and (d) adequate and reasonable notice will be provided to the relevant parties. The Debtors respectfully request that the Cloud/RAN Sale Transaction therefore be authorized.

## II.     Selling the Designated Assets by Sale Conducted Without an Auction Is Appropriate.

34.     Bankruptcy Rule 6004(f)(1) permits sales conducted without an auction.  Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").  Further, courts have generally held that a debtor has broad discretion in determining the manner in which assets are sold.  *Berg v. Scanlon (In re Alisa P'ship),* 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of sale is within the discretion of the trustee . . . ."); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has "'ample discretion to administer the estate, including authority to conduct public or private sales of estate property.'") (*citing In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991)).  So long as a debtor

maximizes the return to its estate, a court should defer to a debtor's business judgment regarding how to structure an asset sale. *Bakalis*, 220 B.R. at 532 (recognizing that although a trustee's business judgment enjoys great judicial deference, a duty is imposed on the trustee to maximize the value obtained from a sale); *In re NEPSCO, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983) ("Clearly, the thrust of th[e] statutory scheme [governing 363 sales] is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate."). Accordingly, if the Debtors conclude that conducting a sale without a public auction, is in the best interests of their estates, the Debtors should be permitted to do so. *See Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction.").

35.     Under the current circumstances, consummation of the Cloud/RAN Sale through the contemplated sale process is not only appropriate, but necessary. As noted, despite a lengthy and thorough prepetition marketing process, there is no source of liquidity at this time adequate to fund the Debtors' operations, any auction process, or any chapter 11 proceedings apart from the proceeds of the Cloud/RAN Sale, and each week during which the Debtors maintain the Cloud/RAN Assets results in an incremental cash burn of $900,000 per week. If the sale is not approved on an expedited timeline, there is no opportunity to pursue an alternative sale process or

more expansive auction process; instead, the Debtors will be forced to initiate a fire sale liquidation

in chapter 7.  A sale on the expedited timeline set forth herein is necessary not only to maximize

the value of the Debtors' estates, but to preserve *any* substantial value for the Debtors as a going

concern, to the benefit of all stakeholders.

**III.    The Cloud/RAN Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code.**

36.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and

clear of liens, claims, interests, and encumbrances if any one of the following conditions is

satisfied:

(a) applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b) such entity consents;

(c) such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d) such interest is in bona fide dispute; or

(e) such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002)

("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions

are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

37.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code]."). The sale of the Cloud/RAN Assets free and clear of all liens, claims, interests, and encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code. Moreover, the Debtors will send notice of the sale to purported lienholders. If such lienholders do not object to the proposed sale, then their consent should be presumed. In accordance therewith, the Debtors request that, unless a party asserting a prepetition lien, claim or encumbrance on any of the Cloud/RAN Assets timely objects to this Motion, such party shall be deemed to have consented to the sale of the Designated Assets. *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

38.     Here, Cloud/RAN Assets are part of the Prepetition Lenders' collateral.   The members of the Ad Hoc Group, who hold 98 percent of the Debtors' prepetition funded debt, including 98 percent of the Company's Superpriority Term Loans and 100 percent of the Stub Term Loan, have consented to the Cloud/RAN Sale Transaction.  As a result, the requisite majority of Prepetition Lenders under the Debtors' prepetition debt documents consent to the sale and therefore, with respect to their liens, section 363(f)(2) of the Bankruptcy Code is satisfied. Accordingly, the Debtors request that the Court authorize the sale of the Cloud/RAN Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances attaching to the proceed thereof in the same order of relative priority, with the same validity, force and effect as prior to such.

## IV.     Purchaser Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.

39.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in

> good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

40.     The Debtors request a finding that the Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.  The terms and conditions of the Cloud/RAN Purchase Agreement have been negotiated by the Debtors and the Purchaser at arm's length and in good faith.  Neither the Debtors nor any of their current or former officers or directors have any connection with the Purchaser to the best of the Debtors' information and belief. On information and belief, the Purchaser is a sophisticated party (and is represented by experienced and sophisticated counsel), and the Debtors believe that the Purchaser has not engaged in any conduct that would indicate or constitute a lack of good faith.  *See In re Gucci*, 126 F.3d 380, 392 (2d Cir. 1997) ("Good faith of a purchaser is shown by the integrity of his conduct during the

35

course of sale proceedings . . . ."); *In re Tempo Tech. Corp.*, 202 B.R. 363, 367 (D. Del. 1996) (stating that a purchaser's good faith status would be destroyed only by conduct involving "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'") (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). Accordingly, the Debtors believe that the Purchaser is entitled to the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

