**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CASA SYSTEMS, INC., *et al.*[1] | Case No. 24-10695 (KBO) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF DAVID S. ZUBRICKI IN SUPPORT OF**
**DEBTORS' BIDDING PROCEDURES MOTION AND CLOUD/RAN SALE MOTION**

I, David S. Zubricki, hereby declare under penalty of perjury as follows:

1.      I submit this declaration (this "Declaration") in support of the (i) *Debtors'*
*Motion for Entry of (I) an Order (A) Approving Bidding Procedures; (B) Approving the Selection*
*of Stalking Horse Purchaser; (C) Approving the Debtors' Entry into the Stalking Horse APA and*
*Approving Bid Protections; (D) Scheduling Auction and the Sale Hearing; (E) Approving Form*
*and Manner of Sale Notice; (F) Approving Form and Manner of Potential Assumption and*
*Assignment Notice; (G) Approving Form and Manner of Notice of Successful Bidder;*
*(H) Approving Assumption and Assignment Procedures and (I) Granting Related Relief; and*
*(II) an Order (A) Approving the Sale of the Assets Free and Clear of Liens, Claims, Interests and*
*Encumbrances; (B) Approving the Assumption and Assignment of Executory Contracts and*
*Unexpired Leases and (C) Granted Related Relief* (the "Bidding Procedures Motion") and
(ii) *Debtors' Motion for Entry of an Order (I) Approving the Sale of Certain of the Debtors' Assets*
*Free and Clear of Liens, Claims, and Encumbrances, with Such Interests to Attach to the Proceeds,*
*(II) Approving Assumption and Assignment Procedures in Connection Therewith, (III) Authorizing*

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtors' federal tax identification number, are Casa Systems, Inc. (8867), Casa Systems Securities Corporation (1151), and Casa Properties LLC (6767).  The Debtors' service address is 100 Old River Road, Andover, MA 01810.

*the Assumption and Assignment of Executory Contracts and Unexpired Leases to the Purchaser, and (IV) Granting Related Relief* (the "Cloud/RAN Sale Motion" and together with the Bidding Procedures Motion, the "Motions"),[2] each filed substantially contemporaneously herewith.

2.      In particular, I believe that (a) approval of the Cloud/RAN Sale Transaction through a sale process on an expedited timeline is necessary under the circumstances to fund these chapter 11 cases and bring them to a successful conclusion; and (b) the Bidding Procedures governing the sale of the Cable Assets, the Cable Stalking Horse APA, and the Cable Bid Protections are in the best interest of the estates.

3.      Although Ducera (as defined below) is being compensated for its work as the investment banker proposed to be retained by the Debtors, I am not being compensated separately for this Declaration or testimony.  Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by Ducera professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors or their other advisors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years and authorized to submit this Declaration.

### Professional Background and Qualifications

4.      I am a Managing Director at Ducera Partners LLC ("Ducera"), and a registered representative of Ducera Securities LLC, which maintains its principal office at 11 Times Square, 36th Floor, New York, New York 10036, and the proposed investment banker for the Debtors in the above-captioned chapter 11 cases.

---

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motions.

