## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>CASA SYSTEMS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10695 (KBO)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 40, 41, & 108** |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING DEBTORS' LIMITED USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO SECURED LENDER, (III) MODIFYING AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Casa Systems, Inc. and its debtor affiliates (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby submits this objection (the "Objection")[2] to the *Debtors' Motion for Entry of an Order (I) Authorizing Debtors' Limited Use of Cash Collateral, (II) Granting Adequate Protection to Secured Lender, (III) Modifying Automatic Stay, and (IV) Granting Related Relief* [Docket No. 40] (the "Cash Collateral Motion").[3]  In support of the Objection, the Committee respectfully states as follows:

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of the Debtors' federal tax identification number, are Casa Systems, Inc. (8867), Casa Systems Securities Corporation (1151), and Casa Properties LLC (6767). The Debtors' service address is 100 Old River Road, Andover, MA 01810.

[2]     Capitalized terms used but not otherwise defined therein shall have the meanings ascribed to them in the Cash Collateral Motion or the First Day Declaration (as defined below), as applicable.  The Debtors extended the Committee's deadline to object to approval of the Cash Collateral Motion on a final basis through April 30, 2024.

[3]     Through the Cash Collateral Motion, the Debtors sought approval of a $750,000 expense reimbursement in favor of Lumine Group US Holdco Inc. in connection with the Private Sale Transaction (as defined below) (the "Expense Reimbursement").  However, at the hearing to consider approval of the Cash Collateral Motion on an interim basis, the Court rejected the Debtors' request to approve the Expense Reimbursement but indicated that the Court would consider the request in the context of the Court's approval of the Private Sale Transaction. At the Committee's request, the Debtors did not seek approval of the Expense Reimbursement in connection with the Private Sale Transaction, which the Court approved on April 26, 2024.  *See* Docket No. 223.  To the extent the Debtors or any other party seeks approval of the Expense Reimbursement at any time, the Committee's rights are hereby fully reserved.

## PRELIMINARY STATEMENT[4]

1.      In the short time since its formation, it has become apparent to the Committee that the staging and cadence of these cases was orchestrated by the Prepetition Secured Lenders in the months leading up to the Petition Date to inure to their sole benefit, to the detriment of the Debtors' estates, general unsecured creditors, and other stakeholders.

2.      In June 2023, a mere ten months prior to the Petition Date, Casa Systems, Inc. and certain of the lenders under the Original Prepetition Credit Agreement negotiated and entered into an agreement whereby Casa Systems, Inc. would exchange nearly all of the funded debt under the Original Prepetition Credit Agreement for no cognizable benefit.  To wit, despite *extending no additional credit*, through the Superpriority Credit Agreement, the Superpriority Secured Lenders received, among other things (a) a $40 million prepayment of the principal amount of the Original Term Loans – which amounts are not available for reborrowing; (b) inclusion of a prepayment penalty in the form of a very generous exit fee, the percentage of which increases each year that the obligations remain outstanding; and (c) additional collateral in the form of guarantees from each of the previously unencumbered direct and indirect subsidiaries of Casa and a pledge of Casa's equity interests therein.

3.      Having secured a significant paydown of their debt and a significant increase in their collateral package, the Prepetition Secured Parties watched as the financial performance of the Debtors continued to suffer. When it became clear that a chapter 11 filing was imminent, the Prepetition Secured Parties decided to cut their losses and, *en route*, cripple the Debtors' ability to conduct a fulsome competitive marketing and sale process with respect to the Cloud/RAN Assets,

---

[4]     Capitalized terms used in the Preliminary Statement but not defined therein shall have the meanings ascribed to them elsewhere in this Objection.

putting the Debtors' in the position of having to seek approval of a private sale transaction at a fire sale price, just to try and keep the business afloat during the bankruptcy process.

4.       In addition, not only did the Prepetition Secured Parties refuse to extend *any* additional postpetition financing to the Debtors (not even in the form of bridge financing) to fund these cases, but the Prepetition Secured Parties succeeded in foreclosing the Debtors' ability to procure third-party financing by (a) adamantly refusing to be primed, and (b) securing liens on all of the assets of the Debtors and its non-Debtor direct and indirect subsidiaries through the prepetition Superpriority Credit Agreement.  Not satisfied with this, the Prepetition Secured Parties locked the Debtors into a restructuring support agreement that heavily favors the Petition Secured Parties, who, incidentally, are the only parties entitled to vote on the Plan, and which provides no recovery to general unsecured creditors.[5]

5.       As a result, the Debtors were faced with a Hobson's choice in the months leading up to their chapter 11 filing – sell one subset of their business enterprise in chapter 11 through a private sale transaction so that the proceeds of same could be used to finance a traditional section 363 competitive marketing and sale process for the rest of its business units – thereby forfeiting any value or synergies that could have been realized from a sale of the entire business enterprise as a unit – or face a liquidation of all of their assets and the termination of their employees in a chapter 7 proceeding.

6.       And now, through the Cash Collateral Motion, the same Prepetition Secured Parties seek to maintain their stranglehold over the Debtors and further expand their recently enhanced

---

[5]     In addition, as a result of the Committee's persistence with respect to the private sale of the Cloud/RAN Assets, the Debtors eventually conducted an auction with respect to sale, the result of which was an increase in the overall cash consideration for the Cloud/RAN Assets of $17.25 million.  The Plan currently provides no recoveries for general unsecured creditors.  It is the Committee's position that general unsecured creditors should realize the upside of the increase in the cash consideration from the sale of the Cloud/RAN Assets.

collateral package, all without any cognizable benefit to the Debtors' estates and to the detriment of unsecured creditors.  In particular, and as described in more detail below, any order granting the Cash Collateral Motion on a final basis must be altered to, among other things: (a) eliminate the adequate protection liens and claims on unencumbered assets, including, without limitation, the proceeds of Avoidance Actions and other Estate Causes of Action; (b) extend the self-serving and unreasonably truncated case milestones; (c) extend the Challenge Period and reject attempts to shorten the Challenge Period under the Final Order; (d) increase the Challenge Budget; (e) increase the amount of the Carve-Out; (f) increase the fees allocated to the Committee's professionals in the cash collateral budget (which currently amounts to less than 4.5% of the overall professional fee budget for these cases); (g) grant the Committee automatic standing to bring a Challenge and the right to serve discovery under Bankruptcy Rule 2004 in certain circumstances; (h) include additional rights in favor of the Committee; and (i) otherwise modify or eliminate other problematic provisions contained in the Interim Order or which would be triggered under a Final Order.

7.      Absent the inclusion of appropriate revisions to the Final Order addressing these concerns, the Court should sustain this Objection and deny entry of an order approving the Cash Collateral Motion on a final basis or enter a further interim order to allow the Debtors and the Prepetition Secured Parties additional time to address the Committee's concerns. To do otherwise would be to reward the callous disregard the Prepetition Secured Parties have shown not only to the Debtors but to all other stakeholders in these Chapter 11 Cases.

## **BACKGROUND**

### I.      **The Chapter 11 Cases**

8.      On April 3, 2024 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"). These chapter 11 cases (the "Chapter 11 Cases") are being jointly administered for procedural purposes only, pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  The Debtors continue to operate their businesses and manage their properties as debtors in possession, and no trustee or examiner has been appointed.