**V.      Purchaser Should Be Entitled to the Protections of Section 363(n) of the Bankruptcy Code.**

41.      The Debtors submit that the terms and conditions of the sale will have been negotiated by the Debtors and Purchaser, as applicable, at arm's length and in good faith, with the assistance of the Debtors' professional advisors, and that the parties did not engage in any conduct that would cause or permit the Cloud/RAN Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

42.      Based on the foregoing, the Debtors submit that they have demonstrated that the proposed sale is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

**VI.     Assumption and Assignment of the 365 Contracts Should Be Authorized.**

43.      Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the

debtor." 11 U.S.C. § 365(a).   Courts employ the business judgment standard in determining

whether to approve a debtor's decision to assume or reject an executory contract or unexpired

lease.  *See, e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (assumption or

rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ

Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision

to assume or reject executory contract is governed by business judgment standard and may only

be overturned if decision is product of bad faith, whim, or caprice).  The "business judgment" test

in this context only requires that a debtor demonstrate that assumption or rejection of a lease

benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40

(3d Cir. 1989).

44.   Any assumption of the 365 Contracts is an exercise of the Debtors' sound business

judgment because the transfer of such 365 Contracts is necessary to the Debtors' ability to obtain

the best value for the Cloud/RAN Assets.  Given that consummation of the sale is critical to the

Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption and

assignment of any 365 Contracts is an exercise of sound business judgment and, therefore, should

be approved.

45.   The consummation of any sale involving the assignment of the 365 Contracts will

be contingent upon the Debtors' compliance with the applicable requirements of section 365 of

the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the 365 Contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.

46.     The Debtors' assumption and assignment of the 365 Contracts will be contingent upon payment of the Cure Amounts and effective only upon the closing of the sale or any later applicable date of assumption and assignment.  Each counterparty to the 365 Contracts that the Debtors seek to assume and assign to the Purchaser will be served with this Motion, as well as the Potential Assumption and Assignment Notice, which identifies the 365 Contracts that the Debtors may seek to assume and assign to the Cloud/RAN Purchaser as well as the Cure Amounts.

47.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007); *see also Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc*., 53 B.R. 789, 803 (Bankr.

N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"). Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

48.     The assumption and assignment of certain executory contracts and unexpired leases is an appropriate exercise of the Debtors' business judgment. Additionally, the Debtors submit that the notice provisions and the objection deadline for counterparties to the 365 Contracts to raise objections to the assumption and assignment of the 365 Contracts as proposed in this Motion are adequate to protect the rights of counterparties to the 365 Contracts. Additionally, the Debtors believe that the Purchaser is able to demonstrate adequate assurance of future performance to the counterparties of the 365 Contracts. In the event that such counterparties object on adequate assurance of future performance grounds, the Debtors will present facts at the hearing on this Motion to show the financial wherewithal, willingness and ability of the Purchaser to perform under the 365 Contracts.

## **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

49.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declarations, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' ongoing operations and value-maximization process.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **Notice**

50.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) JPMorgan Chase Bank, N.A., or a successor thereto; (d) Delaware Trust Company; (e) counsel to the Ad Hoc Group; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the Federal Communications Commission; (j) all parties known by the Debtors to assert a lien or encumbrance on any of the Cloud/RAN Assets; (k) all persons known or reasonably believed to have asserted an interest in or claim to any of the Cloud/RAN Assets; (l) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the

Cloud/RAN Assets within one (1) year prior to the Petition Date; (m) the Purchaser; (n) the counterparties to the 365 Contracts; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

*[Signature Page Follows]*

41

Dated: April 3, 2024
Wilmington, Delaware
/s/ *Joseph M. Mulvihill*

<table>
<tr><td>

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Joseph Barry (Del. Bar No. 4221)
Joseph M. Mulvihill (Del. Bar No. 6061)
Timothy R. Powell (Del. Bar No. 6894)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jbarry@ycst.com
       jmulvihill@ycst.com
       tpowell@ycst.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

</td><td>

**SIDLEY AUSTIN LLP**

Stephen E. Hessler (*pro hac vice* pending)
Patrick Venter (*pro hac vice* pending)
Margaret R. Alden (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: shessler@sidley.com
       pventer@sidley.com
       malden@sidley.com

Ryan L. Fink (*pro hac vice* pending)
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Email: ryan.fink@sidley.com

Julia Philips Roth (*pro hac vice* pending)
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (310) 595-9500
Facsimile: (310) 595-9501
Email: julia.roth@sidley.com
*Proposed Co-Counsel to the Debtors and Debtors in Possession*

</td></tr>
</table>