5.    Ducera is an investment banking firm specializing in providing leading-edge capital structure and restructuring advice to companies, creditors, and investors in bankruptcy. Ducera provides a broad range of corporate and financial services to its clients, including: (a) general corporate advice; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; and (d) private placements. Ducera and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases. Ducera's business reorganization professionals have served as financial and strategic advisors in numerous cases, including, among others: *In re Revitalid Pharmaceutical Corp.*, No. 23-11704 (BLS) (Bankr. D. Del. Nov. 15, 2023) [Docket No. 105]; *In re Yellow Corp.*, Case No. 23-11069 (CTG) (Bankr. D. Del. Sept. 25, 2023) [Docket No. 648]; *In re Diebold Holding Co., LLC*, Case No. 23-90602 (DRJ) (Bankr. S.D. Tex. July 18, 2023) [Docket No. 266]; *In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bankr. D. Del. May 15, 2023) [Docket No. 261]; *In re Core Scientific, Inc.*, Case No. 22-90341 (DRJ) (Bankr. S.D. Tex. March 13, 2023) [Docket No. 675]; *In re Endo Int'l plc.*, Case No. 22-22549 (JLG) (Bankr. S.D.N.Y. Oct. 25, 2022) [Docket No. 527]; *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 22, 2021) [Docket No. 230]; *In re Mallinckrodt plc*, Case No. 20-12522 (JTD) (Bankr. D. Del. Mar. 16, 2021) [Docket No. 1741]; *In re Superior Energy Servs., Inc.*, *et al.*, Case No. 20-35812 (DRJ) (Bankr. S.D. Tex. Feb. 2, 2021) [Docket No. 316]; *In re Remington Outdoor Co.*, Case No. 20-81688 (CRJ11) (Bankr. N.D. Ala. Aug. 11, 2020) [Docket No. 283]; *In re Imerys Talc Am., Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del. Aug. 7, 2019) [Docket No. 927]; *In re Paniolo Cable Co., LLC*, Case No. 18-01319 (RJF) (Bankr. D. Haw. May 7, 2019) [Docket No. 121]; *In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064 (TLS) (Bankr. D. Neb. Jan. 25, 2019) [Docket No. 185]; *In re Sungevity, Inc.*, Case No. 17-10561 (KG) (Bankr. D. Del. Apr.

10, 2017) [Docket No. 202]; *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Jan. 26, 2018) [Docket No. 1624]; *In re Panda Temple Power, LLC,* Case No. 17-10839 (LSS) (Bankr. D. Del. May 25, 2017) [Docket No. 164]; *In re Dacco Transmission Parts (NY), Inc.*, Case No. 16- 13245 (MKV) (Bankr. S.D.N.Y. Jan. 17, 2017) [Docket No. 205]; *In re Hercules Offshore, Inc.*, Case No. 16-11385 (KJC) (Bankr. D. Del. Aug. 23, 2016) [Docket No. 334]; *In re Illinois Power Generating Co.*, Case No. 16-36326 (MI) (Bankr. S.D. Tex. Jan. 25, 2017) [Docket No. 169]; and *In re Paragon Offshore PLC*, Case No. 16-10386 (JKS) (Bankr. D. Del. May 16, 2017) [Docket No. 1503].

6.      Unless otherwise stated herein, all facts, statements, or opinions included in this Declaration are based upon my personal knowledge of the Debtors' operations and financial performance, information learned from my review of relevant financial and operational data regarding the Debtors, information provided to me by Ducera professionals involved in advising the Debtors in these chapter 11 cases, information provided to me or verified by the Debtors or the Debtors' other professional advisors, my involvement with the sale processes for the Debtors' assets, or my experience advising both distressed and non-distressed businesses.

## General Background

7.      As set forth more fully in the Durkin Declaration, the Debtors operate a global communications technology business that offers end-to-end physical, virtual, and cloud-native 5G infrastructure and customer premise networking equipment solutions.  These solutions, in turn, enable the Debtors' customers to transform and expand their public and private high-speed data and multi-service communications networks.  The Debtors' solutions are commercially deployed in more than 70 countries by more than 475 customers, including regional as well as some of the world's largest Tier 1 communications service providers, serving millions of subscribers globally.

## The Debtors' Prepetition Marketing Efforts

**A.    Sale Process and Outreach**

8.    As described in the Durkin Declaration, I understand that in August 2022, the Debtors retained Piper Sandler & Co. ("Piper Sandler") to explore a potential sale of the Debtors' CAD business and related assets (the "CAD Assets"). As set forth in the Durkin Declaration, that marketing process ultimately failed to produce an actionable proposal.

9.    I also understand that, in June 2023, the Debtors launched a targeted sale process to explore a potential sale of the Debtors' Cable Assets. Durkin Declaration, ¶ 83. As part of this process, I understand that the Debtors contacted ten potential parties, with four such parties executing non-disclosure agreements. *Id.* While I understand that the Debtors did initially receive a non-binding indication of interest ("IOI") from three such parties, following additional diligence, two of such parties declined to continue in the process and the remaining party revised its IOI into a bid that the Debtors ultimately determined, in their business judgment, was not an actionable proposal. *Id.*