9.      On April 16, 2024, the Office of the United States Trustee for Region 3 (the "U.S. Trustee") appointed the Committee pursuant to section 1102(a) of the Bankruptcy Code.[6] The Committee is comprised of the following five members: (a) Avnet, Inc.; (b) Sanmina Corporation; (c) Illinois Valley Cellular, LLC; (d) T-Mobile US Inc; and (e) Caroline Reichert.

10.     On April 17, 2024 the Committee selected McDermott Will & Emery LLP as its counsel, and on April 18, 2024, the Committee selected Province, LLC as its financial advisor (both subject to Court approval).  Since being appointed, the Committee and its advisors have been working diligently to get up to speed regarding the Debtors' business affairs, the more than twenty affirmative relief motions filed by the Debtors to date, the Restructuring Support Agreement and Plan, as well as numerous other issues that have presented themselves in connection with these Chapter 11 Cases.[7]

---

[6]     *See Notice of Appointment of Creditors' Committee* [Docket No. 139].

[7]     *See, e.g.,* (a) *Debtors' Motion Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner Of Notice Thereof* [Docket No. 19]; (b) *Joint Plan of Liquidation of Casa Systems, Inc. and Its Debtor Affiliates* [Docket No. 21] (the "Plan"); (c) *Disclosure Statement Disclosure Statement for Joint Plan of Liquidation of Casa Systems, Inc. and Its Debtor Affiliates* [Docket No. 22] (the "Disclosure Statement"); (d) *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing; (II) Conditionally Approving the Disclosure Statement, (III) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures; (IV) Approving the Solicitation Procedures; (V) Approving the Combined Notice; and (VI) Granting Related Relief* [Docket No. 23]; (e) *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures; (B) Approving the Selection of the Cable Stalking Horse Purchaser; Approving the Debtors' Entry into the Cable*

## II.    The Debtors' Prepetition Capital Structure

11.    As of the Petition Date, the Debtors' funded secured debt obligations amounted to approximately $183.04 million in the aggregate, which amount was comprised of a $180.98 million Superpriority Term Loans and $2.06 million in Stub Term Loans (each as defined below).[8] On the Petition Date, the Debtors had approximately $4.2 million of unrestricted cash on hand, all of which was subject to liens held by the Prepetition Secured Parties.[9]

### a.    The Original Term Loan Agreement

12.    The Debtors are party to that certain *Credit Agreement*, dated as of December 16, 2016, by and among Casa Systems, Inc., as Borrower, the lenders from time to time party thereto as Lenders (the "Original Lenders"), JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (together the "Original Term Loan Agents," and together with the Original Lenders, the "Original Term Loan Parties"), and Barclays Bank PLC, as syndication agent, joint lead arrangers and joint bookrunners (the "Original Term Loan Credit Agreement"),[10] providing up to $325,000,000 in available term loan borrowings to Casa (the "Original Term Loans").[11] The

---

Stalking Horse APA and Approving the Cable Bid Protections; (D) Scheduling an Auction and the Sale Hearing; (E) Approving Form and Manner of Sale Notice; (F) Approving Form and Manner of Potential Assumption and Assignment Notice; (G) Approving Form and Manner of Notice of Successful Bidder; (H) Approving Assumption and Assignment Procedures and (I) Granting Related Relief; and (II) An Order Approving the Sale of the Cable Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief [Docket No. 39]; (f) Debtors' Motion for Entry of an Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances with Such Interests to Attach to the Proceeds, (II) Approving Assumption and Assignment Procedures in Connection Therewith, (III) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases to the Purchaser, and (IV) Granting Related Relief [Docket No. 42].

[8]    *See Declaration of Edward Durkin in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 3] (the "First Day Declaration" or "First Day Decl.") ¶45.

[9]    *See Declaration of Brian Whittman in Support of the Debtors' Motions to Use Cash Collateral, Approve Biding Procedures and Approve the Cloud/RAN Sale, and Other First Day Pleadings* [Docket No. 41] (the "Whittman Declaration" or "Whittman Decl.") n. 6.

[10]    *See* First Day Decl. ¶46-7.

[11]    *See id.*

obligations of Casa under the Original Term Loan Credit Agreement were secured by liens on substantially all of Casa's assets.

### b.  The Superpriority Term Loan Agreement

13.     On June 15, 2023, Casa entered into an exchange agreement with a majority of the Original Lenders, which was memorialized in that certain *Superpriority Credit Agreement*, dated as of June 15, 2023 (the "Superpriority Credit Agreement") by and among Casa Systems, Inc., as Borrower, the lenders from time to time party thereto (the "Superpriority Lenders," and together with the Original Lenders, the "Prepetition Lenders"), Delaware Trust Company, as successor to JPMorgan Chase Bank, N.A., as administrative agent, and Delaware Trust Company as collateral agent (in such capacities, the "Superpriority Agent" and, together with the Superpriority Lenders, the "Superpriority Secured Parties").[12]   No additional credit was extended to Casa under the Superpriority Credit Agreement; instead, Casa was required to make a mandatory prepayment of $40 million to reduce the principal amount of the Original Term Loans,[13] which amounts were not available for reborrowing.[14]   The Superpriority Credit Agreement also included a prepayment penalty[15] in the form of an "Exit Fee,"[16] which is triggered upon any prepayment of the loans extended under the Superpriority Credit Agreement (the "Superpriority Term Loans"), and the

---

[12]    Contemporaneously therewith, Casa and the Original Lenders amended Original Term Loan Credit Agreement to be consistent with the Superpriority Credit Agreement and the Intercreditor Agreement (as defined below).

[13]    *See* Superpriority Credit Agreement, § 2.05(c).

[14]    *See id.*, at § 2.01.

[15]    In response to Local Rule 4001-2(a)(i)(I), the Cash Collateral Motion provides that no prepayment penalty exists. The Exit Fee is a prepayment penalty.

[16]    *See id.*, at § 2.23.

percentage of which increases for each year that the Prepetition Term Loans[17] remain outstanding.[18]

14.    The obligations of Casa under the Superpriority Credit Agreement are secured by liens on all of the assets of Casa, including a pledge of all of Casa's equity in its direct and indirect subsidiaries, and are guaranteed by each of Casa's direct and indirect subsidiaries (collectively, the "Superpriority Guarantors," and together with Casa, the "Casa Superpriority Loan Parties").[19] As of the Petition Date, the total outstanding principal due and owing under the Superpriority Credit Agreement was approximately $180.98 million.

---

[17]    The term "Prepetition Secured Loans" refers collectively to the Superpriority Term Loans and the Stub Term Loans (as defined below).

[18]    *See id.*, defined term "Exit Fee," which is defined as:

> an exit fee in cash equal to (a) the principal amount of Initial Term Loans (including any fees or interest paid-in-kind and added to the principal balance thereof) being prepaid, repaid or accelerated, *multiplied by* (b)(i) prior to or on December 31, 2023, 0.00%, (ii) after December 31, 2023 but prior to or on March 31, 2024, 3.00%, (iii) after March 31, 2024 but prior to or on June 30, 2024, 5.00%, (iv) after June 30, 2024 but prior to or on September 30, 2024, 8.00%, (v) after September 30, 2024 but prior to or on December 31, 2024, 10.00%, (vi) after December 31, 2024 but prior to or on March 31, 2025, 15.00%, (vii) after March 31, 2025 but prior to or on June 30, 2025, 17.50%, (viii) after June 30, 2025, 20.00%; *provided* that the maximum percentage provided in clause (b) shall apply if the Exit Fee is due and payable pursuant to any Prepayment Event (other than clause (a) of the definition thereof) regardless of when such Prepayment Event shall have occurred.