10.    In October 2023, as the Debtors' financial position continued to deteriorate, the Debtors decided to explore a wider range of transaction alternatives and engaged Ducera to provide restructuring, financing, and transaction advisory services. In the approximately six months prior to the commencement of these chapter 11 cases, the Debtors pursued an extensive marketing process, and with the assistance of Ducera, contacted more than 26 third parties about potential interest in a sale transaction that could, in the Debtors' determination in consultation with their advisors, be consummated on the timeline dictated by the Debtors' declining liquidity position. This outreach effort included parties who were interested in buying substantially all of the Debtors' assets as well as those who expressed interest in a more limited scope of assets, including the Cable

Assets and Cloud/RAN Assets.  During this time, the Debtors ultimately held substantive discussions with more than 26 parties in connection with potential sale transactions and the Debtors' management team, along with Ducera, engaged in dozens of diligence sessions and other transaction-related conversations with eight parties which expressed a more significant level of interest and requested such further information.  Each of these eight parties signed non-disclosure agreements and were provided access to a virtual dataroom which was populated with more than 3,400 documents comprised of more than 70,000 total pages containing information related to the Debtors' Assets.  Additionally, I understand that the Debtors' management team conducted informal outreach and conversations with a significant number of additional interested parties. This formal and informal outreach bore significant fruit as the Debtors secured the Cable Stalking Horse Bid and a proposed purchaser for the Cloud/RAN Assets (the "Proposed Cloud/RAN Purchaser"),[3] which proved critical in garnering the Ad Hoc Group's support for these chapter 11 cases and the postpetition marketing process contemplated herein.[4]

## B.    Case Funding Process and Outreach

11.    As set forth in the Durkin Declaration, the Debtors commenced these chapter 11 cases to facilitate a sale of substantially all of their assets and an orderly winddown process.  In connection with the foregoing, as described in the Whittman Declaration, the Debtors determined that their cash on hand from operations would be insufficient to fund such cases to a successful conclusion.  Accordingly, during the months preceding these chapter 11 cases, the

[3] Despite the Debtors' marketing efforts, the Debtors received only one actionable indication of interest for the Cloud/RAN Assets:  the indication of interest submitted by the Proposed Cloud/RAN Purchaser.

[4] As described in the First Day Declarations, in the absence of an actionable proposal to sell the CAD Assets, and in light of the immediate funding needs to operate the CAD business as a going concern and the Debtors' overall liquidity challenges, on March 11, 2024, I understand that the director(s) of the NetComm Entities, in consultation with the Debtors and their respective advisors, commenced voluntary administration proceedings ("VA Proceedings") in Australia with respect to the NetComm Entities.

Debtors, with the assistance of their advisors, explored a wide range of potential sources of case funding. In addition to months of arm's-length negotiation with an ad hoc group (the "Ad Hoc Group") of the Debtors' existing lenders (the "Prepetition Lenders") with respect to case funding, in January and February 2024, the Debtors engaged in several discussions with Verizon, a key customer of the Debtors, to solicit, among other things, a potential additional investment into the Debtors' estates to help facilitate a viable path forward, as part of a value maximizing in-court or out-of-court transaction. Following these discussions, Verizon committed to providing incremental liquidity through a payment under an existing contract with the Debtors and expressed support for a transaction centered around the transfer of Cloud/RAN Assets to a third party, but the Debtors and Verizon were ultimately unable to agree to terms for a broader restructuring proposal centered on a potential new money capital injection or debtor-in-possession financing ("DIP Financing").

12.     Accordingly, in January 2024, the Debtors, with the assistance of Ducera, undertook an extensive outreach process to the capital markets to assess whether any financing would be available from a third-party lender. In addition to substantial outreach and engagement with the Debtors' Prepetition Lenders, Ducera considered a wide variety of potential alternative lenders, including third-party financial institutions experienced in distressed lending and financings, initiating outreach to 70 parties to see if they had any interest in providing postpetition financing. Of these parties, ultimately 33 signed a non-disclosure agreement and were provided access to a virtual dataroom with further information on the Debtors' assets and businesses. The Debtors ultimately received four informal term sheets with indicative terms but all were premised on (a) Verizon providing significant funding support to the Debtors and (b) the Prepetition Lenders agreeing to be consensually primed with respect to their secured interests. Because the Prepetition

Lenders indicated an unwillingness to consent to priming of their secured interests and the support from Verizon never materialized, these proposals were not actionable.  Ultimately, no third-party lender was willing to provide postpetition financing on a junior basis or to seek DIP Financing approval on a nonconsensual priming basis.