> Upon information and belief, the Debtors are not seeking approval of any Exit Fees through the Cash Collateral Motion; however, the Committee has requested that the Final Order include language explicitly providing that such Final Order is not seeking approval of any Exit Fees and that, to the extent any such Exit Fees come due during the pendency of these Chapter 11 Cases, the Prepetition Secured Parties file a motion on regular notice seeking approval of such fees.

[19]    The Superpriority Guarantors are: (a) Debtors (x) Casa Systems Securities Corporation, and (y) Casa Properties LLC, and (b) non-Debtors: (i) Casa Communications Limited, (ii) Casa Technologies Pty Ltd; (iii) Casa Communications Holdings Pty Ltd; (iv) NetComm Wireless Pty Ltd; and (v) NetComm Wireless Inc.  On March 11, 2024, Casa Technologies Pty Ltd, Casa Communications Holdings Pty Ltd, and NetComm Wireless Inc. commenced voluntary insolvency proceedings in Australia under the Corporations Act.  *See* First Day Declaration, ¶ 84.

c. **The Stub Term Loans and Intercreditor Agreements**

i. ***The Stub Term Loans***

15.     As noted above, most, but not all, of the Original Term Loan Lenders entered into the Superpriority Credit Agreement.  The non-exchanging Original Term Loan Lenders remained party to the Original Term Loan Agreement – referred to by the Debtors as the Non-Exchanging Prepetition Lenders and the Stub Term Loans, respectively.[20]

16.     As of the Petition Date, Casa owed approximately $2.06 million under the Stub Credit Agreement, which is scheduled to mature on September 30, 2024.  Subject to the terms of the Intercreditor Agreement (as defined below), the obligations under the Original Term Loan Agreement are secured by substantially all of the assets of Casa.

ii. ***Intercreditor Agreements***

17.     In connection with the Superpriority Credit Agreement, the Prepetition Lenders directed their respective collateral agents to enter into that certain *Intercreditor Agreement*, dated as of June 15, 2023, among Delaware Trust Company, as First Lien Collateral Agent and First-Priority Representative, and JPMorgan Chase Bank, N.A., as Second Lien Collateral Agent and Second-Priority Representative (the "Intercreditor Agreement"), which, among other things, provided that the liens securing the Original Loans – which were collateralized solely by the assets of Casa – were subordinate in all respects to the Superpriority Term Loans.[21]

18.     In advance of the Debtors' chapter 11 filing, Casa, Casa Properties, LLC, Casa Systems Securities Corporation, NetComm Wireless, Inc., and Casa Communications Limited, as

---

[20]     *See id.,* at ¶ 59.

[21]     *See* Intercreditor Agreement §2.01.

Grantors (the "Grantors"), and Delaware Trust Company, as the Collateral Agent for the Superpriority Credit Agreement Secured Parties, and Delaware Trust Company, as Collateral Agent for the Non-Exchanging Secured Parties, entered into that certain *Pari Passu Intercreditor Agreement*, dated as of January 12, 2024 (the "Pari Passu Intercreditor Agreement," and together with the Intercreditor Agreement, the "Intercreditor Agreements").  The Pari Passu Intercreditor Agreement replaces the Intercreditor Agreement in its entirety.[22]  Among other things, the Pari Passu Intercreditor Agreement modified the terms of the Intercreditor Agreement to provide that, with respect to liens collateralized by common assets (i.e., the assets of Casa), the liens of both the Non-Exchanging Prepetition Lenders and the Superpriority Lenders Term Loans would be treated as having *pari passu* priority.[23]

## III.    The Debtors' Proposed Restructuring[24]

19.    On April 2, 2024, the Debtors, on the one hand, and the Consenting Superpriority Term Loan Lenders and the Consenting Stub Loan Lenders,[25] on the other hand, entered into that certain *Restructuring Support Agreement* (the "Restructuring Support Agreement"), which, among other things, outlined the terms of the Debtors' chapter 11 plan, and locked the Debtors into the milestones that are dictating the cadence and direction of these Chapter 11 Cases (collectively, the "Milestones").[26]  Consistent with the Milestones, on the Petition Date, the Debtors filed the Plan

---

[22]    *See* Pari Passu Credit Agreement, preamble (providing that "the parties hereto desire t terminate the Existing ICA and enter into this Agreement on the terms and conditions set forth herein.").

[23]    *See* Pari Passu Intercreditor Agreement §2.01.

[24]    Capitalized terms used in this section but not previously defined shall have the meanings ascribed to them in the Plan.

[25]    Each as defined in the Restructuring Support Agreement, as defined below.

[26]    *See* Restructuring Support Agreement, § 4.01, attached to the First Day Declaration as Ex. B. Among other things, the Restructuring Support Agreement required that the Debtors file motions to approve (a) a private sale transaction with respect to the Debtors' Cloud/RAN Assets (the "Private Sale Transaction"), and (b) procedures for the marketing and sale of the Debtors' Cable Assets (the "Cable Sale Transaction," and together with the Private Sale Transaction, the "Sale Transactions") on the Petition Date.

and Disclosure Statement to effectuate the transactions contemplated under the Restructuring Support Agreement.

20.     The Plan contemplates *no recovery* to general unsecured creditors, with the sole potential avenue of recovery being any remaining proceeds from the Sale Transactions or from the liquidation of the Net Distributable Assets available for distribution after the Debtors satisfy all other claims of higher priority under the Plan in full (including the claims of the Prepetition Secured Lenders),[27] and after reserving the Wind-Down Amount, which shall not exceed $2 million pursuant to the terms of the Restructuring Support Agreement.[28] By their own admission, the Debtors do not anticipate that there will be any Net Distributable Proceeds.[29]

21.     In addition, holders of general unsecured claims are not entitled to vote to accept or reject the Plan – the only class of creditors entitled to vote on the Plan are the Prepetition Secured Parties – the very parties who dictated the terms of the Restructuring Support Agreement.[30]

## IV.   The Cash Collateral Motion

22.     Through the Cash Collateral Motion, the Debtors seek, among other things, authorization to:

   a.   Provide an overreaching Adequate Protection Package to the Prepetition Secured Parties, which includes Adequate Protection Claims and Adequate Protection Liens on the proceeds of Estate Causes of Action. *See* Interim Order ¶¶6(1), 6(2), 6(4), and 6(5).

   b.   Commit to continuing to conduct these cases at an unwarranted breakneck pace through truncated Milestones. *See id.*, at ¶10.

---

[27]   *See* Plan, III.B.4.

[28]   *See id.,* at Art. I.A.  The Restructuring Support Agreement includes twenty-one (21) termination right triggers in favor of the Prepetition Lenders, among which is a situation where "the Wind-Down Amount exceeds $2 million (or such other amount expressly permitted by the Plan) or the Priority Claims Amount exceeds the Priority Claims Amount Cap."  *See* Restructuring Support Agreement, § 13.01(u).