13.     As the Debtors continued to negotiate the terms of transactions involving the sale of multiple business units, the Debtors engaged in ongoing discussions with the Prepetition Lenders to solicit postpetition financing or the Prepetition Lenders' to have their liens primed by a third-party provider of such financing.  Those conversations were ultimately unsuccessful.  Eight days prior to the Petition Date, the Ad Hoc Group informed the Debtors that the Prepetition Lenders would not provide any case financing, and that they fully expected that the result would be the Debtors' imminent shutdown of operations and commencement of chapter 7 liquidation proceedings.

**The Cloud/RAN Sale Transaction**

14.     The following morning, the Debtors made a proposal to the Ad Hoc Group that, if successful, would allow the Debtors to avoid a liquidity shortfall and successfully fund and consummate these chapter 11 cases for the benefit of all of the Debtors' stakeholders, including more than 600 employees whose jobs are likely to be preserved pursuant to the contemplated Cable Sale Transaction and Cloud/RAN Sale Transaction.  Specifically, the Debtors asked the Ad Hoc Group to consent to the Debtors' access and use of their cash collateral ("Cash Collateral"), to fund these chapter 11 cases and, in exchange, agreed to seek to close the Cloud/RAN Sale Transaction in the first approximately 21 days of these chapter 11 cases, with the proceeds of that transaction used to fund the remainder of the chapter 11 cases, including a postpetition marketing

process for the Cable Sale Transaction.  The Debtors and the Ad Hoc Group ultimately reached consensus on this approach.[5]

15.     Given the Debtors' extensive prepetition marketing processes, which sought to identify buyers for some or all of the assets described above, including the Cloud/RAN Assets, and the Debtors' other efforts to market and find appropriate financing for these chapter 11 cases, I believe approval of the Cloud/RAN Sale Motion is in the best interests of the Debtors' estates. The Cloud/RAN Purchase Agreement represents consensus reached through fulsome negotiations between the Debtors, certain of their non-debtor affiliates, the Proposed Cloud/RAN Purchaser, and the Ad Hoc Group, which holds over 98% of the Debtors' funded debt, including approximately 98% of the Superpriority Term Loans and 100% of the Stub Term Loan (each as defined in the Durkin Declaration).   Durkin Declaration, ¶ 12.   The Cloud/RAN Purchase Agreement was negotiated over multiple weeks with frequent and daily meetings among the principals and their respective advisors on economic and legal terms.  Based on my review of and participation in such negotiations, I believe the consideration provided for the Cloud/RAN Assets in the Cloud/RAN Purchase Agreement is the result of extensive, good-faith, arm's-length negotiations, and is expected to close shortly after the receipt of the Court's approval.

16.     Additionally, despite the Debtors' efforts, the prepetition marketing process for the Cloud/RAN Assets yielded no other offers, and, in the absence of any actionable DIP Financing proposal, the Debtors do not have the liquidity to continue marketing the Cloud/RAN Assets past the date by which the Court will hear the Cloud/RAN Sale Motion.  Accordingly, the Cloud/RAN

---

[5] This staggered sale approach also reflect the respective markets for the Cloud/RAN Assets and the Cable Assets; based on prepetition discussions and outreach, I believe that a Cable Sale Transaction will generate significantly more interest from potential purchasers than a Cloud/RAN Sale Transaction.

Purchase Agreement represents the best and only option presently available to monetize the Cloud/RAN Assets.

17.    For the avoidance of doubt, however, the Debtors and their advisors will consider any viable proposals for the Cloud/RAN Assets, and, to the extent such proposals might constitute higher and better offers for the subject assets, the Debtors will diligently pursue any such proposals prior to the hearing on the Cloud/RAN Sale Motion.  To that end, Ducera is currently engaged in outreach to parties that previously expressed interest in the Cloud/RAN Assets during the aforementioned marketing process and certain additional potential purchasers, highlighting, among other things, the terms of the Cloud/RAN Purchase Agreement, the transaction's expected closing date, and key information regarding the Cloud/RAN Assets.