[29]   *See* Disclosure Statement, § VI.B.1.

[30]   *See id.*, at § V.B.

    c. Severely limit the Committee's ability to conduct an appropriate investigation and otherwise fulfill its statutory role in these Chapter 11 Cases by abbreviating the Challenge Period, limiting the Challenge Budget, and otherwise attempting to curtail the Committee by failing to budget appropriate amounts for their professional fees. *See id.,* at ¶¶ 4, 14, 15.

    d. Waive valuable statutory rights belonging to their estates. *See id.,* at ¶¶ 19, 20.

## OBJECTION

**I.   The Adequate Protection Package Should Not Extend to Estate Causes of Action**

23. As noted above, in the months leading up to the Debtors' chapter 11 filing, the Superpriority Lenders exchanged their Original Term Loans for Superpriority Term Loans without extending any additional credit, but instead receiving a $40 million prepayment of the Original Term Loans and a lucrative collateral package extending to the assets of the Debtors' previously unencumbered cashflow-positive subsidiaries.  Further, the Prepetition Secured Lenders refused to provide additional bridge or any other postpetition financing to fund the administration of these Chapter 11 Cases, which forced the Debtors to pursue approval of the Private Sale Transaction on an extremely truncated timeline so that the Debtors could use the proceeds from such transaction to fund a competitive marketing and sale process in connection with the Cable Assets and to fund these Chapter 11 Cases generally.

24. Notwithstanding this, through the Cash Collateral Motion, the Debtors seek authority to grant additional protections to the Prepetition Secured Parties in the form of Adequate Protection Liens and Adequate Protection Claims[31] secured by, among other things, the proceeds of Avoidance Actions and other estate causes of action (collectively, the "Estate Causes of Action"), none of which the Committee has had an opportunity to investigate, but which are a

---

[31]   The Adequate Protection Liens and the Adequate Protection Claims, together, the "Adequate Protection Package."

critical (and likely sole) potential source of recoveries for general unsecured creditors in these Chapter 11 Cases.[32]  Granting the Prepetition Secured Lenders Adequate Protection Claims and Adequate Protection Liens on the proceeds of Estate Causes of Action – assets that, by definition, are reserved for the benefit of the unsecured creditor body – will create an improper windfall in favor of the Prepetition Secured Creditors at the expense of general unsecured creditors.  *See Majestic Star Casino, LLC v. Barden Dev., Inc. (In re the Majestic Star Casino, LLC)*, 716 F.3d 736, 761 n.26 (3d Cir. 2013) ("A debtor is not entitled to benefit from any avoidance, and 'courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves.'") (quoting *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.*), 226 F.3d 237, 244 (3d Cir. 2000)) (citations omitted); *Buncher v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been transferred away.  When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.") (citations omitted). Recognizing that unsecured creditors are properly the beneficiaries of avoidance actions official committees of unsecured creditors are often granted standing to pursue such claims on behalf of debtors, and occasionally are granted the right to do so automatically.  *See, e.g.*, *In re YogaWorks, Inc.*, No. 20-12599 (KBO) (Bankr. D. Del. Nov. 9, 2020 [Docket No. 133 ¶ 19(a)] ("The Committee shall have automatic standing to commence a Challenge as to the validity, extent, priority, perfection and enforceability of the Prepetition Liens."); *In re Hygea Holdings Corp.*, No. 20-10361 (KBO)

---

[32]   *See* Interim Order, ¶¶ 6 (1)–(5).

(Bankr. D. Del. April 17, 2020) [Docket No. 342]; *see also, e.g., In re Phoenix Payment Sys., Inc.*, No. 14-11848 (MFW) (Bankr. D. Del. Sept. 3, 2014) [Docket No. 149 ¶ 20] ("The Creditors' Committee is hereby granted standing to file, seek relief and prosecute any and all Claims and Defenses and no further order or notice granting the Creditors' Committee standing shall be necessary.").

25.     What is more, the current Adequate Protection Package effectively renders moot any investigation or Challenge brought by the Committee, inasmuch as the value of the proceeds of any Estate Causes of Action resulting from such investigation or Challenge would inure to the sole benefit of the Prepetition Secured Parties.  Said differently, if the Prepetition Secured Lenders are granted the Adequate Protection Package requested, to the extent the Committee asserts a successful Challenge that reduces, modifies, reclassifies, or otherwise diminishes the liens of the Prepetition Secured Parties (in whole or in part) or otherwise brings a successful causes of action against the Prepetition Secured Parties,  the proceeds of such litigation would make a round trip back into the pockets of the Prepetition Secured Parties.  Such a result is inequitable and should not be countenanced.

26.     In light of the foregoing and where these Chapter 11 Cases currently stand, the Prepetition Secured Parties should not be permitted to capture this value at the expense of unsecured creditors.  Thus, first, the Final Order should exclude the proceeds of Estate Causes of Action from the Adequate Protection Package.[33]  Second, the Final Order should make clear that

---

[33]   To the extent that the Court is inclined to grant the current Adequate Protection Package proposed, at a minimum, the Final Order should (a) carve out the proceeds of Estate Causes of Action brought against the directors and officers; (b) carve out the proceeds of Estate Causes of Action brought against the Prepetition Secured Parties as the result of a successful Challenge or otherwise; (c) require the Prepetition Secured Parties to seek recoveries from collateral other than the proceeds of Estate Causes of Action in the first instance; (d) require that the Prepetition Secured Parties file a claim outlining any diminution in the value of the collateral securing the Prepetition Loans prior to taking any actions to collect against any Adequate Protection Collateral, including the proceeds of Estate Causes of Action; (e) provide that the Adequate Protection Obligations shall be reduced to the extent that any of the Prepetition Liens are successfully challenged; and (f) provide that all rights of the Committee

the Adequate Protection Obligations shall be reduced to the extent that any of the Prepetition Liens are successfully challenged. Finally, the Final Order should reserve all rights of the Committee and other parties in interest to dispute requests for additional adequate protection.

## II. **The Case Milestones Are Unreasonable and Must Be Modified**

27.     Through the Cash Collateral Motion, the Debtors seek approval of the extremely aggressive, and potentially value-destructive, Milestones set forth in the Restructuring Support Agreement, including:

| Milestone | Date | Days Following Petition Date | Days Following Committee Formation |
|---|---|---|---|
| Entry of the Private Sale Order, the Final Cash Collateral Order, the Solicitation Procedures Order, and the Bar Date Order | April 24 | 21 | 8 |
| Commencement of solicitation of votes to accept or reject the Plan | April 26 | 23 | 10 |
| Filing of the Plan Supplement | May 10 | 37 | 24 |
| The hearing on confirmation of the Plan and approval of any Sale Transaction | May 31 | 58 | 45 |
| Entry of the Confirmation Order and the Sale Order approving the sale of the Cable Assets | May 31 | 58 | 45 |
| Outside Date for Effective Date of the Plan and closing of the Sale Transactions | June 6 | 69 | 56 |

28.     The Committee was formed two short weeks ago, and since that time, has been faced with an onslaught of information related to the Debtors' business operations and the more than twenty (20) motions filed by the Debtors seeking affirmative relief from this Court, all on an

---

and other parties in interest to dispute requests to increase or supplement the Adequate Protection Package are fully reserved.

extremely truncated timeframe – a timeframe that was necessitated by the actions, or lack thereof, of the Prepetition Secured Parties. Given the infancy of the Committee, the unnecessarily aggressive and truncated Milestones restrict the Committee's ability to meaningfully participate in these Chapter 11 Cases. *See, e.g., In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Nov. 3, 2014), Nov. 3, 2014 Hr'g Tr. at 20:16–20 ("[T]he proposed timelines must be stretched . . . to allow for sufficient time for any interested party to develop an alternative transaction . . . and the . . . committee to . . . get up to speed."). Accordingly, to allow a fulsome process that maximizes value for all for unsecured creditors, and in consideration of the Debtors' liquidity constraints, all Milestones that have yet to pass should be extended by at least one to two weeks to allow for more meaningful engagement by the Committee.