## The Postpetition Marketing Process and Bidding Procedures

18.    With respect to the Cable Assets, the Debtors, with the assistance of their advisors, are engaged in a postpetition marketing and auction process pursuant to the proposed Bidding Procedures (the "Postpetition Marketing Process"), which represents a continuation of the prepetition marketing process.  I believe that the Postpetition Marketing Process should be sufficient to identify potential bidders for the Cable Assets.  The Postpetition Marketing Process is currently underway, and the Debtors and Ducera plan to contact more than 110 parties, including key parties from the prepetition processes as well as additional potential purchasers.

19.    Pursuant to the Bidding Procedures, the Debtors intend that the Postpetition Marketing Process will be an extensive and fulsome process to identify potential buyers for the Cable Assets and facilitate access to diligence materials.  Such materials include details of the proposed Bidding Procedures, certain non-confidential presentation materials and, for those executing a non-disclosure agreement with the Debtors, access to a virtual data room, confidential

presentation materials and, as appropriate, meetings with management.   This postpetition marketing process for the Cable Assets will include a broader universe of potential buyers due to the public nature of the Bidding Procedures and the ability to sell the Cable Assets free and clear of claims and interests, and, therefore, I believe that the Postpetition Marketing Process in accordance with the Bidding Procedures will provide the best path to maximize value for the benefit of the Debtors' estates.

20.    I have reviewed the Bidding Procedures and I believe that they should facilitate an orderly, competitive, and efficient bidding and Auction process in a fair and transparent manner. The proposed Bidding Procedures contemplate an open Auction process for the Cable Assets with appropriate requirements to (i) submit a qualified bid, (ii) provide potential bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid, and (iii) give parties in interest the opportunity to review and object to a proposed transaction.   Further, the Bidding Procedures provide an appropriate framework for the Debtors and their independent fiduciaries and professional advisors to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtors' estates and their stakeholders, all within the confines of the Debtors' dire liquidity situation.

21.    I believe the Bidding Procedures should increase the likelihood that the Debtors will obtain the highest or otherwise best value for the Cable Assets to the benefit of the Debtors' estates as compared to any other available alternative process.   Further, I believe that compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Successful Bidder(s) and establish that the Debtors and the Successful Bidder(s) proceeded in good faith.

22.     In formulating the proposed sale timeline, the Debtors balanced the need to sell the Cable Assets quickly and efficiently against the need to provide adequate time for potential purchasers to conduct due diligence and submit bids.  The Bidding Procedures provide for an approximate five-week post-petition marketing and bidding process.  As noted above, this Postpetition Marketing Process is a continuation of the Debtors' prepetition sale efforts, which began in 2022 for certain of the Assets.  Moreover, prior to the Petition Date, the Debtors reached an agreement in principle with the Cable Stalking Horse Purchaser to establish a floor for the purchase price of the Cable Assets.

23.     While the Debtors' proposed timeline for the Postpetition Marketing Process is expedited, given the Debtors' liquidity situation and the robust prepetition marketing process described above, I believe that the Debtors' best opportunity to preserve jobs and maximize the value of their estates for the benefit of all the Debtors' stakeholders relies on their ability to expeditiously proceed through these chapter 11 cases and complete the Sale Transactions in a manner that minimizes administrative expenses and provides certainty to the Debtors' employees and customers.  In the absence of additional commitments from third parties to fund an extended in-court sale process, the proposed timeline is the only path for the Debtors to avoid a value-destructive chapter 7 conversion to the detriment of their stakeholders.  As noted above, that path relies on the expedient closing of the Cloud/RAN Sale Transaction to fund a postpetition marketing process for the Cable Assets, which has been carefully tailored to the account for the runway provided by the proceeds of the Cloud/RAN Sale Transaction.  Therefore, I believe that a further extended timeline is not tenable in these chapter 11 cases.

24.     In light of these extenuating circumstances, I believe that the proposed timeline for the post-petition marketing and bidding process is appropriate and that the Bidding Procedures are reasonable and appropriate.