29.     In addition, under the Interim Order, in the event the Debtors fail to comply with any of the Milestones, the Debtors' ability to use Cash Collateral is immediately terminated and the Debtors' automatic stay is immediately lifted, all without the Prepetition Secured Parties having to petition the Court.[34]   Under the circumstances, such relief is unwarranted and should be removed from the Final Order.

### III.   The Committee Must be Allowed to Fulfill its Fiduciary and Statutory Duties

30.     Unsecured creditors' committees have a fiduciary duty to maximize unsecured creditor recoveries for a debtor's estate. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F. 3d 452, 466 (2d Cir. 2007) ("The Committee has a fiduciary duty to maximize their recovery of the Estate's assets.") (citing *Shaw & Levine v. Gulf & Western Indus., Inc. (In re Bohack Corp.)*, 607 F.2d 258, 262 n. 4 (2d Cir. 1979)) (additional citation omitted); Collier on Bankruptcy ¶ 1103.05[1][a] (16th Ed. 2023) (explaining that the

---

[34]   *See* Interim Order ¶ 10(14).

"primary purpose of a committee . . . is to maximize the return to the constituency represented by the committee and all actions undertaken by the committee should be with that goal in mind."); *see also* 11 U.S.C. § 1103(c) (committee may "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan"); *Value Prop. Trust v. Zim Co. (In re Mortg. & Realty Trust)*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997) (noting that the committee has many functions . . . "it investigates, it appears, it negotiates, it may litigate, and it is at all times intimately involved in the reorganization").

31.    As set forth in detail below, absent significant revisions to the current form of Interim Order and the professional fee budget for the Committee's professionals, the Committee will be severely hamstrung in its efforts to fulfil their statutory mandated under the Bankruptcy Code.

**A. The Initial Challenge Period Should be Extended and Efforts to Truncate the Challenge Period Through the Final Order Should be Denied.**

32.    Through the Cash Collateral Motion, the Debtors stipulate to the validity, priority, and extent of the claims and liens of each of the Prepetition Secured Parties.[35]   These stipulations and waivers became effective as to the Debtors upon the entry of the Interim Order, and will bind all other parties in interest unless they are challenged on or before the conclusion of the Challenge Period.[36] The Challenge Period under the Interim Order was seventy-five (75) days from entry of same.[37]   The Interim Order further provides, however, that upon entry of the Final Order, the Challenge Period shall be the ***earlier of***: (i) seventy-five (75) days after entry of the Interim Order;

---

[35]    *See id.*, at ¶ E.

[36]    *See id.*, at ¶15(a).

[37]    *See id.*

(ii) confirmation of the Plan – which is scheduled for June 4, 2024; and (iii) the entry of an order approving the sale of all or substantially all of the Debtors' assets, which must be on or before May 31, 2024 under the Milestones.[38]   Thus, through the Final Order, the Prepetition Secured Lenders inexplicably are seeking to shorten the Committee's Challenge Period by eighteen (18) days, from June 19, 2024 (75 days following entry of the Interim Order) to May 31, 2024 – *a date that is only 45 days from the date the Committee was appointed*.

33.     As noted above, and recognized by this Court, since its formation on April 16, 2024, the Committee has, in accordance with its statutory duties, been working diligently to get up to speed on the relief requested by the Debtors in over twenty (20) pleadings, including the Debtors' unusual request to approve the Private Sale Transaction a mere eight (8) days following the Committee's formation.[39]   To say that the Committee has not yet had a chance to come up for air, let alone to scratch the surface of its investigation into the liens of the Prepetition Secured Parties, would be an understatement. As a matter of fundamental fairness and due process, the Committee should have a reasonable opportunity to investigate the liens of the Prepetition Secured Parties, which requires a Challenge Period that is *at least* 75 days from the date of the Interim Order.  As

---

[38]   *See id.*  The Prepetition Secured Lenders sought approval of these provisions through the Interim Order; however, the Court declined to approve them at that time. *See, e.g.*, April 5, 2024 Hr'g. Tr. 26:12-27:7 ("I'm not going to approve this language in an interim order. I want the typical 75-day language in the order, and you may put "subject to final"; your proposal to the Committee about the truncated challenge period. The Committee, in this case, is going to face a lot of fires that they have to deal with in the next 30 days. They're going to have to evaluate, primarily, I think, the cloud and RAN sale, okay, and that should be their focus. They are also going to need to really seriously look at the bid procedures, as they all do, and then now we're trying to truncate their challenge rights. I'm not going to enter this, so it's seen as a fait accompli, that the Committee has to, then, re-argue at the final. All rights are reserved."); *see id.*, at 27:1-7 ("I see this as an offer to the Committee that you will speak to the Committee about in the upcoming days, but I'm not going to tilt the playing field in this order. And, again, I acknowledge that in two previous cases I've approved this language, but I'm not going to do it here because I am concerned about all of the fires that the Committee is going to have to be putting out.").

[39]   *See* April 5, 2024 Hr'g. Tr. 26:12-27:7 ("The Committee, in this case, is going to face a lot of fires that they have to deal with in the next 30 days."); *id.* at 27:1-7 ("I am concerned about all of the fires that the Committee is going to have to be putting out."); *id.* at 31:16-25 ("I think there's too many fires here for a Committee to realistically look at.").

such, the portions of paragraph 15(a) of the Interim Order shortening the Committee's Challenge Period must be removed from the Final Order.

**B. The Committee Investigation Budget Should be Increased**

34.     The Committee Investigation Budget under the Interim Order is a paltry $25,000,[40] which, for obvious reasons, is wholly unacceptable, as it provides scant funds for a thorough investigation of the liens of the Prepetition Secured Parties.

35.     Moreover, the size of the Committee Investigation Budget is far less than the budgets typically approved in cases of this size and complexity.  *See e.g. In re Yellow Corporation*, No. 23-11069 (CTG) (Bankr. D. Del. 2023) [Docket No. 571] (authorizing a budget of $350,000); *In re Molycorp, Inc.*, No. 15-11357 (CSS) (Bankr. D. Del. 2015) [Docket No. 278] (authorizing a budget of $250,000); *In re Restoration Forest Products Group, LLC*, No. 24-10120 (KBO) (Bankr. D. Del. 2024) [Docket No. 179] (authorizing a budget of $125,000); *In re Amyris, Inc.*, No. 23-11131 (TMH) (Bankr. D. Del. 2023) [Docket No. 558] (authorizing a budget of $100,000); *In re Proterra Inc.*, No. 23-11120 (BLS) (Bankr. D. Del. 2023) [Docket No. 422] (authorizing a budget of $100,000); *In re Teligent, Inc.*, No. 21-11332 (BLS) [Docket No. 174] (authorizing a budget of $100,000); *accord In re McClatchy Co.*, No. 20-10418 (MEW) (Bankr. S.D.N.Y. 2020) [Docket No. 233] (authorizing a budget of $750,000); *In re Rite Aid Corp*., No. 23-18993 (MBK) (Bankr. D. N.J.  2023) [Docket No. 428] (authorizing a budget of $500,000).