### The Cable Stalking Horse Bid

25.     Pursuant to the ongoing Postpetition Marketing Process, the Debtors are seeking approval of a stalking horse bid (the "Cable Stalking Horse Bid") for the Cable Assets submitted by the Cable Stalking Horse Purchaser, subject to higher and better offers in accordance with the Bidding Procedures.  The Debtors, with the assistance of Ducera and their other advisors, determined that the Cable Stalking Horse APA provided substantial value to the estates and that the Cable Stalking Horse Purchaser was prepared to expeditiously complete the diligence process and execute definitive documentation to consummate a Sale Transaction, subject to higher or otherwise better offers at the Auction.

26.     Negotiations in connection with the Cable Stalking Horse APA have included extensive arms-length negotiations between the Cable Stalking Horse Purchaser and the Debtors and their advisors on economic and legal terms.  Following arms-length and good faith negotiations, the Debtors and the Cable Stalking Horse Purchaser have agreed in principle on the Cable Stalking Horse APA for the purchase of the Cable Assets.  The Cable Stalking Horse APA promotes competitive bidding and maximization of the value of the Cable Assets by establishing a baseline bid in connection with the Bidding Procedures and is designed to incentivize potential bidders and thereby maximize the potential value of the Cable Assets.  Moreover, in accordance with the Bidding Procedures, and in advance of the applicable Auction, the Debtors will continue to solicit higher or otherwise better proposals from third parties.

13

## **Material Terms of the Cable Stalking Horse APA**

27.     Based on my review of the negotiations and proposals received to date, the consideration offered for the Cable Assets in the Cable Stalking Horse APA is the result of extensive, good-faith, arm's-length negotiations, and is currently the highest and best proposal for the Cable Assets.  I believe that entering the Cable Stalking Horse APA is in the best interest of the Debtors' estates.  I further believe that the terms of the Cable Stalking Horse APA establish a baseline bid for the Cable Assets that, in accordance with the Bidding Procedures, enables the Debtors to maximize the ultimate purchase price of the Cable Assets.

## **The Cable Bid Protections**

28.     As set forth above, the Cable Stalking Horse APA contemplates certain protections including (i) a provision for reimbursement of reasonable and documented fees and expenses not to exceed $500,000 (the "Cable Expense Reimbursement") and (ii) a breakup fee equal to $600,000, *i.e.*, 3% of the applicable purchase price (the "Cable Break-Up Fee" and, together with the Cable Expense Reimbursement, the "Cable Bid Protections"), each payable in the event that the Cable Stalking Horse APA is terminated under certain circumstances.

29.     The Cable Break-Up Fee and Cable Expense Reimbursement are necessary to induce the Cable Stalking Horse Purchaser to pursue the sale of the Cable Assets and through chapter 11 will not chill bidding.  The Cable Stalking Horse Bid sets a floor for the value of the Cable Assets, encouraging potential buyers to meet or exceed a fair price for the Cable Assets and maximizing the realizable value of such Assets to the benefit of all parties in interest.

30.     The payment of the Cable Bid Protections will not diminish the Debtors' estates to the extent they become payable as competing bids must exceed the Cable Stalking Horse Bid by an amount in excess of the Cable Bid Protections.  I believe that, absent the Debtors' commitment

to the Cable Bid Protections, the Debtors could lose the opportunity to obtain a highest and best offer for the Cable Assets and would lose all downside protections offered by the existence of the Cable Stalking Horse Bid.    Based on the Postpetition Marketing Process and arms-length negotiations between the Debtors and the Cable Stalking Horse Purchaser, the Debtors have determined that the Cable Bid Protections are necessary to retain the Cable Stalking Horse Purchaser's commitment to consummate the Cable Asset Sale Transaction.

31.    Further, I believe that the Cable Bid Protections, taken as a whole, are appropriate under the circumstances.    Executing the Cable Stalking Horse APA has put the Debtors in a position, despite a challenging liquidity position, to solicit competing bids that may be materially higher or otherwise provide better value to the Debtors' estates than the Cable Stalking Horse Bid. Accordingly, I believe that the benefits of the Cable Stalking Horse APA outweigh the costs associated with the Cable Bid Protections and that selection of the Cable Stalking Horse Purchaser is the best way to maximize the value of the Cable Assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  April 3, 2024                          */s/ David S. Zubricki*
                                               David S. Zubricki