36.     Based on the information currently available to the Committee, the Final Order should increase the Committee Investigation Budget to reflect an aggregate amount of not less than $200,000 and should reflect the Committee's ability to seek a further increase in the Committee Investigation Budget for cause shown following notice and a hearing.

---

[40]     *See id.*, at ¶ 14.

**C. The Final Order Should Provide that the Committee Has Standing to Bring a Challenge**

37.     As noted above, these Chapter 11 Cases are progressing at a breakneck pace, requiring the Committee to triage, among other things, two independent Sale Transactions, expedited approval of the Disclosure Statement on a conditional basis, and confirmation of the Plan, all within the span of less than two (2) months.   Under these circumstances, and in consideration of the length of the Challenge Period and the Committee Professionals Fee Budget (as defined below), the Committee should not be required to expend the time or expense filing and prosecuting a motion to obtain standing to bring a Challenge.[41]   Accordingly, the Final Order should provide that the Committee has standing to bring a Challenge without the need to take affirmative steps to secure same.[42]

38.     In addition, given the aforementioned circumstances, the success of the Committee's investigation will hinge on the timely provision of information and the provision of access to relevant documents by the Debtors and the Prepetition Secured Parties.   As such, the Final Order should provide the Committee with authority to serve discovery requests under

---

[41]   The Committee's position in this regard remains the same, regardless of whether the Court sustains the objections to the Prepetition Secured Parties' attempts to shorten the Challenge Period through the Final Order.

[42]   This Court and other courts have approved such provisions in connection with other chapter 11 cases. *See, e.g.*, *In re YogaWorks, Inc.*, No. 20-12599 (KBO) (Bankr. D. Del. Nov. 9, 2020 [Docket No. 133 ¶ 19(a)] ("The Committee shall have automatic standing to commence a Challenge as to the validity, extent, priority, perfection and enforceability of the Prepetition Liens."); *In re Hygea Holdings Corp.*, No. 20-10361 (KBO) (Bankr. D. Del. April 17, 2020) [Docket No. 342]; *see also, e.g., In re Phoenix Payment Sys., Inc.*, No. 14-11848 (MFW) (Bankr. D. Del. Sept. 3, 2014) [Docket No. 149 ¶ 20] ("The Creditors' Committee is hereby granted standing to file, seek relief and prosecute any and all Claims and Defenses and no further order or notice granting the Creditors' Committee standing shall be necessary."); *In re AOG Entertainment, Inc.*, No. 16-11090 (SMB) (Bankr. S.D.N.Y. Apr. 29, 2016) [Docket No. 49] (where cash collateral order provides that debtor is "giving up its right to sue," committee "doesn't have to come in and seek standing").   Further, any reliance the Debtors or Prepetition Secured Lenders might place on this Court decision in *In re Dura Automotive Systems, LLC, et al.*; Case No. 19-12378 (KBO) would be misplaced in the context of these Chapter 11 Cases. More specifically, the official committee of unsecured creditors in *Dura* was seeking entry of an order finding that the committee had derivative standing to bring estate causes of action where the debtor was a Delaware limited liability company. Here, Casa Systems, Inc. is a Delaware corporation, which is an important distinction.

Bankruptcy Rule 2004 relating to the validity, priority, and extent of the liens of the Prepetition

Secured Parties as well as all claims and causes of action the Debtors have waived pursuant to the

Interim Order.   The provision of such relief will enable the Committee to continue to pursue

informal due diligence and provide a safety net should the Committee encounter difficulties in

obtaining the necessary materials as the Challenge Deadline approaches.  Along these same lines,

the Final Order also should provide for that, to the extent the Debtors and/or the Prepetition

Secured Parties do not comply with any requests issued by the Committee pursuant to Bankruptcy

Rule 2004, the Challenge Period shall be tolled day-for-day until such time as the Debtors and/or

the Prepetition Secured Parties comply, or for such other period of time the Court orders.

### D.      The Committee Professionals Fee Budget Should be Increased

39.      The cash collateral budget (the "Budget") attached to the Cash Management

Motion, and approved through the Interim Order, includes a line item of $18 million for the fees

and expenses of estate professionals over the course of these Chapter 11 Cases (the "Estate

Professionals Fee Budget").  The supporting detail to the Budget shows that, of this amount, the

Budget allocates $800,000 to cover the fees and expenses of the Committee's professionals (the

"Committee Professionals Fee Budget"), with the remaining $17.2 million allotted to the Debtors'

professionals.  Thus, the Committee Professionals Fee Budget is *less than 4.5% of the entire Estate

Professionals Fee Budget* as compared to the portion of the Estate Professionals Fee Budget

earmarked for the Debtors' Professionals.  Such an egregious disparity (by design) is inconsistent

with prior precedent and must not be countenanced. *See e.g. In re Cal Dive Int'l, Inc.*, Case No.

15-10548 (CSS), 2015 WL 9487852, at *3 (Bankr. D. Del., Dec. 28, 2015) (Court approved UCC

fees that were roughly 30 percent of all counsel fees); *In re Eastern Outfitters, LLC*, Case No. 17-

10243 (LSS) (Bankr. D. Del. Mar. 31, 2017) [ECF No. 260] (approving final DIP financing order

where the budget reflected committee professional fees of approximately 35% of the Debtors'

professional fee budget); *In re Pacific Sunwear of California, Inc.*, Case No. 16-10882 (LSS) (Bankr. D. Del. Apr. 7, 2016) (committee fee budget approved at 35% of budget of debtors' professionals); *In re Channel Master Holdings, Inc.*, 309 B.R. 855, 860-61 (Bankr. D. Del. 2004) (refusing to enforce a $75,000 cap on committee's professional fees under postpetition financing facility that had Debtors' professionals capped at $990,000). In order for the Committee to comply with its statutory mandate under the Bankruptcy Code, the Committee Professionals Fee Budget should be increased to an amount that is equal to *at least* 40% of the Estate Professionals Fee Budget.

40.     Indeed, as this has Court recognized, the Committee has a critical role to play in these Chapter 11 Cases.[43] In the short time since its appointment, the Committee has already had a significant impact, most notably by encouraging the Debtors to further engage with Skyvera US Holdco, LLC's offer to purchase the Cloud/RAN Assets. That influence alone contributed to $17.25 million additional dollars flowing to the Debtors' estates. Such benefits are not without costs. The Committee has expended significant time and effort as it has gotten up to speed on the relief requested in the Chapter 11 Cases and engaged with the Debtors' professionals to determine the best path forward. Accordingly, the Committee has already made a considerable outlay against the amounts budgeted for its professionals' fees and expenses in light of the significant relief requested in these cases on an expedited basis. Moreover, in light of the pace of these Chapter 11 Cases and the significance of the relief requested such expenditures can be expected to continue.

---

[43]  *See* April 5, 2024 Hr'g. Tr. 25:13-16 ("…the Committee is going to serve a very meaningful role in the next 30 to 45 days in this case…"); *id.,* at 27:22-24 ("I think, really, who the Committee counsel is and who sits on the Committee is really going to serve how this case is going to go forward, and we don't know that until the Committee is formed."); *see also* April 19, 2024 Hr'g. Tr., 15:9-14 ("I welcome counsel for the committee and I look forward to the benefit, I think, that the committee, including their counsel, is going to bring to this process. And so you're right, Mr. Hurst, that I will look to the committee and I will rely upon their – your conclusion and give them great weight.").

As has already been shown, the Committee has an important role to play in these Chapter 11 Cases, and the paltry amount allotted to its professionals is simply insufficient for the Committee to properly engage with the Debtors for the benefit of all stakeholders. As such, the Committee Professionals Fee Budget must be increased.

**IV.  The Final Order Must Reflect Additional Revisions from the Interim Order**

41.    In addition to those provisions discussed above, the Interim Order contains a number of other objectionable provisions that must be modified in, or eliminated under, the Final Order, including, without limitation, as indicated below:

| Provision | Modification |
|---|---|
| Carve-Out | 1) Interim Order, ¶4 should be revised to provide as follows: <br><br> a)  The Post-Trigger Fee Cap shall be $2.0 million. <br><br> b)  The Stub Lenders cannot issue a Trigger Notice unless and until the Prepetition Superpriority Obligations are satisfied in full. <br><br> c)  The funds held in the Carve-Out Account are not Prepetition Collateral or Adequate Protection Collateral and shall not be encumbered. <br><br> d)  Disbursements from the Carve-Out Account following the issuance of a Trigger Notice are not subject to any Approved Budget. <br><br> e)  The Debtors and Prepetition Lenders must take all steps necessary to remove any deposit control or similar |

| | | |
|---|---|---|
| | | agreements with respect to the Carve-Out Account. |
| Approved Budget; Compliance Reporting | 1) | Interim Order, ¶3(a) should be revised to provide that: |
| | a) | The Debtors may deliver an Updated Budget for Approval at any time. |
| | b) | The Debtors shall deliver an Updated Budget no later than one week following the closing of any asset sales, including, without limitation, the closing of the Private Sale. |
| | c) | The Debtors shall deliver a wind-down budget no later than one week following the closing of any asset sales, including, without limitation, the closing of the Private Sale, with respect to the forecasted costs and expenses related to winding down the business units that were sold. |
| | d) | The Debtors shall provide all Approved Budgets and Updated Budgets to the Committee contemporaneously with the Required Consenting Term Loan Lenders' receipt of the same. |
| | e) | The Debtors shall provide all reporting documentation (including all backup in Excel) that is delivered to Required Consenting Term Loan Lenders in connection with all Approved Budgets and Updated Budgets to the Committee contemporaneously with the Required Consenting |

| | |
|---|---|
| | Term Loan Lenders receipt of the same. |
| | f) The Required Consenting Term Loan Lenders shall notify the Debtors and the Committee whether each Updated Budget constitutes an Approved Budget within three (3) business days of their receipt of the same. |
| | g) The Approved Budgets and Updated Budgets shall include forecasts for all Debtor and non-Debtor entities. |
| Variance Reports | 1) Interim Order, ¶3(b) should be revised to provide that: |
| | a) The Debtors shall provide all Variance Reports to the Committee contemporaneously with the delivery of the same to the advisors to the Prepetition Agents and advisors to the Superpriority Lenders. |
| | b) The Variance Reports shall include all Debtor and non-Debtor entities. |
| Accounts Payable Reporting | 1) Interim Order, ¶3(d) should be revised to provide that: |
| | a) The Debtors shall provide the accounts payable reports to the Committee contemporaneously with the delivery of the same to the advisors to the Prepetition Agents and advisors to the Superpriority Lenders. |
| | b) The accounts payable reports shall cover pre- and postpetition accounts payable |

| | |
|---|---|
| | and be broken out by each Debtor and non-Debtor entity. |
| Reporting | 1) Interim Order, ¶6(6) should be revised to provide that the Committee shall receive all reporting which the Prepetition Secured Parties are entitled to. |
| Termination Events | 1) Interim Order, ¶ 10 should be revised to provide that:<br><br>a) Administrator actions in the VA Proceeding cannot trigger a Termination Event.<br><br>b) Any Termination Event shall require notice and a seven (7) day cure period prior to the exercise of any remedies.<br><br>c) There is no automatic termination of the automatic stay, and any such termination shall require the filing of a stay relief motion and an order granting such motion from the Court.<br><br>d) The Stub Lenders cannot issue a Termination Notice until the Prepetition Superpriority Obligations are satisfied in full. |
| Remedies Upon Termination Event | 1) Interim Order, ¶ 11 should be revised to provide that:<br><br>a) The Notice Period shall be seven (7) business days.<br><br>b) The Notice Period shall be tolled until such time as the Court is able to consider a Termination Event on an expedited basis. |
| Reservation of Rights | 1) Interim Order, ¶ 12 should be revised to clarify that the Adequate |

| | |
|---|---|
| | Protection Liens, Adequate Protection Claims, and other rights and benefits granted pursuant to the Order are subject in all respects to the Carve-Out. |
| Prepetition Secured Lender Professional Fees | 1) Interim Order, ¶ 13 (a) should be revised to:<br><br>   a) Remove the "included, but not limited to" qualifier applicable to the Lender Professional Fees.<br><br>   b) Revise the Fee Objection Period from ten (10) calendar days to seven (7) business days.<br><br>   c) Revise the time in which invoices must be paid following the expiration of the Fee Objection Period to five (5) business days. |
| Indemnification | 1) Interim Order, ¶ 13 (b) should be revised to provide that indemnification only applies to Affiliates. |
| Credit Bidding | 1) Interim Order, ¶ 17 should be revised to provide that the rights of the Superpriority Secured Parties to be credit bid and/or be considered "qualified bidders" shall be subject in all respects to the challenge rights of the Committee in ¶ 15. |
| Master Proof of Claim | 1) Interim Order, ¶ 23 should be revised to provide that the Prepetition Secured Parties are required to file proofs of claim, or a Master Proof of Claim, evidencing any diminution in value of their respective interests in any Prepetition Collateral before the Prepetition Secured Parties are |

| | |
|---|---|
| | permitted to recover against any Adequate Protection Collateral.[44] |
| Binding Effect | 1) Interim Order, ¶ 21 should be revised to clarify that the binding effect of the Order is subject in all respects to the challenge rights of the Committee in ¶ 15. |
| Provisions to be Added | 1) The Final Order should include a provision that nothing in the Final Order shall constitute approval or ratification of the RSA, and clarifying that the Committee's rights with respect to all matters other than the use of Cash Collateral, including, but not limited to the RSA, Plan, Disclosure Statement and any Sale Transaction are fully preserved. |
| | 2) The Final Order should include a provision that nothing in the Final Order shall be deemed to trigger an Exit Fee under any Prepetition Credit Facility. |
| Provisions to be Removed | 1) In the Final Order, subsection (B) of paragraph 15(a) should be removed. Inclusion of the provision could result in a shortened Challenge Period. |
| Lumine Expense Reimbursement | 1) For the avoidance of doubt, the Final Order should not contain any provision approving an expense reimbursement to Lumine. |

---

[44]   *See e.g. PGX Holdings, Inc.* No. 23-10718 (CTG) (Bankr. D. Del. Aug. 4, 2023) [Docket No. 332] (requiring the Debtors and/or Prepetition Secured Lender to file a notice providing the basis for any Adequate Protection 507(b) Claim and reasonable detail supporting such basis in order to seek payment).

**V.    The Estates' Waivers Should not be Permitted**

42.    The Court should not approve any waiver of the estates' rights under sections 506(c) and 552(b), of the Bankruptcy Code or the waiver of the equitable doctrine of marshaling.

43.    Section 506(c) ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries, providing that an estate "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit" to the secured creditor.  11 U.S.C. § 506(c).  "The general concept underlying this requirement is the prevention of a windfall to the secured creditor; a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost."  4 Collier on Bankruptcy ¶ 506.05 (16th Ed. 2020); *see also Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) ("section 506(c) is designed to prevent a windfall to the claimant").

44.    Here, by having waived the estates' section 506(c) rights (subject to entry of the Final Order), the Debtors agreed to pay for any and all expenses associated with the preservation and disposition of the collateral of the Prepetition Secured Parties and, therefore, precluded any possibility of recovery of costs imposed on the estates for the exclusive benefit of those parties. But "the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs."  *In re Codesco Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982).

45.    Several courts have held that the statutory mandate embodied in 506(c) is not properly subject to waiver.  As one court aptly stated, "[t]he debtor and secured creditor do not constitute a legislature.  Thus, they have no right to implement a private agreement that effectively changes the bankruptcy law with regard to the statutory rights of third parties."  *In re Colad Grp., Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005); *accord, e.g., Hartford Fire Ins. Co. v. Norwest Bank Minn. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998) (provision in

financing order purporting to immunize postpetition lender from section 506(c) surcharges unenforceable); *McAlpine v. Comerica Bank-Detroit (In re Brown Bros., Inc.)*, 136 B.R. 470, 474 (W.D. Mich. 1991) (waiver of Section 506(c) surcharge rights "not enforceable in light of the congressional mandate that a trustee have the authority to use a portion of secured collateral for its preservation or proper disposal").

46.     Moreover, a 506(c) waiver is wholly inappropriate absent the payment of all administrative expenses.  There can be no assurance at this early juncture that the administrative expenses of these cases will be paid in full.  Until such time as it becomes clear that all costs of administering these chapter 11 cases have been adequately provided or reserved for, the Debtors should not be permitted to waive their section 506(c) surcharge rights.  As such, the proposed 506(c) waiver is premature and should not be included in a Final Order.

47.     The Interim Order also waives, subject to entry of the Final Order, the "equities of the case" exception under Bankruptcy Code section 552(b), which would otherwise allow the Debtors, the Committee, or other parties in interest to assert that equitable considerations warrant the exclusion of post-petition proceeds from the collateral securing the Debtors' prepetition debt. "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value." *In re Muma Servs.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005) (*quoting Delbridge v. Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R. 824,826 (E.D. Mich. 1989)); *see also Sprint Nextel Corp. v. U.S. Bank N.A. (In re TerreStar Networks, Inc.)*, 457 B.R. 254, 270 (Bankr. S.D.N.Y. 2011) ("[T]he equities of the case provision is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts broad discretion in balancing the interests of secured

creditors against the general policy of the Bankruptcy Code . . . .") *(citing In re Patio & Porch Sys.*
*Inc.*, 194 B.R. 569, 575 (Bankr. D. Md. 1996)); *In re Barbara K. Enters.*, 2008 Bankr. LEXIS at
*32-33.

48.     Courts have "decline[d] to waive prospectively an argument that other parties in
interest may make" as to the equities of the case, and have retained "discretion" to determine
whether an exception to liens over postpetition proceeds is warranted.  *See In re Metaldyne Corp.*,
No. 09-13412 (MG), 2009 Bankr. LEXIS 1533, at *20 (Bankr. S.D.N.Y. June 23, 2009) ("If, in
the event, the Committee or any other party [in] interest argues that the equities of the case
exception should apply to curtail a particular lenders' rights, the Court will consider it."); *see also*
*In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009) [Docket No. 281]
(no waiver of the "equities of the case" exception).

49.     The Court cannot possibly ascertain the "equities of the case" at this early stage.
*See Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*, 457 B.R. 254,
272-73 (Bankr. S.D.N.Y. 2011) (request for 552(b) waiver was premature because factual record
not fully developed).  Thus, the Committee requests that the status quo be preserved, and that
issues about extending liens over proceeds not be prejudged at this early stage.  All parties should
retain all rights concerning these issues, and the Court should retain discretion to determine what
relief, if any, should be granted under section 552(b).

50.     Finally, the Interim Order also provides that the Prepetition Secured Parties will not
be subject to the equitable doctrine of marshaling. Marshaling requires a "senior secured creditor
to first collect its debt against the collateral other than that in which the junior secured creditor
holds an interest, thereby leaving that collateral for the junior secured creditor's benefit."  *In re*
*Advanced Marketing Servs., Inc.*, 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007).  Marshaling

"prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 236 (1963). Marshaling can be pursued by Committees for the benefit of unsecured creditors. *See e.g., In re America's Hobby Ctr., Inc.*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("Because a debtor in possession has all the rights and powers of a trustee . . . [the Committee] standing in the shoes of the debtor in possession . . . can assert this [marshaling] claim.").

51.     Through the Cash Collateral Motion, the Debtors seek to limit the Court's ability to apply marshaling. The Prepetition Secured Parties have liens on a diverse pool of assets, and at this early stage in the case there is no basis to waive this important doctrine. At minimum, however, to the extent that the Court determines to approve the grant of liens on previously unencumbered property (including the Available Net Litigation Proceeds), the Court should require the Prepetition Secured Parties to satisfy their claims or adequate protection claims, if any, from the proceeds of assets subject to their Prepetition Liens before they can look to the proceeds of assets on which they did not have liens prepetition.

## **RESERVATION OF RIGHTS**

52.     The Committee and its professionals reserve the right to further object to the Cash Collateral Motion and any other ancillary issues on any grounds and to respond to any reply of the Debtors, the Prepetition Secured Parties, or any other party in interest, either by further submission to this Court, at oral argument or by testimony to be presented at the Final Hearing or any other hearing.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court sustain the Objection and deny the Cash Collateral Motion in its current form. If the Court determines to grant the relief

requested in the Cash Collateral Motion on a final basis, the Committee respectfully requests that the objections raised herein be addressed and incorporated into a revised proposed final order that is acceptable to the Committee. The Committee further requests that the Court grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  April 30, 2024
        Wilmington, Delaware

**McDermott Will & Emery LLP**

*/s/ Maris J. Kandestin*
David R. Hurst (I.D. No. 3743)
Maris J. Kandestin (I.D. No. 5294)
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
dhurst@mwe.com
mkandestin@mwe.com

- and -

Kristin K. Going
Darren Azman
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
kgoing@mwe.com
dazman@mwe.com

*Proposed Counsel to the Official Committee
of Unsecured Creditors*